## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## WESTERN DIVISION

| | |
|---|---|
| Avangrid, Inc., Avangrid Networks, Inc., Central Maine Power Company, and NECEC Transmission LLC, | Case No. |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| NextEra Energy, Inc., NextEra Energy Capital Holdings, Inc., NextEra Energy Resources, LLC, and NextEra Energy Seabrook, LLC, | |
| Defendants. | |

## <u>COMPLAINT</u>

## TABLE OF CONTENTS

**Page**

I.      **Introduction: NextEra's Anticompetitive Campaign to Sabotage
        Massachusetts's Clean Energy Transition** .......................................................................1

II.     **Preliminary Statement** ..........................................................................................................6

III.    **The Parties** ..............................................................................................................................17

IV.     **Jurisdiction, Venue, and Interstate Commerce** ............................................................18

V.      **Factual and Regulatory Background** .................................................................................19

        A.      Electricity Generation and Transmission in the United States...............................19

        B.      The Wholesale Supply and Transmission of Electricity in Massachusetts
                (ISO-New England) .................................................................................................21

        C.      The Impact of Adding New, Lower-Priced Power Generation on Incumbent
                Electricity Generators .............................................................................................22

        D.      NextEra's Substantial Electricity Generation Presence in New England .............27

        E.      Beginning in 2008, Massachusetts Passes Legislation to Transition
                Massachusetts to Clean Energy Generation Away from Fossil Fuels ..................30

        F.      In 2017, Massachusetts Electric Distribution Companies ("EDCs") Request
                Bids for Clean Energy Supply to Comply with Massachusetts Green Energy
                Laws, and Avangrid's NECEC Wins .....................................................................31

                1.      In 2017, Companies, Including NextEra and Avangrid, Submit Bids
                        for Massachusetts Green Energy Contracts and NextEra's Proposals
                        Lose ...........................................................................................................32

                2.      Massachusetts EDCs Choose NECEC as the RFP Winner to Bring
                        Clean Energy to Massachusetts .................................................................33

                3.      NECEC's Competitive Threat to NextEra's Higher-Priced Current and
                        Future Energy Generation Position in New England.................................36

        G.      State and Federal Regulatory Approvals Required for NECEC ............................39

                1.      Maine Public Utilities Commission ("PUC") Certificate of Public
                        Convenience and Necessity .......................................................................39

                2.      Massachusetts Department of Public Utilities ("DPU") Power
                        Purchase Agreement Approval ...................................................................40

                3.      Maine Department of Environmental Protection ("DEP")
                        Development Permit ...................................................................................40

                4.      ISO-New England Interconnection Approval and Affected System
                        Analysis.......................................................................................................40

VI.    **NextEra's Unlawful Scheme to Exclude Competition Brought by Lower Cost, Clean Energy Sources**.................................................................................**44**

    A.    Without a Legitimate Basis and with Anticompetitive Intent, NextEra Mounts at Least Ten Separate Baseless and Failed Challenges to NECEC Permitting and Approval Processes, Delaying NECEC by Years .........................................45

        1.    NextEra Loses Its Baseless Challenge to NECEC's Maine Public Utilities Commission's ("Maine PUC") Approval .....................................46

        2.    NextEra Loses Its Baseless Appeal of the Maine PUC Approval and the Maine Supreme Judicial Court Labels NextEra's Arguments "Absurd" and "Illogical".............................................................................48

        3.    NextEra Loses Its Baseless Challenge to NECEC's Massachusetts Department of Public Utilities ("Massachusetts DPU") Approval............49

        4.    NextEra Loses Its Baseless Appeal of the Massachusetts DPU Approval, and the Massachusetts Supreme Judicial Court Labels NextEra's Arguments "Otherworldly," "Absurd," and "Unrealistic" .......51

        5.    NextEra Loses Its Baseless Challenge to NECEC's Maine Department of Environmental Protection's ("Maine DEP") Permits............................52

        6.    NextEra Loses Its Baseless Appeal of the Maine DEP Permits, Further Advocating for Its Harmful and Disingenuous Undergrounding Proposal.........................................................................................................54

        7.    NextEra and Others Fund the Failed, Unconstitutional 2020 Maine Referendum ("Referendum 1") with the Sole Purpose of Delaying NECEC for NextEra's Anticompetitive Advantage .................................55

        8.    NextEra and Others Fund a Second Failed Referendum Based on the First ("Referendum 2") That Had the Sole Purpose of Delaying NECEC for NextEra's Anticompetitive Advantage .................................65

    B.    To Further Its Scheme, NextEra Intentionally Uses False and Misleading Statements to Undermine NECEC Support, and Violates Maine Campaign Finance Law to Hide Its Involvement in the Referenda to Deceive Maine Voters......................................................................................................................73

        1.    NextEra Deceptively Conceals Its Involvement in Referendum 1 Using Dark Money....................................................................................73

        2.    NextEra Promotes Both Referenda Against NECEC with False and Misleading Statements ................................................................................83

    C.    NextEra Refuses to Upgrade the Seabrook Breaker—Without Which NECEC Cannot Interconnect—Thus Exercising Veto Power over the Entry of NECEC or Any New Power Project into the New England Electricity System.................86

        1.    NextEra Exercises Veto Power over NECEC..............................................88

        2.    NextEra Loses Its 9th and 10th Sham Petitions, Making Baseless and

Anticompetitive Arguments to FERC and the D.C. Circuit ......................92

B.    NextEra Acknowledges Its Scheme to Launch Baseless Legal and Political Attacks with the Sole Purpose of Preventing Competition and Offers to End Its Campaign in Exchange for a Windfall Payment from Avangrid....................96

VII.    Avangrid's Discovery of NextEra's Conduct and Its Impact on NECEC .................97

VIII.    NextEra's Monopoly Power and Relevant Markets .........................................101

A.    NextEra Admits Monopoly Power.......................................................101

B.    NextEra Holds a Bottleneck Monopoly .............................................101

C.    Direct Evidence of NextEra's Monopoly Power................................103

D.    Market Definition and NextEra's Monopoly Power in Defined Markets ...........104

1.    Downstream Markets in Which NextEra Participates ............................105

2.    Upstream Markets in Which NextEra Participates .................................109

IX.    Nextera Has Stifled Competition in the Relevant Markets, Thereby Maintaining and Enhancing Its Monopoly Power ........................................................................110

X.    Claims for Relief ...........................................................................................112

First Claim for Relief – Sherman Act (15 U.S.C. § 2)....................................112

Second Claim for Relief – Massachusetts Antitrust Act (Mass. Gen. Laws ch. 93, § 5) 113

Third Claim for Relief – Sherman Act (15 U.S.C. § 2)...................................114

Fourth Claim for Relief – Massachusetts Antitrust Act (Mass. Gen. Laws ch. 93, § 5) .115

Fifth Claim for Relief – Sherman Act (15 U.S.C. § 2) ...................................116

Sixth Claim For Relief – Massachusetts Antitrust Act (Mass. Gen. Laws ch. 93, § 5)...117

Seventh Claim for Relief – Civil Conspiracy .................................................118

Eighth Claim for Relief – Intentional Interference with Contract ..................120

Ninth Claim for Relief – Unjust Enrichment..................................................122

Tenth Claim for Relief – Regulation of Business Practices for Consumers Protection (Mass. Gen. Laws ch. 93A, §§ 2, 11) ...............................................123

XI.    Prayer for Relief.............................................................................................124

XII.    Jury Trial Demanded .....................................................................................125

Appendix....................................................................................126

Avangrid brings this action against NextEra because NextEra has committed anticompetitive, unfair, and deceptive business practices to foreclose competition for the supply of wholesale electricity on the ISO-New England marketplaces, located in Holyoke, Massachusetts.[1] NextEra has reaped hundreds of millions of dollars from these illegal practices.

For its Complaint, Avangrid alleges as follows:

## I.    INTRODUCTION: NEXTERA'S ANTICOMPETITIVE CAMPAIGN TO SABOTAGE MASSACHUSETTS'S CLEAN ENERGY TRANSITION

1.    For several years, NextEra Energy—the largest electric utility company in the world—has been anticompetitively and tortiously sabotaging Avangrid's development of a transmission line that will bring significant amounts of lower-cost, clean electricity to Massachusetts. To accomplish its scheme, NextEra has abused the regulatory and judicial process, misled voters with illegal dark money and false statements, and obstructed electric infrastructure improvements. As an incumbent electricity supplier with significant power generation assets in New England, NextEra has used these anticompetitive and tortious tactics to line its own pockets by excluding lower-priced competition for electricity supply in Massachusetts from Avangrid's New England Clean Energy Connect project ("NECEC").[2]

2.    NECEC is an electricity transmission line that will carry significant volumes of clean and affordable hydropower from Canada to the New England electrical grid. The Massachusetts legislature authorized the NECEC project and made it a core pillar of the Commonwealth's transition away from fossil fuels to clean energy. Thus, NextEra's actions have not only damaged Avangrid, but have also postponed Massachusetts's clean energy transition and forced consumers across the region to pay hundreds of millions of dollars more for their electricity

---

[1] The parties are fully identified in "The Parties" section of this Complaint, at Section III herein.

[2] A glossary of acronyms is included as Appendix A.

to NextEra and other power generators in the region.

3. The Massachusetts legislature solicited bids for the best project to bring clean electricity to Massachusetts. NECEC won this competition in 2018, and NextEra was one of the losing bidders. NextEra is also an incumbent electricity generator with multiple New England power generation plants threatened by NECEC's lower-cost competition. NECEC will provide lower-cost electricity that will compete with NextEra's existing power generating plants, pushing down the overall price of electricity in Massachusetts and reducing NextEra's profits.

4. So, both on its own and in conspiracy with others, NextEra engaged in a multi-faceted, scorched-earth scheme to delay and even try to block NECEC altogether. NextEra's actions have delayed Avangrid from offering clean, lower cost electricity through ISO-New England's wholesale electricity marketplaces in Holyoke, Massachusetts.

5. The first prong of NextEra's scheme was a series of baseless attacks on NECEC's permits and approvals. NextEra intervened to oppose NECEC in each of the project's key permitting proceedings. NextEra lost each of those baseless (but time-consuming) challenges, then launched baseless, sham appeals of those decisions. NextEra then lost each appeal, wherein the respective appellate bodies rejected NextEra's arguments, at times describing them as "absurd" and "otherworldly."

6. Although NextEra lost at every turn, NextEra's repetitive advancing of baseless objections and arguments—to administrative agencies and to the courts—nonetheless created substantial delays and expenses for the project. Each week that NextEra's sham petitioning delayed NECEC meant NextEra could reap millions in unearned monopoly profits, ultimately totaling hundreds of millions of dollars. NextEra's actions also mean a longer, slower path to

clean energy for Massachusetts, during which Massachusetts suffers unnecessary excess carbon emissions and higher electricity prices.

7.     As NextEra failed to persuade regulators and courts with its baseless challenges, and with resounding appellate losses mounting, NextEra launched a deceptive political attack to undermine the regulatory process itself.  NextEra initiated not one, but two voter referenda—each unconstitutional—seeking to subvert the regulatory process and overturn the Maine Public Utility Commission's approval of NECEC.

8.     NextEra's referenda were assaults on Maine's well-established administrative law process.  They were bound to fail because both plainly infringed basic and well-known principles of constitutional law.  The first referendum violated the separation of powers under the Maine Constitution by attempting to use legislative action to interfere with executive agency adjudications.  And the second referendum was an unconstitutional attempt to apply legislation retroactively to violate due process by impairing Avangrid's vested rights violating the Maine Constitution and violating the Contract Clause of the U.S. Constitution.  As with NextEra's failed permitting interventions before state administrative agencies, its unconstitutional referenda were shams—and they further delayed NECEC and sustained NextEra's monopoly profits for at least three years.

9.     The second prong of NextEra's scheme to foreclose competition from NECEC was a prolonged political campaign rife with deception, campaign finance violations, and dishonesty. To further its illegal referenda efforts, NextEra unlawfully used dark money to fund NECEC opposition groups to mislead Maine citizens with false advertisements that disparaged the project. NextEra hid its involvement with these groups—in violation of campaign finance laws—because

NextEra feared the notoriety that would come from its role becoming public and thereby exposed to consumers, voters, and regulators.

10.     The extent of NextEra's dark-money operation only began to emerge in November 2023, after years of investigation.  That month, the Maine Commission on Governmental Ethics and Election Practices released the results of its enforcement actions and legal findings that NextEra-funded political organizations had violated Maine campaign finance laws by failing to properly register with Maine election authorities.

11.     In their November 29, 2023 settlements with the Maine Ethics Commission, two NextEra-backed political shell corporations admitted that they had failed to properly register with Maine's election authorities and file campaign finance reports that would have shown NextEra as the ultimate source of their funding.  Thus, NextEra's conduct was not only dishonest, but also illegal.

12.     The third and final prong of NextEra's unlawful scheme was its unreasonable refusal to accept a free upgrade of an outdated circuit breaker at its nuclear power plant, Seabrook Station.  This upgrade was required before any new electrical resources (like NECEC or any power source of non-trivial size) could be connected to the New England grid.  Avangrid offered to pay the entire expense of installing a new, higher-performance circuit breaker.

13.     By unreasonably refusing Avangrid's offer and continuing to operate with its antiquated safety equipment, NextEra physically prevented NECEC from being able to connect to the grid.  NextEra controls the Seabrook Breaker, which protects its Seabrook nuclear power plant from technical problems that could arise in the power grid.  But against its own safety and engineering interests, NextEra allowed the breaker to age to the point that it had reached near-

capacity, such that any additional source of power added to the grid could overwhelm the breaker and risk a catastrophic nuclear event.

14.     Accordingly, the regional grid operator, ISO-New England, could not allow any significant new power source project to connect to the grid unless and until NextEra upgraded the breaker.  Thus, NextEra positioned its aging equipment as a bottleneck that it alone controlled, creating for itself—and then wielding—the power to veto any rival power source from connecting to the grid.  NextEra admitted in open court that by purposely refusing to upgrade its safety equipment, it secured a "veto" over NECEC and other electricity suppliers aiming to enter the markets.

15.     NextEra used that veto power to block NECEC from entering the markets for years. Despite Plaintiffs' agreement to pay for the upgrade, NextEra refused to upgrade the Seabrook Breaker.  Not only did NextEra refuse to upgrade the breaker, but it filed yet another sham petition—this time to the Federal Energy Regulatory Commission ("FERC").  This petition further delayed NECEC by ensuring a slow-tracked administrative litigation during which the breaker would not be upgraded.  NextEra's positions in the FERC proceeding were not only baseless, but, as the D.C. Circuit ultimately found, blatantly anticompetitive:

> Seabrook's position . . . implies that Seabrook may prevent interconnection by *any* new generator whose additional power would nudge the breaker from 99.6 percent of capacity to just over 100 percent.[3]

16.     "[T]his kind of anti-competitive behavior," the D.C. Circuit held, "is hardly consistent with 'good business practices.'"[4]  Though a federal court eventually forced NextEra to upgrade the Seabrook Breaker as a matter of good utility practice (still paid for by Avangrid),

---

[3] *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 370 (D.C. Cir. 2024).

[4] *Id*.

NextEra has used the Seabrook Breaker as a means to block competition from new power sources for many years, delaying NECEC and harming Massachusetts's consumers and environment.

17.     Through this premeditated and interwoven scheme, NextEra has and is continuing to exclude from the New England grid the clean and low-cost electricity NECEC would bring. NextEra's scheme has harmed competition, damaged Avangrid and consumers, and held Massachusetts's clean energy transition hostage.

18.     The energy transition is a profoundly positive endeavor for the Commonwealth of Massachusetts.  Massachusetts's clean energy goals and legislation are reflected in the mission and vision of ISO-New England, the organization that oversees the operations of the New England electrical grid.  ISO-New England's Holyoke, Massachusetts, headquarters administers the only centralized wholesale marketplaces to price, buy, and sell electricity for the New England grid. These marketplaces are central to ensuring the grid's reliability as Massachusetts and the rest of New England transition to clean energy.

19.     If incumbent electricity generators such as NextEra can practice scorched-earth, anticompetitive, illegal, and unfair tactics to delay new projects with impunity, then the clean energy transition will become enormously more expensive, if able to succeed at all.  The costs and impacts of the delay caused by such conduct are massive.  Indeed, NextEra's actions in this case caused (1) the needless emission of tons of $CO_2$, (2) Massachusetts consumers to pay significantly more for retail electricity, and (3) hundreds of millions of dollars in additional costs to Avangrid— all so that NextEra could squeeze several more years of additional monopoly profits out of the New England grid.  This cannot stand.

## II.     PRELIMINARY STATEMENT

20.     Starting in 2008, Massachusetts enacted a series of legislative measures to herald a clean energy transition in the Commonwealth.  Massachusetts set long-term goals to reduce by

2050 greenhouse-gas emissions to 80% below 1990 levels.  But for many years now, NextEra has engaged in a continuous, anticompetitive scheme to hijack Massachusetts's clean energy transition process by delaying, and even attempting to kill, green and clean energy projects that compete with NextEra's existing and future generation assets.

21.    A key component of Massachusetts's energy transition plan is the Commonwealth's 2016 Energy Diversity Act, which aims to combat climate change by reducing reliance on coal- and oil-fired power plants.  Under the 2016 Energy Diversity Act, the Massachusetts utility companies—known as Electric Distribution Companies, or "EDCs," which sell retail electricity to end-use consumers—sought proposals for "Clean Energy Generation" projects.  The EDCs examined over 50 proposals—including proposals from Avangrid, NextEra, and many others—to select the best clean energy source.  This would provide enhanced electricity reliability in Massachusetts, lower costs for Massachusetts electricity customers, guarantee electricity delivery in winter months, and reduce winter electricity price spikes.

22.    In March 2018, the EDCs, with the blessing of an independent evaluator who was selected by the Massachusetts Attorney General and the Massachusetts Department of Energy Resources ("DOER"), chose Avangrid's NECEC as the project that would best meet the requirements of Massachusetts law.[5]  The independent evaluator rejected NextEra's competing bids.

23.    NECEC (the winning project) is a joint bid by Hydro-Québec and Avangrid and involves the construction of a 145-mile high-voltage direct current ("HVDC") transmission line running from the Canadian border to Central Maine Power Company's ("CMP," an Avangrid subsidiary) Lewiston, Maine substation.  NECEC's high-voltage transmission line would connect

---

[5] Order Approving Power Purchase Agreements, *NSTAR Elec. Co.*, D.P.U. 18-64, at 21-22 (Mass. D.P.U. June 25, 2019).

Hydro-Québec's clean power to the New England grid—transmitting that clean power source to Massachusetts and other New England consumers.

24.     In transmitting new volumes of hydropower into the New England grid, NECEC would bring substantial environmental and other benefits to Massachusetts, including a 36.61 million metric ton reduction in regional $CO_2$ emissions per year and lessening Massachusetts's dependence on fossil fuels (which have volatile pricing and cause higher air pollution).[6]  Through its contracts with the EDCs and the delivery of hydropower, NECEC will result in lower electricity prices and related economic benefits for Massachusetts.

25.     For instance, the Massachusetts DOER estimated that NECEC would bring Massachusetts electricity customers an average of 20% per kilowatt-hour in direct savings and that NECEC will provide approximately $4 billion in total net benefits.[7]  NECEC is estimated to lead to an additional $213 million in income in Massachusetts, and a $406.4 million increase in New England's gross domestic product.[8]

26.     Though clearly beneficial for Massachusetts, NECEC's effect of lowering electricity prices was and is a direct competitive threat to NextEra.  NECEC threatens both NextEra's incumbent nuclear and fossil fuel plants that serve Massachusetts, as well as NextEra's plans for future expansion in the region.  Without the competition from NECEC, NextEra's fossil fuel-generating plants, including the Wyman Power Station in Yarmouth, Maine, and the Bellingham Energy Center in Bellingham, Massachusetts, have continued and will continue to emit hundreds of thousands of tons of $CO_2$, while enriching NextEra to the tune of tens of millions of dollars per year.

---

[6] Letter, Mass. Dep't of Energy Res., *NSTAR Elec. Co.*, D.P.U. 18-64, at 4 (Mass. D.P.U. July 23, 2018).

[7] Order Approving Power Purchase Agreements, *NSTAR Elec. Co.*, D.P.U. 18-64, at 105 (Mass. D.P.U. June 25, 2019); Initial Brief, Mass. Dep't of Energy Res., *NSTAR Elec. Co.*, D.P.U. 18-64, at 5 (Mass. D.P.U. Mar. 22, 2019).

[8] Order Approving Power Purchase Agreements, *NSTAR Elec. Co.*, D.P.U. 18-64, at 103 (Mass. D.P.U. June 25, 2019).

27.     In the wholesale electricity marketplaces operated by ISO-New England, headquartered in Holyoke, Massachusetts, the hydropower supplied by NECEC would displace the sale of more expensive (and highly polluting) power generated from NextEra's fossil fuel plants, as well as reduce the prices paid to NextEra for output at its nuclear plant.  NECEC hydropower would therefore have the direct effect of lowering wholesale electricity prices throughout the New England grid, including at NextEra's power plants, even potentially causing some of NextEra's plants to not be used at all.  Lower electricity prices would slash NextEra's profits from its existing New England power plants, diminish profits from NextEra's future electricity projects, and threaten NextEra's control over the pace and cost of Massachusetts's energy transition.  Accordingly, NextEra—having lost the Massachusetts clean energy bidding contest to NECEC—engaged in a multi-pronged, anticompetitive strategy to delay or prevent NECEC from coming online, without regard to the benefits NECEC would bring to Massachusetts.

28.     As noted above, the first prong of NextEra's scheme was to launch baseless legal challenges against NECEC by means of sham petitioning in regulatory adjudication and permitting processes.  To move NECEC forward, Avangrid needed (and ultimately received) state and federal permits and approvals from various agencies including the Massachusetts Department of Public Utilities ("DPU"), Maine Department of Environmental Protection ("DEP"), and Maine Public Utilities Commission ("PUC").  But to slow down the permitting process (and thereby gain millions in additional profits by selling electricity without having to compete with NECEC), NextEra intervened in all three regulatory proceedings to oppose NECEC.  NextEra lost each challenge.  NextEra then brought sham appeals of its regulatory losses, and again lost each appeal. Though baseless, NextEra's repeated futile legal challenges served the intended purpose of significantly delaying construction of NECEC.

29.     NextEra's baseless legal challenges were not limited to regulatory interventions and unfounded appeals—NextEra also abused the political process to subvert NECEC's regulatory victories.  Beginning no later than 2019 and continuing to May 2023, NextEra—through shell entities, using dark money, and flouting Maine campaign finance law—worked with others to mastermind and fund two extraordinary and illegal Maine referenda campaigns targeted at depriving NECEC of its regulatory approvals and shutting down NECEC.  NextEra's internal documents will show that this "political activity" was part and parcel to its overall strategy of pursuing sham initiatives to delay NECEC.

30.     The first attempted referendum that NextEra funded was a direct attack on NECEC's successful Maine PUC permitting ruling.  To subvert the well-established regulatory process (in which NextEra had already lost), in an unprecedented move, NextEra urged Maine voters to instruct the Maine PUC to make a finding contrary to the one it had come to after its extensive, 19-month review of NECEC in a formal, quasi-judicial administrative proceeding.[9]

31.     NextEra's conduct reveals that it knew that attacking the Maine PUC through a referendum in 2020 was legally baseless:  in violation of Maine law, NextEra hid its involvement in this first referendum by funding and laundering its financial donations through two dark-money shell companies.[10]  NextEra's shell companies, Clean Energy for ME, LLC (d/b/a "Stop the Corridor") and Alpine Initiatives, LLC ("Alpine Initiatives"), violated Maine Ethics Law by failing to properly disclose their roles in influencing the Referendum 1 campaign.  NextEra's involvement in illegally funding and influencing the first referendum was not uncovered until the Maine Ethics

---

[9] *Avangrid Networks, Inc. v. Sec'y of State*, 237 A.3d 882, 885, 895 (Me. 2020).

[10] Consent Agreement, *In re Clean Energy for ME, LLC d/b/a Stop the Corridor* (Me. Comm'n on Governmental Ethics & Election Pracs.  Nov.   29,   2023),   https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Stop%20the%20Corridor%20Consent%20Agreement_0.pdf; Consent Agreement, *In re Alpine Initiatives, LLC* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023), https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Alpine%20Initiatives%20Consent%20Agreement.pdf.

Commission finished its probe and made public consent agreements with NextEra's shell entities in November 2023.  And even today, NextEra continues to hide from the public the full extent to which it bankrolled the Maine referenda through its shell entities.

32.     NECEC had to undertake the expensive and time-consuming course of challenging NextEra's first referendum in court and demonstrating that NextEra's referendum was unlawful and unconstitutional.  Maine's highest court held that NextEra's first ballot initiative to overturn the Maine PUC decision violated the Maine Constitution, namely its guarantee of a separation of powers, and the initiative never made it on to the ballot.[11]

33.     Undeterred by its first failed effort to overturn the Maine PUC decision and seizing on the momentum against NECEC resulting from NextEra's illegal campaign activities, NextEra devised a second referendum to accomplish the very same end.  NextEra spent at least $20 million to help its political action committee ("PAC"), Mainers for Local Power ("MLP"), propel the second sham referendum effort against NECEC.

34.     NextEra's second referendum tried to retroactively amend certain Maine statutes to ban construction necessary for NECEC, in blatant violation of Avangrid's due process and other constitutional rights.   Avangrid was forced to challenge once again the constitutionality of NextEra's second referendum, and the Maine Supreme Judicial Court held that the second NextEra referendum violated Avangrid's vested rights under the Maine Constitution's due process clause if Avangrid had completed in good faith significant construction on NECEC prior to the second referendum.[12]  The case was remanded to the trial court to determine factually if such good-faith construction had taken place.[13]  On April 20, 2023, a Maine jury found unanimously in favor of

---

[11] *Avangrid Networks, Inc.*, 237 A.3d at 895.

[12] *NECEC Transmission LLC v. Bureau of Parks & Lands*, 281 A.3d 618, 634-35, 637 (Me. 2022).

[13] *Id.* at 637.

NECEC.[14]  With the jury verdict, the trial judge held that the second referendum's retroactive application to NECEC violated Maine's Constitution—consistent with the Maine Supreme Judicial Court's ruling.[15]

35.    The second prong of NextEra's strategy to further its anticompetitive and tortious scheme was to use false and misleading statements and campaign finance law violations to support its sham litigations and referenda efforts.  NextEra and its affiliated groups attempted to sway Maine voters through lies, including accusations that Avangrid cut illegal backroom deals for approval and that NECEC would not reduce greenhouse gas emissions.  And NextEra and its shell groups violated campaign finance laws to cover up NextEra's involvement.

36.    Abuse of the political system is familiar territory for NextEra:  commentators have stated that "NextEra has a history of trying to shield its power plants from competition."[16]  For instance, in election races for the Florida legislature, press reports have described how NextEra funded "ghost candidates"—placing candidates on the ballot who had no intention of genuinely competing for office, but instead were put forward to siphon votes from legitimate candidates disfavored by NextEra.[17]  One such ghost candidate pleaded guilty to election fraud charges.[18] And on September 30, 2024, a political operative, reported to have ties to NextEra, was convicted on criminal charges for making excessive campaign contributions, for conspiracy to make excessive campaign contributions, and for procuring false swearing to another, all stemming from

---

[14] *NECEC Transmission, LLC v. Bureau of Parks & Lands*, No. BCD-CIV-2021-00058, 2023 WL 3439632, at *1 (Me. B.C.D. Apr. 20, 2023).

[15] *Id.*

[16] Benjamin Storrow, *Inside a Clean Energy Titan's Fight to Kill a Climate Project*, E&E News by Politico (Feb. 21, 2024), https://www.eenews.net/articles/inside-a-clean-energy-titans-fight-to-kill-a-climate-project/.

[17] Mary Ellen Klas & Nicholas Nehamas, *"Make His Life a Living Hell." The FPL-Financed Plot to Torpedo a Miami Lawmaker*, EnergyCentral (Sept. 9, 2022), https://energycentral.com/news/%E2%80%98make-his-life-living-hell%E2%80%99-fpl-financed-plot-torpedo-miami-lawmaker.

[18] Steve Litz, *'I Needed the Money': 'Ghost Candidate' Says He Was Offered $50k to Run for Office*, NBC 6 Miami (Sept. 20, 2024), https://www.nbcmiami.com/news/politics/local-politics/ghost-candidate-says-he-was-offered-50k-to-run-for-office/3423228/.

his role in the "ghost candidate" scandal.[19]

37.     As NextEra's sham litigation losses mounted, NextEra unleashed its next weapon (the third prong of its attack):  abuse of its bottleneck monopoly control of the ISO-New England grid via the Seabrook nuclear plant's outdated circuit breaker—the Seabrook Breaker.

38.     NextEra's largest power generation plant in New England, the Seabrook nuclear plant, is protected by a circuit breaker.  NECEC's pre-connection modeling (which ISO-New England required prior to NECEC plugging into the grid) showed that NextEra's 1990s-era Seabrook Breaker was at near-capacity.  Per the modeling, the addition of new power brought to the grid by NECEC could push the Seabrook Breaker over capacity, increasing the risk of a catastrophic incident at the nuclear plant.  Based on these results, NECEC was categorically prohibited from interconnecting to the ISO-New England grid unless and until NextEra upgraded the Seabrook Breaker.

39.     NextEra knew the Seabrook Breaker was old and outdated—"barely-good-enough," according to the D.C. Circuit[20]—yet NextEra refused to upgrade the Seabrook Breaker for decades, even performing "paper upgrades" (not an upgrade at all, just adjustments in technical specifications) to avoid physical improvements.  This was intentional.  NextEra purposefully allowed the Seabrook Breaker to creep up to almost 100% capacity so that any substantial new power source seeking to join the New England grid would be blocked unless NextEra agreed to cooperate in the connection of the competing source of power to the grid.

40.     In short, NextEra strategically maneuvered the Seabrook Breaker so that it held a bottleneck monopoly over any new electricity project seeking to compete on the New England

---

[19] Verdict Sheet, *Florida v. Artiles*, Case No. F21-4768B (Fla. Cir. Ct. Sept. 30, 2024); Alissa Jean Schafer, *Records Show Senior Florida Power & Light Execs Closely Connected to Election Scandals*, Energy & Pol'y Institute (Dec. 6, 2021), https://energyandpolicy.org/records-show-senior-florida-power-light-execs-closely-connected-to-election-scandals/.

[20] *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 369 (D.C. Cir. 2024).

grid.  The Seabrook Breaker bottleneck monopoly gave NextEra a physical veto over NECEC's connection to the grid, and thus a veto over NECEC itself.

41.     NextEra could have upgraded its Seabrook Breaker to state-of-the-art safety standards for free, as Avangrid readily agreed to pay for this improvement.  Counter to any legitimate business reason, NextEra spurned the free upgrade and positioned its antiquated breaker to block competition and ensure the flow of its monopoly profits.

42.     When Avangrid initially approached NextEra about upgrading the Seabrook Breaker, Avangrid made clear it would pay NextEra on the terms of ordinary "network upgrades" routinely required by regional interconnection authorities.  In response, NextEra claimed it would upgrade the Seabrook Breaker—but only in exchange for Avangrid's agreement to NextEra's unreasonable demands.  NextEra demanded that, in addition to Avangrid paying for the out-of-pocket costs to upgrade the Seabrook Breaker, Avangrid would also have to pay for NextEra's consequential costs with no limit.  Worse, NextEra refused to provide an estimate of what those could be—essentially asking Avangrid to write NextEra a blank check.  And NextEra refused even to start planning for the Seabrook Breaker upgrade until Avangrid agreed to its intentionally unreasonable demands.

43.     Eventually, it became clear that NextEra did not intend to upgrade the Seabrook Breaker at all, or at least not before significantly delaying NECEC.  NextEra was willing to risk a physical incident at its nuclear facility by refusing to upgrade its outdated breaker for the anticompetitive purpose of keeping electricity competition out of Massachusetts and to maintain its unique hold on the ISO-New England grid.

44.     Then, NextEra demanded an improper quid pro quo from Avangrid.  NextEra executives at the highest levels—including Kirk Crews, then-NextEra chief financial officer—

contacted Avangrid and stated that NextEra would drop its multi-faceted opposition to NECEC altogether in exchange for Avangrid's agreement to purchase electricity from NextEra's Seabrook Station at substantially above-market rates.  Avangrid refused NextEra's anticompetitive offer.  These actions demonstrated that NextEra's attack on NECEC was entirely motivated to block competition (and not motivated by any genuine environmental or other policy concerns about NECEC).  It also proved that NextEra in fact had, and knew that it had, the power to exclude competition.

45.    NextEra's obstinance over the Seabrook Breaker meant that Avangrid was forced to litigate the breaker issue at FERC for over two-and-a-half years—more delay.  NextEra made baseless arguments to FERC.  NextEra also filed its sham FERC petition on a slow track for resolution, rather than an expedited track (despite knowing Avangrid's urgency to resolve the matter before the upcoming Seabrook refueling date so that the upgrade could be performed).  NextEra knew that on the slow track, it would be years before its baseless arguments would be ultimately rejected.

46.    After three years, FERC sided with Avangrid in June 2023.  In doing so, it recognized NextEra's sham petition, NextEra's monopoly power, and NextEra's anticompetitive conduct.  As FERC put it:  "By refusing to replace the Seabrook Breaker under these circumstances, *Seabrook is, in essence, exercising veto power over the interconnections of new and competing interconnection customers*."[21]  But FERC concluded that because the Seabrook Breaker was part of NextEra's power *generation* assets and not a *transmission asset*, FERC had no authority to remedy NextEra's bottleneck monopoly over the Seabrook Breaker.  In other

---

[21] *NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196, P 23 (2023).

words, FERC could not remedy the anticompetitive outcome of NextEra wielding the bottleneck as a veto card over NECEC.[22]

47.     Though powerless to remedy the anticompetitive effects of NextEra's conduct, or to make Avangrid whole for its losses sustained as a result of NextEra's anticompetitive delay, FERC ordered NextEra to upgrade the aging and dangerous Seabrook Breaker as part of NextEra's obligation to operate its facilities according to Good Utility Practice.  FERC required NextEra to comply with industry standards for nuclear power safety and grid operation, and to stop defying them.  NextEra appealed that decision, and then lost—again—in the D.C. Circuit in October 2024.

48.     FERC's order for NextEra to upgrade the Seabrook Breaker on the ground of Good Utility Practice was a positive step because it stopped NextEra's bad faith manipulation of the Breaker.  Nonetheless, it is still an inadequate remedy because FERC could not order NextEra to compensate Avangrid for the damages it suffered because of NextEra's Seabrook-related conduct.  NextEra's sham FERC petition was designed to slow the regulatory process, and it delayed NECEC.  NextEra's exercise of its bottleneck monopoly veto delayed the start of breaker replacement work until October 2024.

49.     NextEra's delaying tactics were extremely profitable—every day that NextEra kept NECEC offline was another day it could keep prices higher than they otherwise would be and maintain its hold on the electric energy marketplace in New England.

50.     At present, in the aftermath of NextEra's baseless but delaying tactics, NECEC's most optimistic estimated in-service date for NECEC is January 2026.  The original in-service date for NECEC was December 2022.  In other words, NextEra's conduct has delayed NECEC for *over three years*.  These delays have caused hundreds of millions of dollars in damages to Avangrid

---

[22] *NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196, 17-19 & n.39.

and have deprived Massachusetts electricity consumers of cheaper, cleaner energy—costing consumers millions of dollars.

51.     The antitrust laws prevent competitors from exercising monopoly power and engaging in conduct to exclude competition, Massachusetts General Laws Chapter 93A prohibits unfair and deceptive trade practices, and Massachusetts common law protects companies from business torts.  NextEra's obstructionist tactics to frustrate and burden its clean electricity competitor violate these laws.

### III.      THE PARTIES

52.     Plaintiff Avangrid, Inc. is a New York corporation with its principal place of business in Orange, Connecticut.  Avangrid, Inc. wholly owns Avangrid Networks, Inc.

53.     Plaintiff Avangrid Networks, Inc. is a Maine corporation with its principal place of business in Portland, Maine.  Avangrid Networks, Inc. wholly owns CMP Group, Inc., which in turn owns Central Maine Power Company.  Avangrid Networks, Inc. wholly owns NECEC Transmission LLC.

54.     Plaintiff Central Maine Power Company is a Maine corporation with its principal place of business in Augusta, Maine.

55.     Plaintiff NECEC Transmission LLC is a Delaware limited liability company with its principal business address in Portland, Maine.

56.     In this Complaint, Plaintiffs Avangrid, Inc., Avangrid Networks, Inc., Central Maine Power Company, and NECEC Transmission LLC are collectively, "Avangrid" or "Plaintiffs."

57.     Defendant NextEra Energy, Inc. is a publicly held Florida corporation with its principal place of business in Juno Beach, Florida.

58.     Defendant NextEra Energy Capital Holdings, Inc. is a Florida corporation with its principal place of business in Juno Beach, Florida.  NextEra Energy Capital Holdings is a wholly owned direct subsidiary of NextEra Energy, Inc.

59.     Defendant NextEra Energy Resources, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Juno Beach, Florida.  NextEra Energy Resources, LLC is a wholly owned direct subsidiary of NextEra Energy Capital Holdings, Inc.

60.     Defendant NextEra Energy Seabrook, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Seabrook, New Hampshire.  NextEra Energy Seabrook, LLC is a wholly owned direct subsidiary of ESI Energy, LLC, which is a wholly owned direct subsidiary of NextEra Energy Resources, LLC.

61.     In this Complaint, Defendants NextEra Energy, Inc., NextEra Energy Capital Holdings, Inc., NextEra Energy Resources, LLC, and NextEra Energy Seabrook, LLC are collectively, "NextEra" or "Defendants."

62.     According to the NextEra website, the NextEra Defendants' presence extends to 49 states including Massachusetts and all of New England.  On information and belief, either one or some combination of NextEra Energy, Inc., NextEra Energy Capital Holdings, Inc., or NextEra Energy Resources, LLC own and/or operate Bellingham Energy Center in Bellingham, Massachusetts.

## IV.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE

63.     This action arises under the antitrust laws of the United States, including Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

64.     Because this action arises under the laws of the United States, federal jurisdiction is proper under 28 U.S.C. §§ 1331 and 1337(a).  There is supplemental jurisdiction over all causes of action based upon state law under 28 U.S.C. § 1367.

65.     Because, upon information and belief, all Defendants are citizens of different states than all Plaintiffs, and the amount in controversy exceeds $75,000, federal jurisdiction is also proper pursuant to 28 U.S.C. § 1332.

66.     This Court has personal jurisdiction over NextEra because NextEra may be found in and conducts business within the state in which this Court sits and within this judicial district.

67.     NextEra engages in interstate commerce and in commerce within the Commonwealth of Massachusetts.

68.     The violations of law alleged in this Complaint took place, in part, in this judicial district and have injured Avangrid in this district.  NextEra and Avangrid also conduct business in this district, including with and/or through ISO-New England, which is located in Holyoke, Massachusetts.  Plaintiffs' claims arise from Defendants' disruption of transactions conducted, and prices cleared, through the ISO-New England marketplaces at ISO-New England's Holyoke headquarters.  Venue is therefore proper in the District of Massachusetts under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c).

69.     The actions complained of in this Complaint occur in and substantially affect interstate commerce.

## V.     FACTUAL AND REGULATORY BACKGROUND

### A.     Electricity Generation and Transmission in the United States

70.     The electricity that powers Massachusetts homes and offices arrives through the combination of three general steps.  First, electricity is *generated* at an electricity generation facility (a power plant).  Second, the electricity is *transmitted* on high-voltage power lines from

that generator to local, lower-voltage power grids that will deliver the power.  Third, the local power utility *distributes* that power over lines to retail customers' homes and businesses.

71.     With limited exceptions, electricity cannot be efficiently and practically stored, so it must be produced, delivered, and consumed simultaneously.  In other words, at every minute, electricity production must be in balance with consumers' withdrawals of power from the grid (i.e., use of electricity).  To maintain this balance—which fluctuates in real time as consumers turn devices on and turn off—a single entity within a particular region must be responsible for assuring that electricity production (supply) is held in equilibrium with electricity usage (demand).

72.     In some regions (such as New England), these single electrical balancing entities are independent third-party organizations that operate the regional power grids and are known as regional transmission organizations ("RTOs") or independent systems operators ("ISOs").  FERC is responsible for regulating the wholesale sale and interstate transmission of power.

73.     For Massachusetts, the grid operator is ISO-New England, discussed in more detail starting in Section V.A. and B.

74.     Historically, in many regions of the country, electric utilities were vertically integrated—meaning the same entity owned and operated power generation, transmission, and distribution.  Not having access to existing transmission presented a significant barrier to entry for many new sources of power generation.  New power sources would need to gain access to transmission owned by another company, and that other company could limit transmission to the power produced at its own facilities.  Many regions of the country have therefore restructured their electric industries.

75.     In virtually all of New England today, there are no authorized vertically integrated electric utility monopolies.  Owners of power-generating assets are required to abide by the

antitrust laws (the federal Sherman and Clayton Acts and state-level antitrust laws, as well as other applicable state common law).  Power industry participants must play fair or be held responsible for the effects of their anticompetitive actions under the antitrust laws.

      **B.**    **The Wholesale Supply and Transmission of Electricity in Massachusetts (ISO-New England)**

      76.    ISO-New England, headquartered in Holyoke, Massachusetts, is the independent third-party organization that operates the transmission power grid for Massachusetts, Connecticut, New Hampshire, Rhode Island, Vermont, and Maine.

      77.    ISO-New England is responsible for coordinating the operations of the transmission grid in New England as well as administering the organized wholesale electricity marketplace in the region.

      78.    One of ISO-New England's primary functions is to administer the region's central wholesale electricity marketplace exchanges with the goal of providing reliable, competitively priced electricity.  New England's wholesale electricity marketplace is a "multi-settlement" system where parties (including the Massachusetts EDCs) seeking to *buy* wholesale electric energy (in order to provide retail electricity to supply to their end-use customers) can either:  (1) commit to buying electricity today on an hourly basis for delivery tomorrow (the "Day-Ahead" marketplace), or (2) buy electricity for a particular hour today for immediate distribution to retail customers during the same time period (the "Real-Time" marketplace).  The Day-Ahead marketplace provides the ability of buyers and sellers to lock in a price for tomorrow's deliveries, thus helping to mitigate price volatility that might occur for supply purchased in the Real-Time marketplace.

      79.    ISO-New England also administers a third marketplace:  the "Forward-Capacity" marketplace, which provides a mechanism for EDCs to purchase power capacity to be available in a longer-term future time period.

80.     All wholesale purchases and sales of physical electricity output and electric power capacity for consumption in Massachusetts, as well as throughout the New England grid, settle through ISO-New England in Holyoke, Massachusetts.  (Although parties to the marketplaces can enter into bilateral contracts to set the price and other terms of their sales and purchases, as discussed below, the ISO-New England marketplaces determine whether power is physically distributed across New England.)

### C.     The Impact of Adding New, Lower-Priced Power Generation on Incumbent Electricity Generators

81.     Given the design of ISO-New England's markets for selling wholesale electricity and electricity capacity, it was obvious to NextEra that the entry of NECEC's power supply into the New England system would drive down the prices that NextEra could charge.

82.     ***Day-Ahead and Real-Time Wholesale Marketplaces.***  Physical quantities of New England wholesale electricity are typically bought and sold via ISO-New England's centralized "Day-Ahead" or "Real-Time" electric energy marketplaces.  The pricing and dispatch of power in these wholesale marketplaces is illustrated in Figure 1 below.

83.     Represented by the vertical bars "A" through "F," each electricity source makes an offer on the ISO-New England marketplace for supplying quantities of the power plant's megawatts ("MWs") of electricity output at a certain price.  The source's offering price generally incorporates its variable costs, such as fuel.  ISO-New England "stacks" the power source's wholesale price offers from lowest-price to highest-price, as shown from left to right in Figure 1. ISO-New England then compares the "stack" against expected demand, represented by the black dotted line.

*Figure 1*



84.     The blue bars in Figure 1 to the left of the black dotted line show the electricity that is "cleared," or committed to be dispatched and operate with its output purchased.  Here, as shown in Figure 1, the grid purchased 100% of the offered electricity from companies "A," "B," and "C," and part of the electricity offered by power source company "D."  The gray bars in Figure 1 to the right of the black dotted line represent electricity that is not purchased, or did not "clear" (i.e., companies E–F did not sell energy in this illustration, and company "D" sold some but not all of its available output).

85.     Unlike many ordinary consumer retail markets where the price offered is the price paid, in ISO-New England, all power sources that "clear" the wholesale marketplace (the blue electricity generators) are paid at the price offered by the last source selected to satisfy demand. In this illustration in Figure 1, power source company "D" is the last source to "clear" some

quantity of power, so all power that "clears" (all blue power) is purchased at the price offered by "D"—the "clearing price" here equals "P" (the dashed blue line). Electricity from power sources that do not "clear" is not sold (the gray bars), and those companies are not paid (and "D" is paid only for the quantity of electricity represented in blue).

86.     Power plants with higher variable costs (such as fossil-fueled generators that have fuel expenses to operate their plants) offer higher daily prices into the marketplace to cover their variable costs (e.g., fuel) and thus enter the "stack" as higher-priced energy sources on the right. Conversely, power generators with relatively lower variable costs (such as hydropower) can offer lower prices into the ISO-New England marketplace to maximize the chance that the electricity they generate will "clear" and be purchased, and their offerings thus enter the "stack" on the left. Such lower-priced power sources can offer very low prices into the ISO-New England wholesale marketplace, receive payments tied to the higher "clearing price" set by another generating unit (typically one that operates by burning natural gas or oil).

87.     When a new, low-cost source of wholesale electricity enters the ISO-New England marketplace at a lower offering price—such as NECEC bringing hydropower to Massachusetts— it enters the bid "stack" on the far left (due to that lower price), as represented in Figure 2 (below) by the green bar. The entry of new, lower-priced electricity into the marketplace shifts the "stack" to the right as the quantity of power needed to meet demand remains the same ("Q" stays the same as in Figure 1).

88.     As Figure 2 shows, the incumbent power source "stack" is pushed to the right by the new low-cost entrant and, at the same quantity of demand, electricity offered by "D" no longer "clears," and only some of the electricity offered by "C" "clears." Because "C" is now the highest-priced source of electric power to "clear," the "clearing price"—at which all "cleared" electricity

is purchased regardless of offer price—falls from the earlier, higher-priced "P" shown in the gray dotted line (the price offered by "D") to the lower priced "O" shown in the blue dotted line (the price offered by generator "C"). In other words, the addition of new lower-priced electricity not only causes the highest-priced generators to lose revenues (and profits) because they are not purchased at all, but it also causes the wholesale electricity price for *all suppliers* to fall (benefitting consumers).

*Figure 2*



89.   ***Forward-Capacity Wholesale Marketplace.***   The ISO-New England Forward-Capacity marketplace operates in a similar way, except that instead of selling actual, physical electricity output in real time or a day ahead, electric power suppliers bid into Forward-Capacity auctions to sell *capacity commitments* three years ahead of time. (A capacity commitment is an obligation to be available to produce power during a future time period.) So, in the same way that

the entry into the marketplace of a new, lower-priced source of wholesale electricity (like the hydropower that would be transmitted into Massachusetts by NECEC) lowers the clearing price for electricity (in the Real Time and Day-Ahead marketplaces), new lower-priced generation sources will also lower the "clearing price" for capacity in the Forward-Capacity marketplace. Thus, the impact of NECEC on a generator's capacity revenues is similar to its impact on electricity revenues—it will lower the "clearing prices," thereby reducing the revenues paid to generators and in turn reducing the cost of power to consumers.

90.     Even if a power supplier commits power *capacity* on a future date on the Forward-Capacity marketplace, when that future date arrives, the physical power must still be offered on the Real-Time or Day-Ahead marketplaces.  In other words, a Forward-Capacity agreement— whether made through the Forward-Capacity marketplace or by private, bilateral agreement—does not affect whether a generator's *physical power* is purchased (or for what price) on any given day.

91.     ***Smaller Specific Transmission-Constrained Areas.***  The wholesale electricity marketplaces described above operate consistently throughout New England, but there are many smaller geographic electrical submarkets that cover specific parts of New England, including in Massachusetts.  These submarkets arise to address specific demand and supply imbalances within and across particular geographic areas within the ISO-New England grid and at specific times of day.  These imbalances are often caused by transmission constraints that prevent unconstrained delivery of otherwise economical supply across the whole region.  Which and how many power generators' supply of electricity (or capacity, for the Forward-Capacity marketplace) are in the submarket's "stack" varies at each such physically constrained locality at specific times and creates price differentials across the region when such constraints arise (e.g., due to physical electricity

limits of the transmission lines). Individual generators can monopolize these submarkets regardless of their market position in Massachusetts as a whole.

92.  Avangrid and NextEra voluntarily and profitably participate in these ISO-New England marketplaces through contractual agreements, including transmission and interconnection agreements.

### D.  NextEra's Substantial Electricity Generation Presence in New England

93.  NextEra is the nation's largest power company in terms of market capitalization, with a market cap of about $160 billion in November 2024. And NextEra is the world's largest publicly traded power company.

NextEra's New England Generating Facilities

Fossil Fuels
Nuclear
Solar
Wind

94.  NextEra's total assets for the quarter ending September 30, 2024 were reported to be $186 billion, of which physical assets such as property, plants, and equipment account for $134 billion. Over 90% of NextEra's generation portfolio is located in the United States.

95.  NextEra has nearly 47 gigawatts of generating capacity in 41 states and Canada. According to its own website, NextEra is the "world's largest generator of renewable energy from the wind and sun," though it also runs nuclear and fossil fuel plants around the country, including in New England. NextEra, with affiliates, also owns 8,500 circuit miles of high-voltage transmission lines (the majority of which are overhead transmission lines) and 770 substations in North America.

96.  NextEra owns and operates 11 power generation plants in New England, including three fossil-fuel plants that connect to the ISO-New England grid: (1) the oil-fired Wyman Power

Station in Yarmouth, Maine; (2) the Cape Gas Turbine in South Portland, Maine, and (3) the gas-fired Bellingham Energy Center in Bellingham, Massachusetts.  NextEra also owns a large nuclear power plant, Seabrook Station, just over the New Hampshire line from Salisbury, Massachusetts; Seabrook also connects to the ISO-New England grid.  NextEra also has six solar plants (Farmington Solar, Sanford Solar, Nutmeg Solar, Quinebaug Solar, Wallingford Solar, and Coolidge Solar) and one wind farm (Granite Reliable).  In addition, NextEra owns or operates several smaller energy generation facilities in the region.

97.    Across all its power generation facilities in New England, NextEra has over 2,700 MW of power generation capacity.

98.    Protecting Seabrook Station is important to NextEra.  NextEra has stated in a public filing at FERC that its Seabrook nuclear plant generated $560,000 per day in revenue during a ten-day period in April 2020, a period in which NextEra had scheduled the nuclear plant for maintenance and refueling.  Thus, $560,000 times 365 days a year amounts to over $200 million in revenue each year—and that was in 2020.  More recently, NextEra told the D.C. Circuit in briefing that the $560k/day number would be "now several times higher due to increased energy market prices."[23]

99.    The Seabrook nuclear plant is NextEra's largest generating asset in the region, accounting for approximately three quarters of NextEra's New England electricity output.  The remaining quarter is largely attributable to NextEra's fossil fuel-fired generating plants.  Combined, the Seabrook nuclear plant and NextEra's two largest fossil fuel generating plants, Wyman and Bellingham, account for over 90% of NextEra's New England power generation output.

---

[23] Final Reply Br. for Pet'rs NextEra Energy Res., LLC & NextEra Energy Seabrook, LLC at 8, *NextEra Energy Res., LLC v. FERC*, No. 23-01094 (D.C. Cir. Nov. 3, 2023).

100.    On information and belief, the electricity generated by Seabrook Station, Wyman Power Station, Bellingham Energy Center, and NextEra's other New England generation assets is largely sold on the ISO-New England wholesale marketplaces, and thus the plants are subject to the "clearing price" structure of the marketplaces.  On information and belief, all three units also participate in the Forward-Capacity marketplace.

101.    Whether NextEra's units sell capacity through the Forward-Capacity marketplace or through bilateral contracts, prices in capacity sales are driven by prices in the physical wholesale markets through the Real-Time and Day-Ahead marketplaces.

102.    In addition, the power that all of NextEra's New England units sell is included in the smaller, transmission-constrained submarkets.

103.    Through all of these marketplaces, NextEra brings in over $30 million in annual revenue by selling the power produced using fossil fuel energy on the New England grid, including the electricity produced by Bellingham Station and Wyman Station, which is in addition to the over $200 million in annual revenue NextEra collects for output at the Seabrook Station.

104.    NextEra's revenues and profits would decline with the entry of 1,200 MW of low-priced hydropower into New England through NECEC.

105.    Indeed, some of NextEra's higher-priced and dirty or non-renewable fossil-fuel units may not operate at all, which is indeed one goal of Massachusetts's energy transition.

106.    Through its no-holds-barred opposition to NECEC, NextEra has been able to keep its fossil-fuel plants in operation and thus *needlessly* and harmfully inject massive amounts of $CO_2$ into the atmosphere.  For instance, during an especially cold two-day period during the winter holidays in 2022, 31 million gallons of fuel oil were burned for power generation,[24] contributing

---

[24] David Sharp, *Maine's Wyman Station Helped Ease Christmas Power Shortfall*, Press Herald (Jan. 9, 2023), https://www.pressherald.com/2023/01/09/regional-power-plants-fined-39-million-for-coming-up-short-on-christmas-eve/.

318,000 metric tons of $CO_2$ to the atmosphere—equivalent to the annual carbon output of approximately 69,000 cars.  NextEra's Wyman Station, which burns fuel oil and has the largest capacity of any power plant in Maine, surely contributed extensively to that total.

107.    By excluding NECEC from the New England grid, NextEra is able to sell the electricity generated by all of its incumbent plants for prices that are higher than they need to be, and higher than they would be with competitive pressure.  NextEra therefore has a strong economic incentive to delay the entry of competition from new, lower-priced power generation supply, in order to maintain higher prices being paid to its incumbent power generation facilities.

108.    As explained above and as illustrated in Figures 1 and 2, lower-priced power generation would enter the ISO-New England marketplace bid "stack" to the left of the market "clearing price" and quantity.  By blocking the entry of lower-priced power generation (from NECEC, or any future lower-priced competitor), NextEra effectively prevents lower-priced power from clearing the auction (i.e., NextEra stops the bid "stack" from shifting to the right).  As higher-priced units clear the auction, the market "clearing price" ends up being pushed higher.  Not only does the higher price benefit all of NextEra's incumbent power generation that "clears" (i.e., is purchased and dispatched) in the auction, but the higher price also increases the likelihood that NextEra's less efficient fossil fuel-fired generation (such as Wyman and Bellingham, which are higher-priced units toward the right of the stack) will actually clear.  Thus, NextEra has the economic incentive to block new low-variable-cost resources such as NECEC from entering the "stack," at the expense of consumers.

E.    **Beginning in 2008, Massachusetts Passes Legislation to Transition Massachusetts to Clean Energy Generation Away from Fossil Fuels**

109.    Massachusetts's effort to combat climate change with comprehensive legislation began in earnest in 2008 with the passage of the Global Warming Solutions Act (2008 Mass. Acts

1154).  As one of the first legislative packages in the country to address climate change, the Global Warming Solutions Act set ambitious goals for greenhouse gas emissions reductions in Massachusetts:  25% below 1990 statewide levels by 2020, and 80% below 1990 levels by 2050.

110.    To reach those goals, Massachusetts passed the Green Communities Act in 2008 (2008 Mass. Acts 308), which set energy conservation and renewable energy goals for Massachusetts to reach by 2020.  Massachusetts followed up the Green Communities Act by enacting the Energy Diversity Act in 2016 (2016 Mass. Legis. Serv. Ch. 188 (West)).  The Energy Diversity Act, aimed at transitioning a substantial amount of electricity consumption to electricity supplied from renewable power, directed Massachusetts EDCs to solicit proposals for long-term contracts for Clean Energy Generation and/or Renewable Energy Certificates (Massachusetts Section 83D requests for proposal).  The 2016 Act set the competitive process for new sources of clean energy for Massachusetts residents to begin in 2017.

**F.    In 2017, Massachusetts Electric Distribution Companies ("EDCs") Request Bids for Clean Energy Supply to Comply with Massachusetts Green Energy Laws, and Avangrid's NECEC Wins**

111.    On March 31, 2017, Massachusetts's three main EDCs—(1) Fitchburg Gas & Electric Light Company (d/b/a Unitil); (2) Massachusetts Electric Company and Nantucket Electric Company (d/b/a National Grid); and (3) NSTAR Electric Company and Western Massachusetts Electric Company (d/b/a Eversource)—issued a request for proposal ("RFP") for new sources of clean power generation.

112.    The law required Massachusetts DOER and the Massachusetts Attorney General's Office to select an independent evaluator to monitor and issue a report on the bid evaluation and selection process.

1.       **In 2017, Companies, Including NextEra and Avangrid, Submit Bids for Massachusetts Green Energy Contracts and NextEra's Proposals Lose**

113.     The three Massachusetts EDCs, in coordination with the Massachusetts DOER, distributed the RFP to approximately 600 parties, resulting in 46 bid packages and 53 distinct proposals from various power companies, including Avangrid subsidiary Central Maine Power Company ("CMP") and NextEra.  Of the 53 proposals, 17 did not satisfy eligibility and threshold requirements, leaving Massachusetts with 36 proposals to evaluate further.

114.     **Avangrid/CMP's winning bid with Hydro-Québec:**  On July 27, 2017, Central Maine Power and Hydro-Québec (a Canadian power company) submitted a joint bid for NECEC. NECEC would transmit 100% hydropower from Québec to CMP's Larrabee Road Substation in Lewiston, Maine.  NECEC would provide up to 9,400,000 megawatt hours ("MWh") of energy per year sourced exclusively from incremental hydroelectric generation owned and operated by Hydro-Québec.  NECEC would include a 320-kilovolt ("kV") HVDC transmission line between Hydro-Québec and the New England grid.  In Maine, the NECEC transmission line would begin at the Canadian border in western Somerset County and run approximately 145 miles to a new AC/DC converter station in Lewiston, Maine.  At the time, NECEC had a commercial operation start date of December 13, 2022.  (NECEC is described further in Section V.F.2.)

115.     **NextEra & Avangrid/CMP's combined bids using CMP's existing transmission corridor for overhead transmission lose the competition:**  NextEra (with affiliates) also submitted several project proposals in response to the Massachusetts Section 83D RFP.  NextEra made some proposals jointly with other entities, including Avangrid's subsidiary CMP.

116.     NextEra and CMP submitted three joint bids in response to the RFP, all of which were a variation of a project called Maine Clean Power Connection ("MCPC"), which consisted

of wind and solar generation with battery storage resources constructed in western Maine and Québec.

117.   NextEra's MCPC was proposed to provide a new 192-mile overhead transmission line from western Maine to the New England.

118.   NextEra's MCPC proposed project would run along *the same corridor* ultimately used by NECEC.  NextEra's MCPC proposal involved using *overhead* transmission lines along the CMP transmission corridor in Maine as NECEC—not underground transmission.

### 2.   Massachusetts EDCs Choose NECEC as the RFP Winner to Bring Clean Energy to Massachusetts

119.   The Massachusetts EDCs conducted a rigorous solicitation and evaluation process for the RFP submissions.  Once selected by the EDCs, the contracts would be submitted to the Massachusetts Department of Public Utilities ("DPU") for its review and approval.

120.   After the bid from the initial RFP winner was terminated, the Massachusetts Department of Environmental Resources and the independent evaluator chose Avangrid's NECEC proposal as the RFP's winning bid and proceeded with contract negotiations.  The independent evaluator had concluded that NECEC was the highest ranking bid and would provide the highest net benefits and lowest cost per MWh to Massachusetts consumers.  The competing bids were rejected, including all of NextEra's proposals.

121.   Once online, NECEC will be capable of delivering 1,200 MW of hydro-generated electricity from Québec to the New England grid for at least 40 years.  The core electrical elements of NECEC are:  (1) a new 320 kV overhead HVDC transmission line, about 145 miles long, from the Québec/Maine border to Lewiston, Maine, (2) a new converter station at Merrill Road in Lewiston, Maine (with the converter needed to change direct current ("DC") power from Canada to alternating current ("AC"), which is the electric method used for most transmission and

distribution in the U.S.), and certain required upgrades to the Larrabee Road Substation, and (3) a new 1.6-mile 345 kV AC transmission line from the new converter station to CMP's existing Larrabee Road Substation in Lewiston, Maine.  NECEC also includes several other upgrades to existing CMP transmission lines and stations.

122.    NECEC will use a corridor consisting largely of land already devoted to power transmission.  Of the 145-mile length, the NECEC corridor is sited entirely on private land that Avangrid already owns or controls (other than a short 0.9-mile portion of leased public land).  The northernmost portion runs primarily through commercial forest from the Canadian border to the town of Caratunk, Maine.  From there, 92 miles of line will be built within existing CMP transmission corridors to Lewiston, Maine.

123.    NECEC will connect clean hydropower to the New England grid in Maine, conferring significant and long-term benefits on electricity customers, and enhancing bulk electric system reliability, electricity cost savings, and fuel security both within Maine and throughout the region covered by ISO-New England, including Massachusetts.

124.    Two central sets of contracts govern NECEC's delivery of clean hydropower: (1) Power Purchase Agreements ("PPAs") between the Massachusetts EDCs and H.Q. Energy Services (US) Inc. ("HQUS"), an affiliate of Hydro-Québec, pursuant to which Hydro-Québec will sell the electricity it generates at its hydro plants to the Massachusetts EDCs; and (2) two sets of Transmission Service Agreements ("TSAs"), with one between NECEC and HQUS, and another between NECEC and the Massachusetts EDCs, pursuant to which NECEC will transmit the power generated by Hydro-Québec to the Massachusetts EDCs.  The TSAs became effective in 2018.

125.    The Massachusetts EDCs have agreed to purchase 9.45 million MWh annually of hydroelectric power from HQUS for delivery over NECEC for 20 years pursuant to long-term

PPAs.  Additionally, the Massachusetts EDCs and HQUS have agreed to purchase the full 1,200 MW of transmission capacity on the NECEC transmission line for 40 years.

126.   ***Cost savings for Massachusetts consumers with NECEC.***   As of 2018, when NECEC won the RFP, the Massachusetts EDCs expected a reduction of approximately 2–4% in Massachusetts customers' monthly electricity bills due to the entry of NECEC's lower-priced power.[25]  Also at that time, the NECEC project was expected to provide Massachusetts electricity at a price significantly below pre-NECEC prices.[26]  Massachusetts electricity rates are consistently among the top five highest among U.S. states.[27]  It has been recognized that the primary anticipated beneficiaries of the project in terms of the volume of energy consumed are the much larger population centers in Massachusetts and that legislative initiatives in Massachusetts are the impetus for NECEC.

127.   ***Helping to meet Massachusetts's clean energy goals with NECEC.***   At the time of its approval, the Massachusetts DOER estimated that NECEC would result in nearly half of the electricity consumed by Massachusetts being generated from clean energy.  When in service, NECEC is estimated to reduce at least an estimated 36.61 million metric tons of $CO_2$ equivalents in the Massachusetts Green House Gas Inventory from 2019 to 2040, or an average of 1.93 million metric tons of $CO_2$ equivalents annually.  This is roughly the same as removing 413,000 cars off the road every year.  Thus, implementation of NECEC will significantly contribute to Massachusetts's progress in meeting its future Global Warming Solution Act goals.[28]

---

[25] Letter, Mass. Dep't of Energy Res., *NSTAR Elec. Co.*, D.P.U. 18-64, at 2 (Mass. D.P.U. July 23, 2018), https://macleanenergy.files.wordpress.com/2018/07/doer-83d-filing-letter-dpu-18-64-18-65-18-66july-23-2018.pdf.

[26] *Id.*

[27] Eileen Woods, *Massachusetts No. 2 in the USA for Highest Electricity Prices*, Boston.com (July 12, 2024) https://www.boston.com/real-estate/real-estate-news/2024/07/12/mass-ranks-in-top-10-for-high-energy-costs/;   U.S. Energy Information   Administration,   *Electric   Power   Monthly*, https://www.eia.gov/electricity/monthly/epm_table_grapher.php?t=epmt_5_6_a (last updated Aug. 2024).

[28] Letter, Mass. Dep't of Energy Res., *NSTAR Elec. Co.*, D.P.U. 18-64, at 4 (Mass. D.P.U. July 23, 2018),

128.    In addition, NECEC was expected to reduce wholesale energy prices in Maine up to $44 million annually.[29]  NECEC was expected to reduce wholesale capacity prices in Maine up to $27 million per year during NECEC's first 10 years alone.[30]

### 3.    NECEC's Competitive Threat to NextEra's Higher-Priced Current and Future Energy Generation Position in New England

129.    NECEC threatens to substantially reduce NextEra's anticompetitive profits from its existing energy generators in New England.  Specifically, NECEC threatens NextEra's ability to sustain energy prices at its existing generators (including Seabrook Station, Wyman Station, and Bellingham Energy Center), at levels higher than they would be after the entry of power delivered by NECEC.  And NECEC threatens the higher prices that Seabrook and other NextEra generation receive when more efficient sources of generation are successfully excluded from the market.

130.    As mentioned, NextEra sells power from Seabrook, Wyman, and Bellingham on ISO-New England's wholesale marketplaces.  Figure 3 below illustrates an example of how NextEra's three largest power generation assets may operate in the ISO-New England marketplace in general.

---

https://macleanenergy.files.wordpress.com/2018/07/doer-83d-filing-letter-dpu-18-64-18-65-18-66july-23-2018.pdf.

[29] Order Granting Certificate of Public Convenience and Necessity and Approving Stipulation, *Cent. Me. Power Co.*, No. 2017-232, at 25 (Me. P.U.C. May 3, 2019).

[30] *Id.* at 31.

*Figure 3*



131.    But when NECEC comes online, there will be times where generators with bids further to the right of the supply "stack," i.e., bids with higher offer prices, will no longer be needed to meet demand.  As a result, the market "clearing price" will fall, thereby decreasing NextEra's profits.  If not out for maintenance or refueling, the Seabrook nuclear plant is "always on" and has very low variable operating costs, which means it can bid into the market at zero or close to $0. During the hours when the Seabrook nuclear plant operates, it will get paid at whatever the market clearing price is.  In other words, if the market price falls, so do NextEra's Seabrook nuclear plant revenues (and profits).

132.    NECEC's potential impact on NextEra is illustrated in Figure 4:

*Figure 4*



133.    NECEC also threatens NextEra's fossil-fuel plants, such as Wyman Station, Cape Gas, and Bellingham Energy Center, because they are not "always on," meaning that they have variable costs tied to fuel costs, which in turn means that they are higher priced and likely to be towards the right of the graph in Figure 4.   Accordingly, when NECEC comes online and the supply offer at which demand is satisfied shifts to the left, in this illustrative model, Wyman will go offline altogether (bringing no wholesale electricity market revenues to NextEra), and Bellingham will only sell some of its electricity.

134.    But importantly, even for the power NextEra *does* sell, the entry of NECEC will have the effect of lowering the "clearing price" (from "P" to "O" in Figure 4), and thus NECEC will lower the price for electricity NextEra receives from all of its assets.   So, as Figure 4 shows,

even though the Seabrook nuclear plant may still clear its entire available electricity quantities, it will receive a lower price and lower revenues with NECEC in the marketplace than it would without it.

135.    In recognition of these auction dynamics, NextEra has admitted that its Cape Gas Turbine (fossil fuel), Wyman Station (fossil fuel), and Casco Bay Storage (battery storage) project are substantially and directly affected by NECEC's impact on the economics of the grid.

### G.    State and Federal Regulatory Approvals Required for NECEC

136.    In order to be built, NECEC needed to secure certain permits and regulatory approvals.  As described further below, NextEra's conduct directly and indirectly delayed the permits needed for NECEC.  NextEra's conduct delayed construction, and ultimately delayed the commercial operation start date of NECEC by several years.  The required approvals included:

### 1.    Maine Public Utilities Commission ("PUC") Certificate of Public Convenience and Necessity

137.    Maine requires entities seeking to construct transmission lines capable of operating at 69 kV or more to apply for and receive a Certificate of Public Convenience and Necessity ("CPCN") from the Maine PUC.[31]  In reviewing an application, the Maine PUC must find a public need, defined by regulation as a determination that ratepayers would benefit from the construction of the proposed transmission line.[32]

138.    CMP filed a petition with the Maine PUC for a Maine CPCN to begin construction on NECEC on September 27, 2017.  After a 19-month review, on May 3, 2019, the Maine PUC unanimously granted CMP's CPCN application for NECEC.

---

[31] Me. Rev. Stat. tit. 35-A, § 3132 (2023).

[32] 65-407-330 Me. Code R. § 9(A-B) (LexisNexis 2024).

### 2.  Massachusetts Department of Public Utilities ("DPU") Power Purchase Agreement Approval

139.    Under Massachusetts law, long-term contracts for energy generation by distribution companies must be approved by the Massachusetts DPU.[33]

140.    On July 23, 2018, the Massachusetts EDCs sought DPU approval of their contracts with NECEC.  On June 25, 2019, the Massachusetts DPU approved the NECEC PPAs, determining that the PPAs and TSAs were consistent with the Massachusetts RFP requirements and that the RFP process was open, fair, transparent, and reasonable.

### 3.  Maine Department of Environmental Protection ("DEP") Development Permit

141.    Under Maine law, any entity seeking to construct a development project must notify the Maine DEP of the intent, nature, and location of the development.[34]  The Maine DEP is required to analyze the proposed project's effects on a number of environmental issues.[35]

142.    CMP applied to the Maine DEP for land-use permits on September 27, 2017.  The Maine DEP approved CMP's application on May 11, 2020.

### 4.  ISO-New England Interconnection Approval and Affected System Analysis

143.    Under ISO-New England's Transmission, Markets and Services Tariff—essentially, the set of rules that all power grid participants agree to adopt and follow to participate in the grid and ISO-New England's marketplaces—a new transmission project seeking to connect to the New England grid must request interconnection from ISO-New England.

144.    The process for requesting interconnection is established in ISO-New England Open Access Transmission Tariff Section 25, which requires a System Impact Study ("SIS") to

---

[33] 220 Mass. Code Regs. 24.03 (2024).

[34] Me. Rev. Stat. tit. 38, § 485-A; *id.* § 480-D.

[35] *Id.* § 480-D.

assess what impact the proposed project will have on the existing system.  The SIS identifies what specific changes, such as equipment upgrades or system modifications, if any, are needed to ensure that the new project can connect to the grid without risking the safety or reliability of the grid.

145.    No new project can interconnect to the New England grid until all such impacts are resolved.

146.    If the System Impact Study shows a potential adverse impact on an existing *transmission* system, the ISO-New England Tariff requires the parties to negotiate in good faith and on commercially reasonable terms to perform whatever upgrades or adjustments are needed to mitigate the adverse impact, and the company owning the impacted transmission system must implement necessary changes and upgrades in a timely manner.

147.    The D.C. Circuit has recently ruled that when the impacted system is a *generation* system (rather than a *transmission* system), that part of the ISO-New England Tariff does not apply.[36]  Thus, neither FERC nor ISO-New England can compel a *generation system* to take any action in this circumstance.[37]  In these cases, the power generator is bound not by FERC but by the antitrust laws, common law (such as relating to business torts), and the terms of any other contracts, such as the interconnection agreement between a power plant like the Seabrook nuclear plant and ISO-New England—an agreement known as the Large Generator Interconnection Agreement ("LGIA").

148.    In the spring of 2017, pursuant to ISO-New England Open Access Transmission Tariff Section 25, Central Maine Power submitted a request for the interconnection of NECEC.

---

[36] *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024).

[37] *NextEra Energy Seabrook, LLC*, 182 FERC ¶ 61,044, P 76 (2023).

149.    Three years later, on March 12, 2020, ISO-New England's System Impact Study identified the circuit breaker at NextEra's Seabrook nuclear plant as a piece of equipment that would be adversely impacted by NECEC's interconnection.

150.    The circuit breaker at NextEra's Seabrook nuclear plant is a large piece of industrial equipment (approximately 20 feet long by 15 feet wide) that, when "tripped" into operation, isolates the plant from power and electrical events in the New England grid, thereby protecting the nuclear plant.  The Seabrook Breaker is original to Seabrook Station.  It was built in 1990.  By 2020, the Seabrook Breaker was working at 99.6% of its capacity; consistent with good utility practice, the growing electricity demands of Massachusetts and New England should have caused NextEra to replace the Seabrook Breaker long ago.  Until November 2024, NextEra had never upgraded it.

151.    The System Impact Study found that at 99.6%, the Seabrook Breaker was close enough to operating at its maximum capacity that the additional power brought to the grid by NECEC risked forcing the outdated Seabrook Breaker to operate *over* its capacity.  As the D.C. Circuit Court of Appeals found, "[i]f further power flowed from the NECEC line, the breaker would operate at 101.2% of its capacity.  In other words, the size of a potential fault current could overwhelm the breaker and cause it to fail."[38]  The study found that a breaker failure at Seabrook would be a problem because it could lead to "catastrophic equipment failure including equipment melting, catching fire, or exploding at the nuclear facility."[39]

---

[38] *NextEra Energy Res., LLC*, 118 F.4th at 367.

[39] Br. of ISO New England at 5, *NECEC Transmission LLC v. NextEra Energy Res., LLC*, Docket No. EL 21-6-000 (F.E.R.C. Oct. 7, 2021).

152.     Thus, Avangrid "cannot interconnect [NECEC] unless and until the breaker is replaced."[40]

153.     In addition to the "obvious safety concerns," the SIS found that such a failure "would also result in a significant loss of [Seabrook's] baseload generation that would need to be replaced, creating potential reliability concerns depending on system conditions."[41]

154.     Because the Seabrook Breaker is located within NextEra's Seabrook nuclear generation facility, it is not part of the New England transmission system.  Therefore, as the D.C. Circuit recently found, the part of the ISO-New England Tariff that would require NextEra to cooperate with Avangrid's planned NECEC interconnection did not apply to the Breaker.[42]

155.     Under ISO-New England's requirements (with which Avangrid must comply), there was no alternative to upgrading the Seabrook Breaker to ensure that a new source of electricity, such as NECEC, could connect to the grid without risking safety and reliability.  As NextEra has publicly stated in its court papers, "the NECEC Project will not be permitted to change system conditions [i.e., interconnect] unless and until the breaker is replaced."[43]

156.     Accordingly, even when construction is finished and with all other obstacles removed, NECEC could not connect to the New England grid and begin to provide power to New England until NextEra's Seabrook Breaker was upgraded.  NextEra, of course, has exclusive control over the Seabrook Breaker.

---

[40] Final Br. for Pet'rs NextEra Energy Res., LLC & NextEra Energy Seabrook, LLC at 40, *NextEra Energy Res., LLC v. FERC*, No. 23-01094 (D.C. Cir. Nov. 3, 2023).

[41] Br. of ISO New England at 5, *NECEC Transmission LLC v. NextEra Energy Res., LLC*, Docket No. EL 21-6-000 (F.E.R.C. Oct. 7, 2021).

[42] *NextEra Energy Res., LLC v. FERC*, 118 F.4th at 371.

[43] Final Reply Br. for Pet'rs NextEra Energy Res., LLC & NextEra Energy Seabrook, LLC at 10, *NextEra Energy Res., LLC v. FERC*, No. 23-01094 (D.C. Cir. Nov. 3, 2023).

## VI.   NEXTERA'S UNLAWFUL SCHEME TO EXCLUDE COMPETITION BROUGHT BY LOWER COST, CLEAN ENERGY SOURCES

157.   Faced with competition from NECEC and its lower-priced clean hydropower, NextEra launched a three-pronged scheme to delay or stop NECEC.

158.   The first prong of NextEra's scheme to foreclose competition from NECEC was to deploy a series of objectively baseless attacks on NECEC's applications for required permits and approvals.  All delay was good for NextEra:  it meant more profits.

159.   NextEra intervened in NECEC's agency permitting proceedings, and made baseless, sham appeals to the courts after the regulatory agencies granted each permit or approval. Although NextEra lost every one of its regulatory interventions, NextEra was able to delay NECEC by years.   Moreover, NextEra's conduct had a compounding ripple effect, causing delays throughout NECEC's efforts to come online.

160.   In addition to its baseless arguments opposing NECEC at the regulatory agencies, and the baseless appeals that followed, NextEra also launched two referenda in Maine seeking to enact laws to bar NECEC that were bound to fail because they were objectively unlawful—both referenda were found to violate the Maine Constitution.  But like NextEra's failed permitting interventions, the referenda had one of NextEra's desired effects of delaying NECEC (and sustaining higher-than-justified NextEra profits) for many years.

161.   The second prong of NextEra's scheme was to launch a campaign of false and misleading statements to wrongfully mislead Maine citizens into supporting the referenda, while hiding NextEra's own involvement through dark money and campaign finance violations.

162.   The third prong of NextEra's scheme was its refusal to upgrade the Seabrook Breaker at NextEra's nuclear plant, Seabrook Station, thus playing a veto card to block virtually any new, large electricity generation facility from connecting to the New England grid, at the

expense of consumers in ISO-New England.  By refusing to upgrade its breaker, NextEra held a

very profitable bottleneck monopolist power to deny any new electricity source from entering ISO-

New England's grid.

163.    As described herein, NextEra took numerous overt acts through 2024 in furtherance

of its continuing overarching scheme to anticompetitively and unfairly foreclose NECEC from

competing.

**A.    Without a Legitimate Basis and with Anticompetitive Intent, NextEra Mounts at Least Ten Separate Baseless and Failed Challenges to NECEC Permitting and Approval Processes, Delaying NECEC by Years**

164.    NextEra, alone and by funding efforts brought by other parties, abused the

regulatory and judicial processes in pursuing at least ten serial sham petitions, which no reasonable

litigant could realistically expect to succeed on the merits, with the purpose of anticompetitively

delaying NECEC's permits and approvals, needlessly but intentionally postponing NECEC.

165.    NextEra itself directly challenged three of NECEC's license adjudications before

the regulatory agencies—and lost each and every challenge.

166.    NextEra then appealed all three agency decisions, making baseless arguments—

and lost three more times.

167.    In another regulatory arena, NextEra filed a baseless petition at FERC to further

delay the case and secure its ability to protect its bottleneck monopoly over the Seabrook breaker—

and lost.  It appealed that loss to the D.C. Circuit Court of Appeals—and lost again.

168.    In its scorched-earth campaign, NextEra did not stop at sham regulatory challenges

and sham litigation.  NextEra created and supported two failed unconstitutional referenda that were

directly aimed at delaying NECEC.  The referenda were facial attacks on NECEC and were both

found to violate Maine's Constitution—two more losses in NextEra's column.

169.     As a result of NextEra's baseless and failed litigation and referenda, NextEra, with anticompetitive intent, purposefully delayed NECEC, causing harm to both consumers and Avangrid.

### 1.     NextEra Loses Its Baseless Challenge to NECEC's Maine Public Utilities Commission's ("Maine PUC") Approval

170.     NextEra's first objectively baseless challenge was to NECEC's Certificate of Public Convenience and Necessity.  CMP filed its application for the Certificate, which was over 90 pages long and accompanied by 2,000 pages of supporting exhibits, with the Maine PUC on September 27, 2017.

171.     On March 8, 2018, NextEra intervened at the Maine PUC in opposition to NECEC without regard for the merits of its positions and with intent to delay NECEC to protect its own future energy projects and profits.  NextEra's petition to intervene was a "late-filed" petition.[44] NextEra challenged CMP's petition with baseless attacks on NECEC and unreasonable interpretations of the requirements for the PUC to approve NECEC.

172.     For instance, NextEra argued that NECEC would cause additional congestion in New England's electrical grid.  NextEra supported that argument with its own unreliable modeling that it knew contained errors.[45]

173.     On March 29, 2019, the Maine PUC hearing examiners issued a 162-page report favorable to NECEC in which they recommended approval of CMP's petition for a Certificate of Public Convenience and Necessity.[46]

---

[44] *NextEra Energy Res., LLC v. Me. Pub. Utils. Comm'n*, 227 A.3d 1117, 1120 (Me. 2020).

[45] Order Granting Certificate of Public Convenience and Necessity and Approving Stipulation, *Cent. Me. Power Co.*, No. 2017-232, at 30 (Me. P.U.C. May 3, 2019).

[46] *NextEra Energy Res., LLC*, 227 A.3d at 1121.

174.     On May 3, 2019, the Maine PUC adopted the hearing examiners' findings and unanimously granted CMP's application for a Certificate of Public Convenience and Necessity for NECEC.[47]  The Maine PUC's approval process was rigorous, and its finding—that NECEC merited the required Certificate—was based on substantial evidence and consideration.

175.     In granting CMP's application for a Maine Certificate of Public Convenience and Necessity, the Maine PUC soundly rejected NextEra's arguments against NECEC.  In particular, the Maine PUC called out NextEra's arguments that NECEC would increase congestion, criticizing its reliance on defective modeling.  The Maine PUC specifically noted that in making its congestion argument, "NextEra subsequently acknowledged errors in its modeling that render their results unreliable."[48]

176.     The Maine PUC also stated that NextEra's arguments that NECEC could have a negative impact on reliability were proven false by NextEra's own witnesses, who "admitted that NECEC system upgrades would resolve the N-1 reliability problems their study revealed."[49]  This means that NextEra was unable to support its argument that the Maine transmission system would suffer reliability impacts if NECEC came into operation.

177.     As to NextEra's arguments concerning the interpretation of the rules setting forth the standard to approve NECEC, the Maine PUC stated that NextEra's proposed interpretations "would lead to absurd results and cannot be the intent of the Legislature."[50]

---

[47] Order Granting Certificate of Public Convenience and Necessity and Approving Stipulation, *Cent. Me. Power Co.*, No. 2017-232, at 98 (Me. P.U.C. May 3, 2019).

[48] *Id.* at 30.

[49] *Id.* at 39.

[50] *Id.* at 19-20.

178.    NextEra, itself a participant in the Massachusetts RFP with a project on a transmission line overlapping with NECEC, maintained positions that a company in NextEra's position knew or would have known were baseless and would not succeed.

### 2. NextEra Loses Its Baseless Appeal of the Maine PUC Approval and the Maine Supreme Judicial Court Labels NextEra's Arguments "Absurd" and "Illogical"

179.    Despite its resounding loss at the Maine PUC, NextEra appealed the Maine PUC's decision directly to Maine's highest court, the Supreme Judicial Court.  NextEra appealed without regard for the merits of its positions and with intent to delay NECEC to protect its own future energy projects and profits.

180.    NextEra's appeal was baseless in light of the thorough review of the record conducted by the Maine PUC.  The Maine PUC's review of NECEC took over 19 months and included thousands of pages of argument, testimony, and supporting materials.  In addition to eight rounds of pre-filed testimony, which included written discovery and technical conferences after each phase of testimony, the Maine PUC held six days of evidentiary hearings and three public hearings at which over 100 witnesses testified.

181.    Nonetheless, on appeal, NextEra advanced the failed and baseless arguments it made before the Maine PUC.  In particular, NextEra argued that Maine law required CMP to undertake an independent third-party analysis to determine if there could be lower-cost non-transmission alternatives.[51]  But NECEC is being constructed at "*no* cost" to Maine ratepayers,[52] and proposing a non-transmission alternative to what had always been a transmission project is facially illogical.

---

[51] *NextEra Energy Res., LLC*, 227 A.3d at 1122.

[52] *Id.* at 1123.

182.    Unsurprisingly, on March 17, 2020, the Maine Supreme Judicial Court rejected each of NextEra's arguments and affirmed the Maine PUC's decision.

183.    In doing so, the Maine Supreme Judicial Court found, among other things, that NextEra's arguments were not simply incorrect, but stated that NextEra was advocating an analysis for which there was "no logical reason" to undertake because NECEC "will be constructed at *no* cost to Maine ratepayers," and that NextEra's statutory argument "to require the undertaking and consideration of a futile investigation into lower-cost NTAs would lead to an absurd and illogical result."[53]

184.    NextEra, itself a participant in the Massachusetts RFP with a project on a transmission line overlapping with NECEC, maintained positions that a company in NextEra's position knew or would have known were baseless and would not succeed.

### 3.    NextEra Loses Its Baseless Challenge to NECEC's Massachusetts Department of Public Utilities ("Massachusetts DPU") Approval

185.    NextEra also filed a petition to intervene in the Massachusetts Department of Public Utilities proceeding.   By intervening in the Massachusetts proceeding, even with meritless arguments, NextEra had the intent and the ability not only to delay losing profits—as a result of NECEC's impact of lowering wholesale electricity prices in New England—but also to dictate the terms of Massachusetts's clean energy transition so that it favors NextEra.

186.    NextEra was a direct participant in various administrative proceedings in Maine and had knowledge of NECEC's progress towards obtaining various approvals.   Despite this knowledge, NextEra made the unsupportable argument that the record was "devoid" of evidence that NECEC would be constructed in a commercially reasonable timeframe.

187.    Furthermore, NextEra challenged the Larrabee Road Substation as an appropriate

---

[53] *NextEra Energy Res., LLC*, 227 A.3d at 1123.

delivery point for NECEC.  But NextEra knew that Larrabee Road was an appropriate delivery point because NextEra's *own joint bid* in the Massachusetts RFP proposed Larrabee Road as the delivery point for a significant quantity of energy.

188.    NextEra also raised hypothetical concerns that lacked factual bases—including that Hydro-Québec's U.S. affiliate could ignore its contractual obligations and interrupt winter delivery without regard to its relationship with customers and its reputation.[54]  NextEra offered no modeling or analysis to support these assertions and admitted it had no such modeling.  NextEra also fabricated a concern about further transmission upgrades it claimed NECEC required, despite a dearth of evidence that such upgrades would be needed.

189.    In February 2019, the Massachusetts DPU held joint evidentiary hearings to assess the Massachusetts Electric Distribution Companies' petitions for approval of their Power Purchase Agreements.[55]  The record for each EDC included hundreds of exhibits, including responses to hundreds of information requests.[56]

190.    On June 25, 2019, the Massachusetts DPU approved the power purchase agreements for NECEC in a 153-page order.[57]  On the same day that the Massachusetts DPU issued an order rejecting each of NextEra's arguments concerning the Massachusetts EDCs' petitions, the Massachusetts DPU also denied NextEra's requests for extensive discovery from CMP and H.Q. Energy Services (US) Inc., finding NextEra's requests "unreasonable."[58]

---

[54] Order Approving Power Purchase Agreements, *NSTAR Elec. Co.*, D.P.U. 18-64, at 82 (Mass. D.P.U. June 25, 2019).

[55] *Id.* at 3.

[56] *Id.* at 4.

[57] *Id.* at 151-52.

[58] Interlocutory Order on NextEra Energy Resources, LLC's Mot. to Compel Disc. and a Dep., or, in the Alternative, Written Disc., and Req. to Issue a Subpoena, *NSTAR Elec. Co.*, D.P.U. 18-64, at 21 (Mass. D.P.U. June 25, 2019).

191.    In approving the PPAs for NECEC, the Massachusetts DPU rejected each of NextEra's arguments.  For instance, the Massachusetts DPU stated that there "was no evidence" to support NextEra's claims that NECEC would require significant transmission upgrades elsewhere on the New England system.[59]  In other words, NextEra's claims were baseless.

192.    NextEra, itself a participant in the Massachusetts RFP with a project on a transmission line overlapping with NECEC, maintained positions that a company in NextEra's position knew or would have known were baseless and would not succeed.

### 4.      NextEra Loses Its Baseless Appeal of the Massachusetts DPU Approval, and the Massachusetts Supreme Judicial Court Labels NextEra's Arguments "Otherworldly," "Absurd," and "Unrealistic"

193.    On July 12, 2019, NextEra appealed the Massachusetts DPU's decision to the Supreme Judicial Court of Massachusetts—despite the Massachusetts DPU's sound rejection of NextEra's arguments and without expectation of success.  NextEra appealed without regard for the merits of its positions and with intent to delay NECEC to protect its own future energy projects and profits.  The Supreme Judicial Court of Massachusetts's findings make clear that NextEra, as a sophisticated industry participant and a participant in the Massachusetts RFP with a project on a transmission line overlapping with NECEC, knew its arguments were objectively false.

194.    For instance, NextEra argued that NECEC should use a certain tracking system that "flies in the face of industry practice," was "impractical and incompatible with the Commonwealth's goals to advance renewable energy,"[60] and was "at worst an exercise in futility and at best unnecessary and cost-ineffective."[61]    Unsurprisingly, the Court affirmed the

---

[59] Order Approving Power Purchase Agreements, *NSTAR Elec. Co.*, D.P.U. 18-64, at 95 (Mass. D.P.U. June 25, 2019).

[60] *NextEra Energy Res., LLC v. Dep't of Pub. Utils.*, 152 N.E.3d 48, 64-65 (Mass. 2020).

[61] *Id.* at 65 n.22.

Massachusetts DPU's decision, describing NextEra's arguments as "unrealistic," "absurd," and "otherworldly."[62]

195.    NextEra argued that the DPU order was deficient for failing to apply NextEra's (erroneous) interpretations of Massachusetts Section 83D.[63]   The Court disagreed, finding that NextEra's reading of the statute would impose "additional cost and environmental harm" and that NextEra argued for a requirement that was "absent" from the statute.[64]   In short, NextEra's position would have been counterproductive for achieving the goals of Massachusetts's clean energy transition.

196.    NextEra's arguments show both that NextEra's position objectively lacked merit and that NextEra's purpose in bringing the appeal was to delay, not argue issues meritorious under Massachusetts law.

### 5.    NextEra Loses Its Baseless Challenge to NECEC's Maine Department of Environmental Protection's ("Maine DEP") Permits

197.    NextEra continued its scheme to prevent the timely connection of NECEC through its intervention in the Maine Department of Environmental Protection proceeding for land-use permits.   NextEra, itself a participant in the Massachusetts RFP with a project on a transmission line overlapping with NECEC, maintained positions that a company in NextEra's position knew or would have known were baseless and would not succeed.

198.    The Maine DEP spent over two years reviewing CMP's NECEC application, including six days of evidentiary hearings and two nights of public testimony.   Dozens of witnesses testified and were cross-examined, and many parties submitted argument on the application.[65]

---

[62] *Id.* at 57, 65.

[63] *Id.* at 62.

[64] *Id.*

[65] Findings of Fact and Order, *In re Cent. Me. Power Co.*, L-27625-26-A-N, at 1 (Me. D.E.P. May 11, 2020).

199.     NextEra made baseless arguments before the Maine DEP to attempt to delay the decision on land-use permits, and thereby delay NECEC.  NextEra argued that CMP's application was insufficient because it did not consider building portions of NECEC's transmission lines underground.  But the objective baselessness of this position, and NextEra's actual beliefs and true motivation were facially obvious because *NextEra itself had proposed to Massachusetts an above-ground transmission line on the exact same corridor* for its MCPC proposal with CMP.  Furthermore, NextEra's position was unsupportable because its expert witness supporting this "alternative" option provided no details about how undergrounding would work in the context of NECEC, while also admitting that the feasibility of burial is unique to the geography at issue.

200.     The Maine DEP unambiguously rejected NextEra's baseless position, finding both that "undergrounding . . . may be so technically challenging as to be impracticable," and that "the trenching that undergrounding entails would result in *greater impacts to natural resources . . . .*"[66] In other words, under the guise of raising environmental concerns, NextEra argued for "alternatives" that actually would have greater negative impacts on the environment.

201.     NextEra's disparagement of NECEC was particularly egregious considering that NextEra's own bids in response to the Massachusetts RFP had included transmission via the Maine Clean Power Connection Project to be built by CMP and consisting of approximately 192.1 miles of overhead transmission line along the *same* corridor that NECEC used.  NextEra only opposed aboveground transmission lines when it had lost the RFP and was trying to shield its profits from competition from NECEC.  NextEra's flip-flop when it presented the issue to the Maine DEP made clear that it was not interested in protecting Maine's natural resources, but was interested only in delaying NECEC for its own benefit.

---

[66] *Id.* at 2 (emphasis added).

202.     Rejecting NextEra's arguments, the Maine DEP granted CMP's petition to approve NECEC on May 11, 2020.[67]

### 6.     NextEra Loses Its Baseless Appeal of the Maine DEP Permits, Further Advocating for Its Harmful and Disingenuous Undergrounding Proposal

203.     Unfazed by the Maine DEP's decision that NextEra's "alternative proposal" would have *worse* impacts on the Maine environment than NECEC, NextEra appealed the DEP's decision to the Maine Board of Environmental Protection ("Maine BEP").[68]   NextEra appealed without regard for the merits of its positions and with intent to delay NECEC to protect its own future energy projects and profits.

204.     On appeal, NextEra repeated its baseless arguments, including pursuing its hypothetical and environmentally harmful insistence that NECEC should bury the transmission lines.[69]   NextEra's litigating position did not match its bidding position.   NextEra also made arguments that were futile because those arguments were raised for the first time on appeal.[70]

205.     The Maine BEP rejected each of NextEra's arguments on July 21, 2022.[71]   In doing so, the Maine BEP addressed the extensive evidence provided to the Maine DEP on the negative environmental impacts of NextEra's proposed approach of undergrounding the transmission line.

206.     In regard to NextEra's argument that North American Electric Reliability Corporation vegetation management standards should apply to NECEC, the Maine BEP wrote that "NextEra points to no law or regulation that preempts the [Maine DEP]'s environmental permitting

---

[67] *Id.* at 109.

[68] *Id.* at 3.

[69] *Id.* at 37, 59.

[70] *Id.* at 37.

[71] *Id.* at 73-75.

authority over the NECEC project, nor is the [Maine BEP] aware of any such provision."[72]   The

Maine BEP also addressed the futility of this argument because NextEra did not raise this issue

before the Maine DEP:  "Had NextEra wished to present evidence that tapering or the maintenance

of taller vegetation within the corridor would not be possible, it had ample opportunity to do so

during the public hearing process."[73]

207.    In August 2022, NextEra, along with its ally the Natural Resources Council of

Maine ("NRCM"), appealed the Maine BEP's final decision to the Kennebec County Superior

Court.  But in June 2023, tellingly, NextEra abandoned its appeal after the second referendum

failed for good (discussed below).[74]   NextEra continued to rely on its bottleneck monopoly to

foreclose NECEC.

> **7.    NextEra and Others Fund the Failed, Unconstitutional 2020 Maine Referendum ("Referendum 1") with the Sole Purpose of Delaying NECEC for NextEra's Anticompetitive Advantage**

208.    NextEra did not limit its attacks on NECEC to the project's permits and approvals.

NextEra also resorted to exploiting and distorting the political process to achieve its

anticompetitive objective:  NextEra, while hiding its identity through a web of dark-money

organizations and funneling monies to shell organizations in violation of Maine campaign finance

laws, sought an objectively baseless ballot referendum to legislatively condemn NECEC

("Referendum 1").

209.    Referendum 1 was a baseless sham designed to delay NECEC because it expressly

proposed "legislation" to direct the Maine Public Utilities Commission—which performs an

---

[72] *Id.* at 58.

[73] *Id.* at 59.

[74] NextEra Notice of Dismissal, *NextEra Energy Res., LLC v. Me. Bd. of Env't Prot.*, No. AP-22-28 (Me. Super Ct. June 15, 2023).

executive branch function and an adjudicatory function—to take a specific action and rescind NECEC's approval, a flagrant breach of the separation of powers in Maine's Constitution.

210.    NextEra and others funded and orchestrated Referendum 1 (formally titled "2020 Maine NECEC Transmission Project Certificate Initiative").  Publicly, four groups—"Stop the Corridor," "No CMP Corridor," "Say No to NECEC," and "Mainers for Local Power—initiated and drafted, collected signatures for, advertised for, and generally ran Referendum 1.  But all four groups were working in concert with and were financially supported by NextEra, including in conjunction with co-conspirators.

211.    ***Stop the Corridor (NextEra's dark-money NECEC opposition vehicle).***  In 2018, NextEra secretly established and funded "Clean Energy for ME, LLC," which did business under the name "Stop the Corridor."[75]  The LLC was not a registered PAC or ballot question committee ("BQC"),[76] allowing it to hide its funding sources from the public.  Lance Dutson, a political operative based in Maine, served as Stop the Corridor's principal officer.[77]  Dutson is the proprietor of Red Hill Strategies and has held high-ranking positions on a number of political campaigns in Maine.

212.    On November 29, 2023, the Maine Commission on Governmental Ethics and Election Practices ("Ethics Commission") released the Consent Agreement with Stop the Corridor. The Consent Agreement revealed the Ethics Commission's finding that NextEra's Stop the Corridor violated Maine campaign finance law by failing to register as a BQC—an organization that receives or spends more than $5,000 to initiate or influence the outcome of a statewide ballot

---

[75] Consent Agreement at 1, *In re Clean Energy for ME, LLC d/b/a Stop the Corridor* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023), https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Stop%20the%20Corridor%20Consent%20Agreement_0.pdf.

[76] *Id.*

[77] *Id.* Ex. A.

question—with respect to Referendum 1.  In the Consent Agreement, Stop the Corridor agreed with the Maine Ethics Commission that "it should have registered as a ballot question committee" and "filed its own Maine campaign finance reports from October 2019 through April 2020."[78]  As a result, the Ethics Commission fined Stop the Corridor $50,000 in civil penalties.[79]

213.    Despite NextEra's relentless efforts to keep its identity and influence over Referendum 1 a secret, the Ethics Commission investigation resulted in a public finding that NextEra's sham LLC was an illegal dark-money mechanism set up for NextEra to covertly drum up support for its anti-NECEC movement.

214.    Stop the Corridor was bankrolled by NextEra, and NextEra employees were directly involved in coordinating and orchestrating the signature gathering efforts of Stop the Corridor and the groups it was assisting.[80]  In email sent on February 10, 2022—and only released to the public pursuant to Maine's Freedom of Access Act on October 4, 2024—Jonathan Wayne, Executive Director of the Maine Ethics Commission, stated that the documents the Ethics Commission received "indicate[d] that both Hawthorn Group and NextEra Energy Resources knew that a portion of the funding provided by NextEra would specifically be used to promote the 2020 citizen initiative (for example, the petitioning activities conducted by Lance Dutson and his associates)."

215.    As made public by the Maine Ethics Commission in November 2024, NextEra knew that the Stop the Corridor funding it provided would "specifically be used to promote the 2020 citizen initiative, for example, the petitioning activities conducted by Lance Dutson and his associates."

---

[78] *Id.* at 1.

[79] *Id.* ¶ 26.

[80] *Id.* ¶ 5; *id.* Ex. B (showing NextEra as "[t]he Client" that provided Stop the Corridor with 100% of its funding).

216.     Stop the Corridor was a conduit for NextEra to fuel Referendum 1 directly, as well as by funding other groups furthering Referendum 1.  At the same time, Stop the Corridor concealed NextEra's involvement, intentionally misleading Maine voters into believing that Stop the Corridor was a genuine grassroots effort.  According to the 2023 consent agreement between Stop the Corridor and the Maine Ethics Commission, NextEra's consultants—Bernstein Shur and The Hawthorn Group, L.C. ("Hawthorn")—followed the directive that NextEra's name should never be divulged as the source of Stop the Corridor's funding.[81]

217.     ***NextEra funds No CMP Corridor and Say No To NECEC.***  On information and belief, Sandra Howard founded the non-PAC group "Say No to NECEC," along with Thomas Saviello.  "Say No to NECEC" formed "No CMP Corridor," a PAC registered on September 17, 2019.  "Stop the Corridor," using NextEra's money, funded "No CMP Corridor."  By January 2020, "No CMP Corridor" had accepted almost $80,000 in contributions, over half of which included contributions from NextEra through NextEra's sham LLC, "Stop the Corridor."  "No CMP Corridor" reported collecting more than 25,000 signatures in support of Referendum 1 after mobilizing campaign volunteers to polling places on November 5, 2019, the date of that year's election.

218.     ***NextEra funds Mainers for Local Power.***  Upon information and belief, and while NextEra was covertly funding the other anti-NECEC groups, NextEra was working with another PAC—Mainers for Local Power—to further conceal NextEra's participation in the political process.  Upon information and belief, NextEra was involved with Mainer for Local Power throughout Referendum 1.  For example, Mainers for Local Power's lobbying firm Pineau Policy Associates listed Florida Power & Light ("FPL")—NextEra's largest subsidiary, and a regulated

---

[81] *See id.* ¶ 6.

utility in Florida that does not operate in Maine or anywhere in New England—as a client on its website but did not list either of the energy companies who registered Mainers for Local Power. Mainers for Local Power took responsibility, along with others, for submitting the signatures required for pursuing Referendum 1 to the Maine Secretary of State.

219.   ***NextEra funnels cash through Alpine Initiatives to oppose NECEC.***   In addition to the groups listed above, NextEra further deceived Maine voters by creating a shell pass-through organization, Alpine Initiatives, as another vehicle for secretly funneling money to support its baseless initiatives against Avangrid.  NextEra used Alpine Initiatives to secretly make a $150,000 contribution to the Maine Democratic Party on October 30, 2018.[82]  NextEra's consultants, Bernstein Shur and Hawthorn, followed the directive that NextEra's name should never be divulged as the source of the contribution.[83]

220.   NextEra targeted the Maine Democratic Party because NextEra's consultants "viewed Democratic officials as generally more likely to oppose the NECEC project," and therefore, "believed the contribution would help their relationships with Democratic officials" as they began their campaign to target NECEC through the sham referenda.[84]  Alpine Initiatives existed solely to make this $150,000 contribution and was dissolved after 14 months.[85]  Alpine Initiatives never registered as a PAC.[86]

---

[82] Consent Agreement ¶ 32, *In re Alpine Initiatives, LLC* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023), https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Stop%20the%20Corridor%20Consent%20Agreement_0 .pdf.

[83] *See* Consent Agreement ¶ 6, *In re Clean Energy for ME, LLC d/b/a Stop the Corridor* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023), https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/ Stop%20the%20Corridor%20Consent%20Agreement_0.pdf.

[84] Consent Agreement ¶ 9, *In re Alpine Initiatives, LLC* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023), https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Stop%20the%20Corridor%20Consent%20Agreement_0 .pdf.

[85] *Id.* ¶ 18.

[86] *Id.* ¶ 17.

221.    As it found with NextEra's sham LLC, the Maine Ethics Commission also found that NextEra's sham pass-through organization, Alpine Initiatives, violated Maine campaign finance law—this time, for failing to register as a PAC.[87]   As a result, Alpine Initiatives paid a penalty of $160,000 and entered into the 2023 Consent Agreement where it admitted "that it should have registered as a [PAC] and, as a result, filed a Maine campaign finance report."[88]

222.    Through and with all of these groups, and others likely to be revealed in discovery, NextEra supported its baseless Referendum 1 operation with a campaign of intentionally deceptive communications to spread misinformation about NECEC.   This part of NextEra's scheme is discussed further below in Section VI.B.

223.    Eventually, on February 3, 2020, the Referendum 1 campaign submitted the required signatures to qualify the ballot initiative with the office of then-Maine Secretary of State Matthew Dunlap.

224.    On May 12, 2020, Avangrid filed suit against Secretary of State Dunlap, arguing that the NextEra-backed ballot initiative was not a proper exercise of legislative power and violated the separation-of-powers clause in Article III, Section 2 of the Maine Constitution by usurping judicial and executive authority.

225.    On August 13, 2020, the Maine Supreme Judicial Court agreed, holding that Referendum 1 violated Maine's separation of powers, and accordingly, Referendum 1 was not placed on the ballot.[89]

226.    NextEra's conduct with respect to pushing Referendum 1 was anticompetitive by delaying NECEC and driving up NECEC's costs, as well as deceptive and unfair.

---

[87] *Id.* at 5.

[88] *Id.* at 1.

[89] *Avangrid Networks, Inc. v. Sec'y of State*, 237 A.3d 882, 884 (Me. 2020).

227.     The referendum itself was a sham.  NextEra filed it only to further delay NECEC and obtain ongoing inflated profits from its existing power generation facilities.

228.     As with each of NextEra's permitting interventions, Referendum 1 was objectively baseless.  The referendum proposed "legislation" to direct the Maine PUC—which functions as part of the executive branch—to rescind its own specific adjudicated decision.   In essence, Referendum 1 sought to overturn the adjudicatory decisions of the Maine PUC.  It also sought to overturn the Maine Supreme Judicial Court's decision upholding the Maine PUC's decision (discussed in Sections VI.A.1 and 2, above).

229.     Specifically, Referendum 1 proposed that "the Public Utilities Commission shall amend 'Order Granting Certificate of Public Convenience and Necessity and Approving Stipulation' . . . [and] [t]he amended order must deny the request for a certificate of public convenience and necessity for the NECEC transmission project."   By its very terms, the referendum initiative was a citizens' legislative effort to direct the Maine PUC to overturn its prior order, thereby rescinding NECEC's approval.

230.     Referendum 1 was a sham because the initiative plainly violated the Constitution of Maine.  As the Maine Chamber of Commerce explained in its motion to intervene in Avangrid's challenge to Referendum 1, "any number of permits for any number of activities by any number of Maine businesses are also at least indirectly under attack by this Initiative which seeks not to make any new law or, generally or prospectively, to affect any industry or group of businesses but is singly targeted to reverse a single PUC decision . . . ."[90]

231.     In its memorandum in support of a preliminary injunction, the Maine Chamber of Commerce further pointed out the absurdity of the supposed basis for this Referendum, comparing

---

[90] Unopposed Mot. to Intervene of Me. Chamber of Com. at 2, *Avangrid Networks, Inc. v. Sec'y of State*, Docket No. CV-2020-206 (Me. Super. Ct. May 14, 2020).

it to past Maine referenda.  It explained that "the Chamber invites the Court to review any random number of resolves to observe that this Initiative is the one that does not belong . . . [O]ne would struggle to find in the records of Maine Legislature a single resolve that overrules the Law Court, either with or without enacting or repealing any rule of law. . . .   Legislatures do not issue injunctions.  Functionally, that is all this Initiative is."[91]

232.    Similarly, the Industrial Energy Consumer Group—whose members "typically are on opposite sides of electricity transactions" from Avangrid—recognized that NextEra's initiative was a sham.[92]  The Industrial Energy Consumer Group explained that Referendum 1 threatened "the integrity of Maine administrative and judicial processes for permitting energy infrastructure projects . . . ."[93]  Indeed, as the Industrial Energy Consumer Group put it, the referendum would "cause regulatory chaos" not only for NECEC, but for "future essential projects by allowing any opponent of an infrastructure project with the wherewithal to finance a signature-gathering operation to delay and require a vote on any approved project in Maine . . . ."[94]

233.    A group of former Commissioners of the Maine Public Utilities Commission also saw the plain invalidity of NextEra's Referendum 1, explaining in an amicus brief that "[the Referendum's] mandate puts the [Maine Public Utilities] Commission and the current Commissioners in an absurd and self-contradictory position," because "having concluded that 2+2=4, they would now be ordered to conclude, despite facts to the contrary and their own judgment, that 2+2=9 (or some other equally incorrect and unsupported number)."[95]

---

[91] Mem. of Pl.-Intervenor Me. State Chamber of Com. at 5-6, *Avangrid Networks, Inc. v. Sec'y of State*, Docket No. CV-2020-206 (Me. Super. Ct. May 28, 2020).

[92] Indus. Energy Consumer Grp. Mot. to Intervene at 1, *Avangrid Networks, Inc. v. Sec'y of State*, Docket No. CV-2020-206 (Me. Super. Ct. May 14, 2020).

[93] *Id.* at 2.

[94] *Id*.

[95] Br. of Former Comm'rs of the Me. Pub. Utils. Comm'n as *Amici Curiae* at 18-19, *Avangrid Networks, Inc. v. Sec'y of State*, Docket No. Cum-20-181 (Me. July 13, 2020).

234.    Even the then-Maine Secretary of State Matthew Dunlap—the *defendant* in Avangrid's lawsuit to stop NextEra's baseless referendum—agreed with Avangrid on the merits of Avangrid's challenge and opposed NextEra, stating, "The Secretary agrees that Avangrid has presented a persuasive argument that the Initiative, as written, is not legislative in nature and is therefore beyond the power of the citizens to enact."[96]

235.    ***The Maine Supreme Judicial Court rules Referendum 1 is beyond the constitutional power of citizens to legislate.***   On August 13, 2020, the Maine Supreme Judicial Court, based on its prior precedents and other well-established authorities, held that the Referendum 1 initiative exceeded the constitutional power of citizens to legislate because it "directs the Commission, in exercising its executive adjudicatory powers, to reverse its findings and reach a different outcome in an already-adjudicated matter in violation of the [separation of powers] constraints of article IV, part 3, section 18 of the Maine Constitution."[97]   The Court cited to two earlier Maine Supreme Judicial Court decisions, *Grubb v. S.D. Warren Co.* and *Friends of Congress Square Park v. City of Portland*.[98]

236.    The Maine Supreme Judicial Court held that "the initiative fails to meet the constitutional requirements for inclusion on the ballot because it exceeds the scope of the people's legislative powers conferred by article IV, part 3, section 18 of the Maine Constitution."[99]

237.    The Maine Supreme Judicial Court also held:

> [T]he Commission functions in an executive capacity as an administrative agency, including by holding a public hearing—sometimes, as in the proceeding at issue here, a hearing substantial both in duration and in the volume of information submitted to and considered by the Commission—and rendering a decision in a

---

[96] Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. and J. at 2, *Avangrid Networks, Inc. v. Sec'y of State*, Docket No. CV-2020-206 (Me. Super. Ct. June 15, 2020).

[97] *Avangrid Networks, Inc.*, 237 A.3d at 895.

[98] *See id.*; *see also Friends of Cong. Square Park v. City of Portland*, 91 A.3d 601 (Me. 2014); *Grubb v. S.D. Warren Co.*, 837 A.2d 117 (Me. 2003).

[99] *Avangrid Networks, Inc.*, 237 A.3d at 896.

particular case when a utility has applied for a certificate of public convenience and necessity.[100]

238.    The Court ruled that Maine PUC adjudicatory decisions are "subject to judicial—not legislative—review."[101]

239.    Thus, the Court found that "[t]he initiative at issue here is not legislative in nature because its purpose and effect is to dictate the Commission's exercise of its quasi-judicial executive-agency function in a particular proceeding.  The resolve [Referendum 1] would interfere with and vitiate the Commission's fact-finding and adjudicatory function—an executive power . . . ."[102]

240.    In short, by its terms, NextEra's Referendum 1 was objectively baseless because it was a facial violation of the Maine Constitution.  As the Court held, "[d]irecting an agency to reach findings diametrically opposite to those it reached based on extensive adjudicatory hearings and a voluminous evidentiary record, affirmed on appeal, is not 'mak[ing] and establish[ing]' a law."[103] The Court continued:  "the initiative is unconstitutional and cannot be submitted to the electors for popular vote—which is precisely our clear holding today . . . ."[104]

241.    Despite that NextEra had full knowledge or should have known that the referendum would ultimately fail or be struck down by Maine courts, NextEra pursued it for the purpose of delaying NECEC (thereby increasing NextEra's profits) and causing damage to Avangrid.

---

[100] *Id.* at 894.

[101] *Id.*

[102] *Id.*

[103] *Id.* at 895 (quoting Me. Const. art. IV, pt. 3, § 1).

[104] *Id.* at 896.

**8.    NextEra and Others Fund a Second Failed Referendum Based on the First ("Referendum 2") That Had the Sole Purpose of Delaying NECEC for NextEra's Anticompetitive Advantage**

242.    ***NextEra launches Referendum 2.***  Stymied by its loss in the August 2020 ruling of the Maine Supreme Judicial Court (NextEra's second such loss on its crusade against NECEC in that court), NextEra contrived a new stratagem to delay NECEC.  On or about September 16, 2020, through Mainers for Local Power, along with the PAC No CMP Corridor, NextEra continued its efforts to delay NECEC with a second ballot initiative ("Referendum 2").  After challenging the administrative approvals that NECEC had won through Referendum 1, NextEra helped set into motion a second referendum that was a cosmetic repackaging of Referendum 1, yet sought to achieve the same unconstitutional goals as Referendum 1.

243.    The application for the second ballot initiative (Referendum 2) was filed by Thomas Saviello, the head of the NextEra-backed NECEC opposition group, No CMP Corridor.  No CMP Corridor also organized the effort to collect the signatures needed for the ballot initiative to be certified by the Secretary of State.  Upon information and belief, NextEra and its PAC, Mainers for Local Power, worked with and/or funded Thomas Saviello in this effort.

244.    Stop the Corridor and its dark-money donors were subjects of an ongoing ethics investigation by the Maine Ethics Commission for their conduct during Referendum 1.  With this scrutiny ongoing, NextEra concluded that it could no longer use Stop the Corridor as a method to secretly funnel money to anti-NECEC organizations and efforts.  NextEra had previously not appeared on public records as supporting official anti-NECEC PACs.  After the failure of Referendum 1, and with the pending ethics investigation, NextEra changed tactics and quickly shifted its financial support to PACs that disclosed their donors.  In October 2020, after the Ethics Commission had subpoenaed Stop the Corridor, NextEra publicly provided $1,475,000 in cash

contributions to Mainers for Local Power for the first time.  NextEra also provided in-kind contributions in the form of legal services between August and September 2020.

245.    Over the next year, NextEra became the largest-ever donor to Mainers for Local Power, providing close to $20 million in cash contributions.

246.    In an effort to conceal the constitutional violation that plagued Referendum 1 but achieve the same outcome of delaying NECEC's entry into the market, Referendum 2 sought to revoke NECEC's certification by *retroactively* changing Maine law to prevent construction of NECEC.  Specifically, NextEra's Referendum 2 asked voters to vote in favor of:  (1) prohibiting construction of high-impact electric transmission lines, such as NECEC, in the Upper Kennebec Region; and (2) requiring that high-impact electric transmission line projects such as NECEC that go through public lands, obtain approval through a two-thirds vote in each state legislative chamber.

247.    Although the referendum did not mention NECEC by name, the *only* proposed transmission project the referendum would retroactively impact was NECEC.[105]  The initiative was placed on the November 2021 ballot and passed on November 2, 2021.

248.    ***The Maine Business and Consumer Court.***   On November 3, 2021, Avangrid sought a preliminary injunction against the referendum in an action brought in the Maine Business and Consumer Court.  In response to Avangrid's challenge to Referendum 2, NextEra worked with the NRCM and six individual petitioners, including Thomas Saviello, who each intervened before the Maine Business and Consumer Court.  Upon information and belief, NextEra coordinated with the other intervenors in their litigation efforts, while also providing financial support to these parties.

---

[105] *Black v. Bureau of Parks & Lands*, 288 A.3d 346, 364 n.13 (Me. 2022).  The Court noted that opponents to NECEC had merely "swapped a targeted directive in the first initiative for a nominally nontargeted retroactive mandate."

249.   For instance, during the Referendum 2 trial, the NRCM and the individual intervenors were represented by James Kilbreth and others from his law firm Drummond Woodsum, who also represented NextEra in anti-NECEC challenges, including before the Maine PUC and Maine DEP.  Documents newly released in fall 2024 through a Maine Freedom of Access Act ("FOAA") request reveal that members of Drummond Woodsum's government relations and campaign practice (e.g., Mark Gallagher, Adam Cote) had worked extensively on Referendum 1 with Lance Dutson (of Stop the Corridor) and with Tom Saviello (of No CMP Corridor) as part of NextEra's effort to delay NECEC.

250.   Drummond Woodsum publicly advertises that it represents NextEra and that its attorneys "have represented a broad coalition of generators, state legislators, landowners, and environmentalists opposed to [NECEC] in ongoing litigation and matters before state regulators and the Maine Legislature."[106]  Specifically, Drummond Woodsum represented NextEra in its efforts to delay NECEC before Maine's Land Use Planning Commission, the Maine Department of Environmental Protection, the Maine Public Utilities Commission, the Maine Board of Environmental Protection, and the Maine Supreme Court.  Drummond Woodsum also represented the plaintiffs in *Black v. Cutko*, yet another failed attack on NECEC over NECEC's lease of 0.9 miles of land in Maine required to complete NECEC.  Although NextEra was not a named plaintiff in the *Black* litigation, upon information and belief, NextEra funded the litigation and was heavily involved in the strategy underlying the lawsuit.

251.   And in addition to providing millions of dollars in funding, NextEra provided in-kind contributions of legal and consulting services to the PAC MLP, according to campaign finance reports filed with the Maine Commission on Governmental Ethics and Election Practices.

---

[106] Drummond Woodsum, *Energy & Public Utility Law – Practice Overview*, https://dwmlaw.com/practice-areas/energy-public-utility-law/.

252.    On December 16, 2021, the Maine Business and Consumer Court denied Avangrid's Motion for Preliminary Injunction seeking to stay the applicability of Referendum 2 to NECEC.[107]  The court's decision was not an approval of Referendum 2—the court was aware of the implications of its decision and wanted to ensure the Maine Supreme Judicial Court was able to weigh in appropriately.[108]  The court thus granted Avangrid's subsequent motion to have the injunction ruling appealed to the Maine Supreme Judicial Court.[109]

253.    On November 23, 2021, the Maine DEP ordered that Avangrid suspend all construction of NECEC as a direct result of NextEra's Referendum 2.[110]  The Maine DEP order by its terms was to remain in effect until final resolution of Avangrid's legal challenge to Referendum 2.[111]

254.    ***The Maine Supreme Judicial Court holds in August 2022 that NextEra's Referendum 2 violated Avangrid's due-process rights under the Maine Constitution if NECEC had started activity (vested rights).***   After expedited briefing and argument, the Maine Supreme Judicial Court issued an order on August 30, 2022 in *NECEC Transmission LLC v. Bureau of Parks and Lands*, affirming the validity of "Maine's vested rights doctrine [as] a constitutional limitation on legislative authority."[112]

---

[107] Order Denying Plaintiff's Motion for Preliminary Injunction, *NECEC Transmission LLC v. Bureau of Parks and Lands*, BCD-CIV-2020-58 (Me. Super. Ct. Dec. 16, 2021).

[108] *Id*. at 3 ("Of course, the Court's decision on Plaintiffs' Motion is by no means the last word.  Plaintiffs and supporting Intervenors can file an interlocutory appeal or move to have the questions of law reported to the Law Court pursuant to M.R. App. P. 24(c).  If the latter, this Court will expeditiously grant the motion to report.").

[109] Order Granting Avangrid's Motion to Report Interlocutory Ruling, *NECEC Transmission LLC v. Bureau of Parks and Lands*, BCD-CIV-2020-58 (Me. Super. Ct. Dec. 28, 2021).

[110] License Suspension Proceeding Decision and Order, *Cent. Me. Power Co. New England Clean Energy Connect*, L-27625-26-A-N (Me. D.E.P. Nov. 23, 2021).

[111] *Id*.

[112] *NECEC Transmission LLC v. Bureau of Parks & Lands*, 281 A.3d 618, 630 (Me. 2022).

255.    With respect to NECEC, the Maine Supreme Judicial Court explained that the applicability of the vested rights doctrine to this case turned on a factual question:  whether NECEC had undertaken substantial good-faith expenditures or activity (1) in reliance on the Certificate of Public Convenience and Necessity, (2) before the law changed as a result of the referendum, and (3) according to a schedule that was not created or expedited for the purpose of creating a vested rights claim.[113]   Based on this inquiry, the Court held that if the plaintiffs had acquired vested rights, the retroactive application of the Initiative "would infringe on NECEC's constitutionally-protected vested rights."[114]   Accordingly, the case was remanded to the lower court for further proceedings.

256.    ***The Maine Supreme Judicial Court held in November 2022 that Referendum 2 would violate the Contract Clause of the United States Constitution with respect to NECEC's Maine lease.***  Separately, on November 29, 2022, the Maine Supreme Judicial Court in *Black v. Bureau of Parks and Lands* found that Referendum 2 was unconstitutional as applied to NECEC's Maine lease.  The Maine Supreme Judicial Court held that—like Referendum 1—Referendum 2 unlawfully targeted NECEC.   The Maine Supreme Judicial Court held that Referendum 2 "substantially impair[ed] the lease between the Bureau [of Parks and Land] and CMP" and "that the Contract Clause does not permit the impairment caused by section 1 of the Initiative."[115]

257.    The Maine Supreme Judicial Court stated in *Black* that "it would be unreasonable to suggest that it was foreseeable, at the time of the execution of the lease (June 23, 2020), that a

---

[113] *Id.* at 623.

[114] *Id*. at 637.

[115] *Black v. Bureau of Parks & Lands*, 288 A.3d 346, 363, 365 (Me. 2022).

citizens' initiative (approved by voters on November 2, 2021) with a retroactivity provision dating

back seven years would *completely invalidate* the lease."[116]

258.    The Maine Supreme Judicial Court further explained how Referendum 2 was

directly targeted at NECEC: "There clearly was a more moderate course available here that would

have promoted the alleged goals of environmental protection and legislative oversight—to make

the statutory change prospective only and require legislative approval for all future transmission

line leases on public lands.  Of course, if the true purpose of the Initiative was to stop the [NECEC]

Project, that more moderate course would not have been sufficient."[117]

259.    The Maine Supreme Judicial Court recognized in *Black v. BPL* that Referendum 2

was an attempt to circumvent the ruling that Referendum 1 violated the Maine Constitution:

> The stated purpose of the Initiative is not specifically to prevent the Project from
> being built. . . . Project opponents tried that direct approach in a 2020 initiative [i.e.,
> Referendum 1] that impermissibly targeted the PUC's authorization for this Project.
> . . . The State has a long-standing, multifaceted permitting process through which
> several state agencies and impacted local governments authorize electric
> transmission lines.  The 2021 Initiative [Referendum 2] did not purport to reverse
> a particular decision from a state agency or commission, as the first initiative did.
> But the 2021 Initiative's language affected no agency subject to the Designated
> Lands statutes other than the Bureau; affected no activity allowed on designated
> lands other than the construction of transmission lines and other linear projects on
> public reserved lands; and made section 1 retroactive to September 16, 2014—a
> date that appears to have relevance only because it predates the execution of the
> 2014 lease.  ***Opponents have swapped a targeted directive in the first initiative for
> a nominally nontargeted retroactive mandate in the one before us now.***[118]

260.    The Maine Supreme Judicial Court's decision was unambiguous—Referendum 2

was a targeted attack on NECEC just like Referendum 1, which had already failed as

---

[116] *Id.* at 363.

[117] *Id.* at 364.

[118] *Id.* at 364 n.13 (emphasis added).

unconstitutional.   The Court in *Black* remanded on the narrow factual question of whether Avangrid had vested rights that the retroactive Referendum 2 had trampled.[119]

261.   ***In April 2023, Avangrid wins at trial establishing vested rights through its construction of the NECEC Transmission Line, proving Referendum 2 violates Avangrid's due-process rights under the Maine Constitution.***   On October 24, 2022, after remand from the Maine Supreme Judicial Court, the Natural Resources Council of Maine together with the other intervenors (including Thomas Saviello) made a demand for a jury trial for the factual determinations related to NECEC's vested rights.   NextEra remained involved in the litigation and played a substantial role in preparing the case for trial, including filing significant motions and taking part in extensive discovery.

262.   The 2023 jury trial was a continuation of NextEra's objectively baseless assault on NECEC.   On information and belief, NextEra and its allies at all relevant times were carefully monitoring NECEC construction progress:  they were aware that NECEC had begun construction of the NECEC transmission line.   NextEra knew that Referendum 2 caused the DEP to suspend construction and that progress on NECEC construction was halted abruptly.

263.   Nonetheless, Avangrid was put to its proof in a jury trial.  The only remaining issue in the case was establishing whether the plaintiffs had undertaken substantial construction in good faith according to a schedule that was not created or expedited for the purpose of generating a vested-rights claim, and had thereby obtained vested rights to continue the work authorized by the CPCN.   After seven trial days, on April 20, 2023, a nine-person jury unanimously found that Avangrid had undertaken substantial construction on NECEC in good faith, leading to the court's

---

[119] *Id*. at 370-71.

finding that Referendum 2 violated the Maine Constitution.[120]  Specifically, the jury concluded that Avangrid had undertaken substantial construction on NECEC:  (1) in reliance on the Maine Certificate of Public Convenience and Necessity, (2) before the approval of Referendum 2, and (3) according to a schedule that was not created or expedited for the purpose of generating a vested rights claim.

264.    Based on the jury's factual findings, the court's final judgment concluded that Avangrid's rights had indeed vested and it could continue construction on NECEC.  Therefore, the court entered judgment in favor of Avangrid because Referendum 2's retroactive application to NECEC would violate Maine's Constitution.[121]

265.    Tellingly, in another sign of baselessness, neither NextEra nor any other party appealed the court's judgment in favor of Avangrid.

266.    NextEra knew or should have known, as a result of the outcome on Referendum 1, that its second referendum was just as baseless and would violate the Maine Constitution as applied to NECEC.

267.    The purpose and result of NextEra's interventions in the ten serial failed challenges (described in Sections VI.A. and VI.C.2) was to delay the entire permitting and approval process for NECEC.  NextEra's baseless interventions and political machinations achieved their purpose: to sow baseless doubt and cause a downstream delay of legitimate approvals for NECEC. NextEra's litigation record was 0-10.

---

[120] Final Judgment, *NECEC Transmission LLC v. Bureau of Parks and Lands*, BCD-CIV-2020-58, (Me. Super. Ct. April 20, 2023).
[121] *Id.*

**B.    To Further Its Scheme, NextEra Intentionally Uses False and Misleading Statements to Undermine NECEC Support, and Violates Maine Campaign Finance Law to Hide Its Involvement in the Referenda to Deceive Maine Voters**

268.    Not only did NextEra attack NECEC through serial sham petitioning, litigations, and referenda, NextEra used unfair, deceptive, and anticompetitive measures to further that effort. Specifically, NextEra, in violation of Maine's campaign finance laws, purposefully and systematically concealed its funding of the various political organizations that were the public face of the anti-NECEC campaign.  NextEra used those organizations to knowingly spread false and misleading statements about NECEC to undermine NECEC's support and to deceive voters into backing NextEra's sham initiatives, with the purpose of thwarting competition from NECEC.

**1.    NextEra Deceptively Conceals Its Involvement in Referendum 1 Using Dark Money**

269.    As explained above, Referendum 1 was organized and promoted by four groups, which were all funded and guided by NextEra.  As confirmed by recently released FOAA documents, NextEra—through its operatives—established this complex web of groups for the purpose of concealing its involvement.  NextEra aimed to deceive Maine voters into trusting the groups' positions as genuine grassroots efforts organized by concerned citizens, rather than fronts for a large corporation with anticompetitive commercial motives.

270.    ***NextEra Uses Dark Money to Delay Competition from NECEC.***  NextEra's core tool was its sham LLC, Stop the Corridor, which was the operational name of "Clean Energy for ME, LLC," and which it used to funnel money to the PAC "Mainers for Local Power."  NextEra (both through Stop the Corridor and in its own name) funded No CMP Corridor and Say No to NECEC.  Through No CMP Corridor, NextEra paid for the lobbying efforts of MLP.  In addition, Stop the Corridor also donated an undisclosed amount of money to the NRCM (Natural Resources Counsel of Maine).

271.   As revealed over five years later after an extensive Ethics Commission investigation, in late 2017 or early 2018, NextEra began using the public campaign firm The Hawthorn Group, the law firm Bernstein Shur, political operative Lance Dutson, and other consultants to create a coalition to delay NECEC.

272.   According to documents released in October 2024 by the Ethics Commission pursuant to requests under Maine's Freedom of Access Act, NextEra secretly engaged The Hawthorn Group to organize support for Referendum 1.  On February 10, 2022, Jonathan Wayne (Executive Director of the Maine Ethics Committee) wrote to NextEra's lead attorney:  "The documents our office received in the investigation indicate that both Hawthorn Group and NextEra Energy Resources knew that a portion of the funding provided by NextEra would specifically be used to promote the 2020 citizen initiative (for example, the petitioning activities conducted by Lance Dutson and his associates)."

273.   According to FOAA documents, Hawthorn, a Virginia-based public affairs company, worked with attorneys and political consultants employed by NextEra's Maine-based law firm Bernstein Shur to stand up the entity Stop the Corridor.  Stop the Corridor was officially formed in April 2018 with the purpose of furthering NextEra's scheme to delay NECEC.  As the FOAA documents reveal, Dutson, a veteran political operative based in Maine, operated as Stop the Corridor's principal officer and, along with fellow political operative Riley Ploch, coordinated NextEra's support for Referendum 1.

274.   As further shown in the newly released FOAA documents, Dutson and Ploch conspired with, among others, Tom Saviello, Sandra Howard, and employees of the NRCM, to lead the campaign against NECEC in Maine.  NextEra's consultants abided by NextEra's strict

instructions not to use NextEra's name in connection with Stop the Corridor's anti-NECEC activities.[122]

275.    With its pass-through shell organizations and deep wallet, NextEra built an artificial moat between it and the campaign in support of Referendum 1.  But despite NextEra's desire for the appearance of clean hands, the truth about NextEra's dirty politics is only now becoming apparent.  According to the Ethics Commission's November 2023 Consent Agreement and the FOAA documents released in October 2024, at least one NextEra official joined biweekly calls with Hawthorn, Bernstein Shur, Dutson, and Ploch to discuss the referenda.  These regular calls also included discussion of the other various regulatory challenges described above brought by NextEra and its allies, further confirming that NextEra's sham regulatory petitions and political malfeasance were part of a larger scheme with the singular goal of delaying NECEC.

276.    When the Maine Ethics Commission was closing in, NextEra turned to attorneys from long-time NextEra/Seabrook defense firm Pillsbury Winthrop Shaw Pittman to represent The Hawthorn Group before the Ethics Commission.

277.    Over the course of 2018 through 2020, building up to Referendum 1, NextEra's consultants "worked as a team to organize opposition" to NECEC and "influence public opinion against the project," with Stop the Corridor forming in April 2018 as a vehicle for these activities.[123]  While deceptively presenting itself as merely a "coalition of concerned citizens and organizations," Stop the Corridor was engaging in explicitly political activity and operating as

---

[122] *See, e.g.*, Steve Mistler, *Documents Reveal NextEra's Hidden Attempts to Derail CMP's Transmission Line Corridor*, Me. Pub. (Nov. 30, 2023, 4:35 PM), https://www.mainepublic.org/politics/2023-11-30/documents-reveal-nexteras-hidden-attempts-to-derail-cmps-transmission-line-corridor.

[123] Consent Agreement ¶ 5, *In re Clean Energy for ME, LLC d/b/a Stop the Corridor* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023), https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Stop%20the%20Corridor%20Consent%20Agreement_0.pdf.

*NextEra*'s BQC because it received contributions from NextEra that were used to finance activities to qualify Referendum 1 for the ballot.

278.    Using NextEra's money, Stop the Corridor collected signatures for Referendum 1 from October 18, 2019 through February 3, 2020.  NextEra, through Stop the Corridor, provided $85,726 in in-kind contributions to the No CMP Corridor PAC.  These payments financed efforts to support Referendum 1 such as "field workers to train volunteers on the technicalities of collecting signatures on petitions" and "other expenses to help with the coalition's petitioning effort."  No CMP Corridor's reporting "indicated that Stop the Corridor had engaged in paid activities to assist with petitioning, but it did not disclose any information about the sources that paid for Stop the Corridor's assistance."  These "sources," as would become public in 2023 only years after Referendum 1 failed, were NextEra.[124]

279.    Additionally, from 2018 to 2020, "Stop the Corridor worked with a coalition of organizations opposed to NECEC that included, among others, [NRCM], the Sierra Club, and an association of volunteers that has been organized through a Facebook page."[125]  As FOAA documents show, representatives of Stop the Corridor, including Lance Dutson, communicated with the NRCM to discuss NECEC.  NextEra puppeteered opposition to NECEC through "coordinating citizens to oppose NECEC in municipal proceedings, influencing public opinion through advertising, and coordinating with coalition partners on generating comments to state and federal agencies."[126]

280.    Despite engaging in these ballot question activities, Stop the Corridor did not register under Maine campaign finance laws.  As a purportedly private LLC, Stop the Corridor did

---

[124] *Id.* Ex. B.

[125] *Id.* ¶ 8.

[126] *Id.*

not release public financial statements—thereby illegally concealing NextEra's involvement in the campaigns against NECEC and deceiving Maine voters into believing that all groups were truly "grassroots" funded.

281.    The circumstances of Stop the Corridor's funding and participation in political activity were so muddied that the Maine Ethics Commission opened an investigation into Stop the Corridor.

282.    NextEra fought to ensure its identity would not become known through this investigation—including demanding that it not be identified and instead be called "The Client" in the publicly available consent agreements resulting from the investigation.[127]  On June 19, 2020, Stop the Corridor filed an appeal in the Maine Superior Court to severely limit the investigation's scope.   Stop the Corridor also largely refused to cooperate with the Ethics Commission investigation, denying the Commission's requests for documents and information.  Accordingly, on September 18, 2020, the Ethics Commission was forced to resort to issuing a subpoena for records to Stop the Corridor and its primary political consulting firm (which remained unnamed in the Ethics Commission's public documents).[128]   Stop the Corridor's (i.e., NextEra's) stonewalling opposition substantially delayed the Ethics Commission's investigation.[129]

283.    Ultimately, in December 2022, the Maine Superior Court found that the Ethics Commission had proper jurisdiction and the subpoena was proper.

---

[127] Rachel Ohm, *Documents Reveal NextEra's Hidden Efforts to Oppose Transmission Line Corridor*, Portland Press Herald (Nov. 30, 2023),  https://www.pressherald.com/2023/11/29/documents-reveal-nexteras-hidden-efforts-to-oppose-transmission-line-corridor/.

[128] Scott Thistle, *Maine Ethics Panel Votes to Pursue Records from Power Line Opponents*, Portland Press Herald (June 14, 2021), https://www.pressherald.com/2021/06/11/ethics-watchdog-panel-votes-to-pursue-records-from-powerline-foes.

[129] *See* Consent Agreement ¶ 1, *In re Clean Energy for ME, LLC d/b/a Stop the Corridor* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023),  https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Stop%20the%20Corridor%20Consent%20Agreement_0.pdf.

284.    On November 29, 2023, the Ethics Commission released a Consent Agreement with Stop the Corridor confirming that (1) NextEra was the creator and sole financial backer of Stop the Corridor and (2) Stop the Corridor violated campaign finance laws for failing to register as a BQC (which kept NextEra's identity and involvement in the Referendum 1 campaign hidden).[130]

285.    The Ethics Commission found what NextEra had hidden through the entire course of its Referendum 1 campaign—that "The Client" (presumably, NextEra) was the creator and sole funder of Stop the Corridor:



Consent Agreement in the Matter of Clean Energy for ME, LLC d/b/a Stop the Corridor, Nov. 29, 2023, at p. 3.

286.    The Commission also found that NextEra itself "reviewed the language of the initiative" (Referendum 1).    Furthermore, NextEra (through Stop the Corridor) "paid an undetermined amount to Bernstein Shur for strategic political advice concerning the 2020 initiative."[131]    The Commission recognized that such advice was "information and recommendations to promote the successful collection of signatures and related services to qualify [Referendum 1] for the ballot."[132]

---

[130] *Id*. ¶¶ 10, 24.

[131] Consent Agreement ¶¶ 11, 14, *In re Clean Energy for ME, LLC d/b/a Stop the Corridor* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023), https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Stop%20the%20Corridor%20Consent%20Agreement_0.pdf.

[132] *Id*. ¶ 14.

287.    Under Maine's Ballot Question Committee Registration & Reporting Requirements, codified in 2019 under 21-A M.R.S. § 1056-B and since reorganized under 21-A M.R.S. § 1052-A, an organization that receives or spends more than $5,000 to initiate or influence the outcome of a statewide ballot question qualifies as a BQC, and must register and file campaign finance reports with the Commission.  The Commission found that because NextEra contributed $95,726 to Stop the Corridor to initiate and/or influence the Referendum 1 statewide ballot question, Stop the Corridor qualified as a BQC and thus had violated Maine campaign finance laws by failing to register.  As a result, Stop the Corridor entered into a Consent Agreement to pay $50,000 in administrative penalties.

288.    NextEra's illegal duplicity was unmasked in a separate consent agreement with the Maine Election Commission that became public on November 29, 2023.  As part of this investigation, the Commission found that the NextEra-created (and now-defunct) organization, Alpine Initiatives, had served as a "pass-through" for a $150,000 political donation to the Maine Democratic Party, paid to them because Bernstein Shur advised that Democrats would be more likely to oppose NECEC.[133]

289.    ***Maine Ethics Commission Fines NextEra's Shell Corporation for Illegal Dark-Money Donations***.  The same consultants that NextEra used for its Stop the Corridor activities also formed another shell company for NextEra:  Alpine Initiatives (though NextEra attempted to obfuscate that connection during the Ethics Commission investigation).  Through this shell organization, NextEra financed a $150,000 donation to the Maine Democratic Party.[134]  Once this

---

[133] Ohm, *supra* note 127.

[134] *Id.* (noting that though "NextEra is not named in the Alpine Initiatives agreement," during the November 29, 2023 Maine Ethics Commission meeting announcing the Stop the Corridor and Alpines Initiatives consent agreements Paul McDonald of Bernstein Shur "confirmed in response to a question from a commissioner that 'the client' mentioned in the Stop the Corridor campaign finance report is the same client as is mentioned in that agreement").

transaction was complete, the FOAA documents reveal that on October 1, 2019, Henry Rubin, Senior Vice President at Hawthorn, admitted that it "will not use Alpine Again." The Commission concluded that Alpine Initiatives had been formed solely for "The Client" to facilitate "transfer of funds to the Maine Democratic Party for the purpose of influencing [the Referendum 1] campaign."



Consent Agreement ¶ 12, *In re Alpine Initiatives, LLC* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023).

290.    As a result of its investigation, the Maine Ethics Commission determined that (1) Alpine Initiatives had violated Maine campaign finance laws governing the registration of PACs, which provide that an organization qualifies as a PAC if it receives or spends over $1,500 for the "major purpose" of influencing a campaign; (2) Alpine Initiatives qualified as a PAC; (3) Alpine Initiatives had failed to register as a PAC; and (4) Alpine Initiatives must pay $160,000 in civil penalties for failing to register as a PAC and file a campaign finance report.[135]

291.    ***NextEra's Dirty Tricks Are Part of a Pattern: Dark Money and Ghost Candidates in Florida.*** NextEra's dark money, which concealed financing of its opposition to NECEC, is not the only time that NextEra has engaged in such tactics. Based on press accounts, there is a clear pattern of NextEra using such improper and possibly illegal methods. NextEra has used dark

---

[135] Consent Agreement ¶¶ 24-30, *In re Alpine Initiatives LLC* (Me. Comm'n on Governmental Ethics & Election Pracs. Nov. 29, 2023), https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Stop%20the%20Corridor%20Consent%20 Agreement_0.pdf.

money to fund ads to target competition from clean-energy projects other than NECEC, including to attack an offshore wind power project in Maine.[136]

292.    Additionally, it was reported that during the 2020 elections, NextEra and its subsidiary Florida Power & Light secretly funded a network of nonprofit organizations to steer funding to particular "ghost candidates" whose only goal was to confuse voters in an ultimately successful effort to unseat incumbent Florida state legislators who were viewed as unfriendly to NextEra's interests.

293.    In one such instance, according to media reports, one of these non-profit groups run by consultants working with FPL funded efforts designed to mislead voters about the identity of Florida candidates.[137]  It has been reported in one example that FPL was behind a campaign for ghost candidate Alex Rodriguez, who shared the last name of José Javier Rodriguez, the incumbent that FPL sought to unseat.[138]

294.    According to press reports, Eric Silagy, then head of FPL, wrote in an email dated Jan. 7, 2019, "JJR at it again" after José Javier Rodriguez filed a bill that threatened FPL's dominance in the Florida solar-energy market.[139]  "I want you to make his life a living hell," he

---

[136] Alissa Jean Schafer & Dave Anderson, *NextEra Spent $20 Million to "Ban" Clean Energy Transmission Project in Maine*, Energy & Pol'y Institute (Nov. 3, 2021), https://energyandpolicy.org/nextera-spent-20-million-to-ban-clean-energy-transmission-project-in-maine/.

[137] Samantha J. Gross et al., *When This Florida Woman Was an NPA Candidate for State Senate, She Was Moving to Sweden*, Miami Herald (Apr. 28, 2021, 3:26 PM), https://www.miamiherald.com/news/politics-government/election/article2509610 89.html; *see also* Annie Martin, *Central Florida "Ghost" Candidate Consultant Pleads Not Guilty*, Orlando Sentinel (Aug. 2, 2022, 9:15 PM), https://www.orlandosentinel.com/2022/08/02/central-florida-ghost-candidate-consultant-pleads-not-guilty/ (noting that the "advertising blitz" used to get Jestine Iannotti's name on the ballot was "paid for by a dark money non-profit group run by consultants working closely with Florida Power & Light").

[138] Mary Ellen Klas & Nicholas Nehamas, *"Make His Life a Living Hell." The FPL-Financed Plot to Torpedo a Miami Lawmaker*, EnergyCentral (Sept. 9, 2022), https://energycentral.com/news/%E2%80%98make-his-life-living-hell%E2%80%99-fpl-financed-plot-torpedo-miami-lawmaker.

[139] *Id.*

wrote to senior FPL executives.[140]  The executives promptly forwarded the message to Jeff Pitts, then-CEO of Matrix LLC.[141]

295.    NextEra's subsidiary FPL reportedly set up a nonprofit to secretly spoil the state senate race by funneling money to Alex Rodriguez**,** a non-party affiliated ghost candidate, in the general election.[142]  Ghost candidate Alex Rodriguez siphoned 6,300 votes from incumbent José Javier Rodriguez, who lost the election by 32 votes.[143]

296.    Alex Rodriguez eventually pleaded guilty to accepting campaign contributions in excess of legal limits, in addition to a related conspiracy charge.[144]  Alex Rodriguez testified against Frank Artiles, former Florida state Senator with connections to FPL, stating that Artiles had offered Alex Rodriguez  $50,000 to file and run as an independent candidate.[145]  On September 30, 2024, a jury found Artiles guilty of three felony counts of campaign finance violations stemming from the scheme.[146]

297.    The criminal complaints filed against Artiles and others concerning ghost candidates were prompted in large part on reporting by the Orlando Sentinel, which connected millions of dollars in donations from FPL to a number of political committees ultimately responsible for funding ghost candidates.[147]

---

[140] *Id.*

[141] *Id.*

[142] *Id*.

[143] *Id.*

[144] *Id.*; Samantha J. Gross, *No-Party Candidate in Miami Election Fraud Case Takes Plea Deal, Apologizes to Voters*, Miami Herald (Aug. 24, 2021, 5:33 PM), https://www.miamiherald.com/news/politics-government/election/article253696658.html.

[145] Gross et al., *supra* note 137; Klas & Nehamas, *supra* note 138; Steve Litz, *'I Needed the Money': 'Ghost Candidate' Says He Was Offered $50k to Run for Office*, NBC 6 Miami (Sept. 20, 2024), https://www.nbcmiami.com/news/politics/local-politics/ghost-candidate-says-he-was-offered-50k-to-run-for-office/3423228/.

[146] Charles Rabin, *Former State Senator Artiles Found Guilty of Campaign Finance and Registration Violations*, Miami Herald (Oct. 1, 2024, 5:14 PM), https://www.miamiherald.com/news/politics-government/state-politics/article293215254.html.

[147] Annie Martin & Jason Garcia, *Florida Power & Light Execs Worked Closely with Consultants Behind "Ghost" Candidate Scheme, Records Reveal*, Orlando Sentinel (Apr. 14, 2022, 2:06 PM), https://www.orlandosentinel.com/2021/12/02/florida-power-light-execs-worked-closely-with-consultants-behind-ghost-candidate-scheme-records-reveal-special-report/.

298.     The ghost candidates funded by NextEra's subsidiary FPL did not actually intend to win office; their candidacy was intended to confuse voters and draw votes away from bona fide candidates unfriendly to FPL.[148]  Thus, in Florida, NextEra's subsidiary FPL has been accused of engaging in tactics similar to those NextEra used in its opposition to NECEC, where it provided undisclosed funding to opposition organizations to give the appearance of grassroots opposition to NECEC, in order to confuse voters.

### 2.     NextEra Promotes Both Referenda Against NECEC with False and Misleading Statements

299.     Through its illegal anti-NECEC political organization fronts, NextEra spread false and misleading statements to smear NECEC and undermine its support, and to mislead voters into supporting NextEra's baseless referenda.

300.     NextEra, along with MLP and No CMP Corridor, led the effort to turn public opinion against NECEC by misleading voters.  A significant amount of the financing provided by NextEra to MLP in support of Referendum 2 was dedicated to an organized media campaign against NECEC.  BBC News reported that most of the $20 million that NextEra donated to MLP was spent on television advertising, citing a University of Maine School of Law professor who stated that "[t]hose . . . television ads proved deadly" to NECEC and who "blam[ed] lobbying from fossil-fuel competitors for the project's demise in the polls."[149]

301.     From 2019 through present, NextEra-connected organizations have spread countless lies about NECEC via television, radio, and newspaper advertisements, planted "op-ed"

---

[148] Klas & Nehamas, *supra* note 138; Charles Rabin, *Trial in Florida 'Ghost Candidate" Case Set to Begin*, Tampa Bay Times (Sept. 15, 2024), https://www.tampabay.com/news/florida-politics/2024/09/15/trial-florida-ghost-candidate-case-set-begin/.

[149] Robin Levinson-King, *Maine Energy: How One Hydropower Project Sparked a $100m "Hoohah*," Brit. Broad. Corp. (July 12, 2022), https://www.bbc.com/news/world-us-canada-62072844; *see Mainers for Local Power*, Me. Ethics Comm'n, https://mainecampaignfinance.com/index.html#/exploreCommitteeDetail/356331 (showing NEE donated $20 million to MLP).

and opinion pieces in local publications, radio and television appearances, and through their websites, social media groups, and mass mailings.

302.    NextEra knew that each of these statements was false at the time, and/or demonstrated reckless disregard as to their falsity—and made each statement with an anticompetitive intent.  Many of the NextEra claims fly in the face of NextEra having submitted bids in response to the Massachusetts RFP with Avangrid/CMP along the very same corridor.

303.    ***Dirty hydropower.***  For instance, in an October 2020 radio appearance, Sandra Howard—the founder of the No CMP Corridor PAC and the organization Say No to NECEC— said that NECEC would bring "dirty hydropower."

304.    "Clean" and "dirty" energy are not matters of opinion, these are meaningful terms, and Ms. Howard disparagingly calling hydropower "dirty" is verifiably false.   The U.S. Department of Energy unequivocally categorizes hydropower as "clean."[150]

305.    ***Genocide issue.***   In that same interview, Ms. Howard claimed NECEC's hydropower is a "genocide issue" for indigenous people.

306.    Such an allegation is highly damaging to NECEC's (and therefore also Avangrid's) reputation, and it, too, is verifiably false.  Ms. Howard was either intentionally proliferating or recklessly regurgitating false talking points from the so-called North American Megadams Resistance Alliance, a group claiming to speak for Québec indigenous communities.  But that group, like NextEra's many anti-NECEC front organizations, was another shell organization, and it had no real ties to any Canadian First Nations.  As reported by the Bangor Daily News, the North American Megadams Resistance Alliance's link for funding contributions went to an address in

---

[150] *Hydropower Program*, Off. Energy Efficiency & Renewable Energy, https://www.energy.gov/eere/water/hydropower-program.

New York, not to a Canadian indigenous group, and Québec First Nations had to affirmatively request that the group stop speaking illegitimately in their name.

307.   ***Few real jobs.***  Similarly, in a June 2020 letter to the editor of a Central Maine newspaper, Ms. Howard wrote that "NECEC would bring few real jobs" and that "many of these jobs . . . won't be filled by Mainers."

308.   Both statements are false.  NECEC would create 1,600 jobs on average for the two-and-a-half-year construction period, peaking at 3,500 jobs during the busiest part of construction, and not only would Mainers be given preference during the hiring process, but 70% of the labor for NECEC would be members of the local chapter of the International Brotherhood of Electrical Workers.

309.   ***Failure to go through approval process.***  MLP, specifically, has also spread countless falsities, including that NECEC did not go through the required formal approval processes.

310.   Again, this statement is patently and verifiably false.  Given how intimately involved NextEra was in the numerous regulatory processes and itself acted to extend the regulatory process, the statement was made with knowledge of its falsity.

311.   As described above, there is an extensive public record of the Maine PUC's "thorough, independent, and meticulous review of the project" that "determined it was in the best interest of Maine ratepayers" and confirmed that it "met all applicable standards, provided significant benefits, and was in the public interest."  And the Maine Supreme Judicial Court overruled challenges to the Maine PUC's approval of NECEC.

312.   Another media source commented that some of the anti-NECEC advertising "fe[d] on xenophobia" with "[t]he claim . . . that foreign companies (not Mainers) will benefit,

specifically:  Canadian power company Hydro-Québec and the ultimate parent company of Avangrid, the Spanish energy company Iberdrola (incidentally, one of the largest developers of wind and solar power in the U.S. and worldwide)."[151]  For example, a September 29, 2021 advertisement by MLP warned of "[t]he foreign corporations behind CMP's corridor" and alleged that "CMP *cut an illegal backroom deal* to run their corridor right through our public lands just to send power to Massachusetts."  This claim of an "illegal backroom deal," like others detailed in this Section, was a total fabrication, meant only to stoke fears of Maine voters.  These advertisements promoted false narratives to sway citizens to vote in favor of Referendum 2.

313.    No CMP Corridor organized similar, baseless attacks against NECEC.  On February 24, 2021, an advertisement sponsored by No CMP Corridor featured a Maine resident stating, "for years now, CMP has operated in the dark, making deals behind closed doors with unelected officials, lying to the public and skirting the law."  This defamatory statement is false and belied by the years of regulatory proceedings leading to NECEC's approval.  Instead, it was NextEra and its operatives who operated in the dark.

**C.    NextEra Refuses to Upgrade the Seabrook Breaker—Without Which NECEC Cannot Interconnect—Thus Exercising Veto Power over the Entry of NECEC or Any New Power Project into the New England Electricity System**

314.    In addition to bringing sham litigation and launching campaigns to deceive Maine voters into voting for unconstitutional legislation, NextEra unlawfully leveraged its exclusive control over the Seabrook Breaker to block NECEC.

315.    ISO-New England's System Impact Study for NECEC concluded that the Seabrook Breaker was at 99.6% capacity and needed to be upgraded to accommodate NECEC.  At that time, NextEra had known for decades that the Seabrook Breaker was approaching maximum capacity.

---

[151] Ken Gray, *Mainers Opposing Clean Energy Renewable Energy? What's Wrong?*, JD Supra (May 19, 2021), https://www.jdsupra.com/legalnews/mainers-opposing-clean-renewable-energy-7229199/.

Not only was NextEra surely aware of the issue from routine measuring and maintenance, but NextEra was specifically informed at least twice:  ISO-New England communicated its concerns about the Seabrook Breaker once in 2010, and again in 2013.  The issue was brought to NextEra's attention for a third time in 2016 through the results of the System Impact Study performed to study the Northern Pass transmission project (the original winning bid for the contracts that were eventually awarded to NECEC).

316.    By intentionally letting the Seabrook Breaker reach and languish at near-maximum capacity, NextEra accepted the risk that any new project that added power to the grid and that impacted the flow of power through the Breaker could over-duty the Breaker, leading to an uninterrupted short circuit, and "as a result, could lead to catastrophic equipment failure including equipment melting, catching fire, or exploding at the nuclear facility."[152]

317.    As ISO-New England explained it:  "In addition to the obvious safety concerns and issues associated with the catastrophic failure of equipment at a nuclear plant, such a failure would also result in a significant loss of baseload generation that would need to be replaced, creating potential reliability concerns [for New England's power]."[153]

318.    Thus, in addition to risking human life and a nuclear plant disaster, NextEra was willing to risk its own profits: "[C]atastrophic equipment failure resulting from the Seabrook Breaker being over-dutied would result in a long-term outage of the Seabrook Station."[154]

---

[152] Br. of ISO New England at 5, *NECEC Transmission LLC v. NextEra Energy Res., LLC*, Docket No. EL 21-6-000 (F.E.R.C. Oct. 7, 2021).

[153] *Id*.

[154] *Id*. at 6.

319.     Indeed, the D.C. Circuit earlier this year explained that upgrading the breaker could be "fairly described as benefiting Seabrook by allowing it to continue selling power through an integrated and expanding transmission system."[155]

320.     NextEra knew the Seabrook Breaker was at near-capacity for a decade, and that operating under such conditions created enormous risks associated with a potential fault, should the Breaker be over-dutied.  Nevertheless, NextEra refused to act.  Nor can NextEra's inaction be explained by a dearth of opportunities:  NextEra had no less than six opportunities since 2010 to upgrade the Seabrook Breaker without impacting Seabrook's schedule.  By refusing to remedy the Breaker's inevitable operations at an unsafe level of capacity, NextEra acted against its own short-term economic interest.

321.     Instead, the only adjustment NextEra made was to ensure that any future study would recognize the veto power NextEra had.  Specifically, NextEra made sure that a future SIS for any substantial power generation competitor's project would identify the Seabrook Breaker as equipment that would be impacted by additional power entering the grid, putting NextEra in sole control of the viability of any future project.

### 1.     NextEra Exercises Veto Power over NECEC

322.     Beginning in the spring of 2020, after the SIS identified that the Seabrook Breaker needed to be upgraded before any new substantial power could join the grid, Avangrid diligently sought to work with NextEra to upgrade the Seabrook Breaker at Avangrid's expense.

323.     In April 2020, NextEra told Avangrid that it preferred to undertake the Seabrook Breaker replacement during a planned refueling outage of the Seabrook nuclear plant—in other words, when the nuclear plant was already scheduled to be offline for refueling, which happens

---

[155] *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 373 (D.C. Cir. 2024).

every 18 months.  At that time in April, 2020, the next Seabrook nuclear plant planned outage was not until a year and a half later, in the fall of 2021, and the scheduled outage after that was not scheduled until the spring of 2023.

324.    Avangrid repeatedly told NextEra that NECEC was targeting an (already-delayed) in-service date of May 2023.  With the work required to make that date, it was critical to complete the Seabrook Breaker replacement during the fall 2021 planned refueling outage.

325.    On August 19, 2020, NextEra informed Avangrid that NextEra would not consider attempting the Seabrook Breaker replacement during the fall 2021 planned outage—inexplicably pushing back the date until 2023.  NextEra claimed that there was not enough time, and offered no explanation as to why over a year for planning a breaker replacement was insufficient.

326.    NextEra also refused to start pre-construction planning—or any planning or preparation at all—to perform the Seabrook Breaker replacement during the scheduled 2023 outage until it had a finalized agreement with Avangrid.  But NextEra then continued its obfuscation, refusing to negotiate in good faith—ensuring that a finalized agreement would not be reached in time for the 2023 upgrade, if at all.

327.    On August 19, 2020, NextEra sent to Avangrid a draft Affected System Agreement for the Seabrook Breaker replacement where NextEra proposed that Avangrid would be liable for all economic losses that NextEra could suffer as a result of the replacement, which included all lost profits for the downtime, all consequential damages, and all legal fees, regardless of whether the downtime was caused by NextEra.

328.    Not only are the terms NextEra insisted upon unheard of in contracts regarding work on Affected Systems for such situations, but such liability without limits could be astronomical.  NextEra's lost revenues alone could amount to over $560,000 per day, let alone

starting to quantify other consequential costs.  NextEra was asking Avangrid to sign a blank check—completely unreasonable terms that NextEra knew Avangrid could not possibly accept.

329.    NextEra's refusal to consider replacing the Seabrook Breaker in the 2021 outage, its refusal to begin planning for the 2023 outage, and NextEra's insistence for patently unreasonable commercial terms for the replacement agreement amounted to a full refusal to upgrade the Breaker.  NextEra was refusing to upgrade the Breaker to harm both consumers of electric power and a competitor, Avangrid, despite knowing that doing so risked physical damage and lost profits to NextEra's own nuclear facility and delayed environmental and monetary benefits to Massachusetts citizens.

330.    Incurring greater risks is economically equivalent to a short-term profit sacrifice. In exchange for greater risks, NextEra could expect longer-term profits through three potential mechanisms:  (1) higher prices awarded to Seabrook nuclear plant and NextEra's other generation assets selling power in the ISO-New England marketplaces, achieved by keeping out the entry of new low-cost power generation sources (e.g., hydropower from Québec transmitted through NECEC), (2) a greater likelihood that NextEra's less-economic generation assets would "clear" in the marketplaces (i.e., be purchased and dispatched) because cheaper hydropower would be excluded from the markets, and/or (3) potentially delaying NECEC to allow for the expansion of NextEra's own renewable generation projects.  All three mechanisms have the effect of increasing NextEra's total sales, revenues, and profits.

331.    But for the longer-term profit expectation, it would not make economic sense for NextEra to incur the risk to its Seabrook equipment and profits.  Indeed, as the D.C. Circuit explained in its October 2024 ruling (paraphrasing FERC), "the [breaker] upgrade may also be fairly described as benefitting Seabrook by allowing it to continue selling power through an

integrated and expanding transmission system."[156]  In other words, NextEra was unreasonably refusing to upgrade the breaker despite an upgrade being in *Seabrook's—and NextEra's—*best interest.  NextEra's refusal to upgrade the Seabrook Breaker therefore amounts to anticompetitive exclusionary conduct and has no pro-competitive effect.

332.    NextEra used its monopoly control over the Seabrook Breaker to foreclose power generation competition from NECEC, and to gain a competitive advantage against Avangrid and over all other sources of new electric power in or planning to enter the New England market.

333.    NextEra's bottleneck monopoly (its at-capacity breaker) permitted NextEra to unilaterally decide whether electricity generation output could be increased in the New England power grid.  And if so, by whom.

334.    Indeed, in a recent hearing before the D.C. Circuit, NextEra admitted that its at-capacity Seabrook Breaker was preventing new power projects:

> Court:        ***Your circuit breaker is hanging on by a thread.***  *There's nothing,* **I don't think there's anything that can connect to the entire grid now** *that won't require a replacement of your circuit breaker.  Is that right? . . . .*

> NextEra:     *There is enough room for the circuit breaker to operate reliably **without an additional interconnection**, which is key."*[157]

335.    In that same hearing, NextEra admitted that it had the power to exclude any rivals of significant new sources of power generation from the ISO-New England grid, stating plainly: "we have a veto . . . ."[158]

336.    Upgrading the Seabrook Breaker would mean NextEra would lose its veto card: with a new, upgraded breaker, Seabrook would not appear on a new project's SIS as an affected

---

[156] *Id.*

[157] Oral Argument at 16:25-17:00, *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361 (D.C. Cir. 2024) (No. 23-1094), https://www.courtlistener.com/audio/90523/nextera-energy-resources-llc-v-ferc/ (emphasis added).

[158] *Id.* at 31:57-32:02.

system and therefore, after an upgrade, a new project would be able to "plug in" without NextEra's permission. This is precisely what NextEra sought to avoid with its sham permitting interference and its dubious political attacks—if NextEra could delay NECEC long enough for its own future renewable projects to come online, it could preserve and increase its own profits.

2.      **NextEra Loses Its 9th and 10th Sham Petitions, Making Baseless and Anticompetitive Arguments to FERC and the D.C. Circuit**

337.    To maximize its control over the Seabrook Breaker—and its power to block NECEC—NextEra turned to FERC, seeking to enlist the federal government to further its illegal scheme to delay NECEC.

338.    Knowing that its refusal to upgrade the Seabrook Breaker had undeniable anticompetitive effects by foreclosing competing power generators from introducing new sources of power to the New England grid, NextEra knew that Avangrid would imminently file a petition with FERC seeking a resolution. And knowing that Avangrid would need an expedited petition given that the window for the Breaker to be upgraded during the upcoming fall 2021 planned outage was quickly closing, NextEra knew that Avangrid would be seeking fast-track processing.

339.    For the sole purpose of further hindering Avangrid's efforts and slowing down the process, NextEra beat Avangrid to FERC. On October 5, 2020, NextEra filed a petition for a declaratory order before FERC seeking a ruling that it had no duty to upgrade the Seabrook Breaker. To further deter and/or exclude Avangrid, NextEra also wanted FERC to make Avangrid pay not just the direct costs of replacing the Seabrook Breaker (which Avangrid had already agreed to cover), but also uncapped consequential losses and costs, including NextEra's legal expenses, lost revenues, and other opportunity costs that might arise during the replacement—a potentially astronomical sum unrelated to any losses caused by Avangrid. Purposefully, NextEra's petition

was filed for ordinary processing time (rather than expedited), which NextEra knew could take years.

340.    On October 13, 2020, Avangrid filed its own FERC complaint and sought fast-track processing.   Avangrid argued—in its own petition and in opposition to NextEra's parallel petition—that the ISO-New England Tariff required NextEra to interconnect NECEC and required NextEra to negotiate the corresponding contract in good faith with commercially reasonable terms; NextEra argued that the ISO-New England Tariff did not apply because the Seabrook Breaker was a generation facility, not a transmission facility, and therefore it also had no obligation to negotiate in any particular manner.

341.    On February 1, 2023, FERC resolved both issues in Avangrid's favor, dismissing NextEra's petition and granting Avangrid's complaint in relevant part.   FERC held that "the Seabrook [LGIA] does not permit Seabrook to refuse to replace the breaker . . . [and] Good Utility Practice requires Seabrook to replace the breaker before Avangrid interconnects because the breaker will be overdutied following the interconnection."[159]

342.    By violating its LGIA, NextEra effectively terminated its prior course of dealing with Avangrid and other ISO-New England marketplace participants.

343.    FERC also held that Avangrid was required to pay only the direct cost of replacing the Seabrook Breaker, not the additional opportunity and legal costs that NextEra sought.[160] NextEra sought rehearing, which FERC denied on June 15, 2023.[161]

344.    NextEra's petition and the arguments NextEra made in opposing Avangrid's complaint were objectively baseless and transparently anticompetitive.

---

[159] *NextEra Energy Seabrook, LLC*, 182 FERC ¶ 61,044, P 79 (2023).

[160] *Id*. P 100.

[161] *See NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196, P 2 (2023).

345.    For example, NextEra argued that under the LGIA it was required to upgrade the Seabrook Breaker only if NextEra's *own* facilities required such an upgrade, but not to enable a third party, such as NECEC, to interconnect.  The plain text of the LGIA said otherwise, explicitly requiring NextEra to upgrade its facilities in response to third-party changes consistent with Good Utility Practice.  As FERC recognized, "***it would make no sense*** . . . for [NextEra] to be required to maintain its generation facilities consistent with Good Utility Practice only in response to reliability problems . . . created by [NextEra] . . . ."[162]  NextEra's contrary contention was "***inconsistent with the text of the [LGIA]***," which expressly contemplated NextEra making modifications.[163]

346.    Nor was there any basis for NextEra's unreasonable demand—designed to shore up NextEra's power to block NECEC—that Avangrid pay NextEra for consequential costs and losses.  As FERC noted, NextEra's attempt to ground this demand in the Tariff was "***unsupported***," because "***no language***" in the Tariff indicated that Avangrid should pay these costs.[164]  And "***no precedent***" supported NextEra's position, either; instead, NextEra cited exclusively to "***inapplicable case law***."[165]

347.    NextEra's objectives in initiating and pursuing the FERC proceedings were obvious—to impose further harm and delay on Avangrid and protect NextEra's illegal monopoly profits.  In its order denying rehearing, FERC expressed "concern" at NextEra's position in the proceedings, noting that it "tends to lend credence to Avangrid's argument that [NextEra] may be seeking 'to prevent the development and completion of the NECEC Project'" and noting that

---

[162] *NextEra Energy Seabrook, LLC*, 182 FERC ¶ 61,044, P 83 (quotations omitted).

[163] *NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196, P 20-21.

[164] *Id.* P 38; *NextEra Energy Seabrook, LLC*, 182 FERC ¶ 61,044, P 101.

[165] *NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196, P 20-21; *NextEra Energy Seabrook, LLC*, 182 FERC ¶ 61,044, P 104.

NextEra was "in essence, exercising veto power over the interconnection of new and competing interconnection customers."[166]

348.     Others, too, recognized the obvious anticompetitive intent behind NextEra's arguments about the Seabrook Breaker.  For example, the Attorney General of Massachusetts, in an October 7, 2021 letter filed with FERC, stated her concern that "a direct competitor of NECEC can thwart a major transmission project simply by refusing to negotiate and agree to commercially reasonable terms . . . ."[167]

349.     After two resounding losses at FERC (the first, when FERC resolved NextEra's initial petition on February 1, 2023, and the second, when FERC denied NextEra's request for rehearing on June 15, 2023), NextEra asserted the same baseless and unfounded arguments on appeal to the D.C. Circuit Court of Appeals.

350.     The D.C. Circuit affirmed FERC's decision, agreeing that "[NextEra's] duty to upgrade [the Seabrook Breaker] arises under article 9.7.5 of the LGIA, construed in accordance with the LGIA's definition of Good Utility Practice."  The court also recognized the anticompetitive effects of NextEra's attempts to use the Seabrook Breaker as a veto card to delay or block NECEC, noting that "this kind of anti-competitive behavior is hardly consistent with 'good business practices.'"[168]

351.     And, just as FERC had done, the D.C. Circuit highlighted the baseless foundation of NextEra's sham arguments explaining that "Seabrook's position plainly implies that it may exclude Avangrid from the grid by refusing to upgrade its circuit breaker, ***no matter what compensation Avangrid offered or was ordered to pay.***  Even worse, the argument further implies

---

[166] *NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196, P 23.

[167] Letter from Rebecca Tepper, Chief, Mass. Off. Att'y Gen., to Fed. Energy Regul. Comm'n, *NECEC Transmission LLC v. NextEra Energy Res., LLC*, Docket No. EL 21-6-000 (F.E.R.C. Oct. 7, 2021).

[168] *NextEra Energy Res*, LLC, 118 F.4th at 370.

that *Seabrook may prevent interconnection by any new generator* whose additional power would nudge its breaker from 99.6 percent of capacity to just over 100 percent."[169]

### B. NextEra Acknowledges Its Scheme to Launch Baseless Legal and Political Attacks with the Sole Purpose of Preventing Competition and Offers to End Its Campaign in Exchange for a Windfall Payment from Avangrid

352. NextEra's motivation to protect its own bottleneck monopoly profits is clear in its motions to intervene in the various regulatory proceedings described above. Additionally, NextEra's efforts to foreclose NECEC's entry into the New England power system are being driven by NextEra executives at the highest levels.

353. In the fall of 2020, in the months preceding the parties' filing petitions with FERC regarding the Seabrook Breaker, NextEra executives, including NextEra's then-Chief Financial Officer Kirk Crews, reached out to Avangrid executives a number of times in an apparent effort to attempt to broker a deal: in exchange for Avangrid agreeing to a power purchase agreement whereby CMP would purchase power from the Seabrook nuclear plant on substantially above-market terms (that is, at inflated prices), NextEra would withdraw its multi-front attack on NECEC.

354. NextEra's naked quid-pro-quo offer was simply a ploy to force Avangrid to pay NextEra the money it would lose when NECEC would enter the market. NextEra's extortionate offer highlights the disingenuous nature of the negotiations on upgrading the Seabrook Breaker. NextEra would only stop its illegal campaign of massive project resistance, sham litigation, and regulatory interference if Avangrid would pay it to do so via a PPA (in this case, a bilateral electricity supply agreement that sets a specific price, regardless of the "clearing" price determined by the ISO-New England marketplaces). Because Avangrid refused to be bought out, NextEra did not withdraw its attacks.

---

[169] *NextEra Energy Res., LLC*, 118 F.4th at 370 (emphasis added).

355.     It took a FERC order (ultimately affirmed by the D.C. Circuit) to force NextEra to upgrade the Breaker.  NextEra's campaign against NECEC was so cumulative, aggressive, and no-holds-barred, that Avangrid knew that NextEra would likely pull the plug, delay, or erect additional hurdles to the Breaker upgrade with even the slightest provocation.  NextEra finished the Breaker upgrade only in November 2024.  This Complaint was filed days later.

## VII.    AVANGRID'S DISCOVERY OF NEXTERA'S CONDUCT AND ITS IMPACT ON NECEC

356.     Continuing to the present, NextEra has repeatedly engaged in conduct that violates the Sherman Act, the Massachusetts Antitrust Act, the Massachusetts Unfair Trade Practice Act, and common law.  NextEra's violations of these laws occurred each time NextEra engaged in conduct in furtherance of its exclusionary and anticompetitive scheme to delay NECEC.  These violations occurred each time NextEra (a) pursued baseless sham petitioning attacks against NECEC, (b) used deception, corrupt means, and dark money to deceive the public, wrongfully disparage NECEC, and improperly delay construction on NECEC; and (c) used its monopolistic control over the Seabrook Breaker to harm Avangrid, stifle competition, and hurt consumers.  This conduct included overt acts that constitute monopolization, attempted monopolization, civil conspiracy, intentional interference with contract, sham petitioning, dark-money deception, and false and misleading statements.

357.     In November 2021, construction on NECEC was halted as a result of NextEra's unlawful conduct.  At the time NECEC was halted, the estimated in-service date was December 2022.  NextEra continuously refused to upgrade the Seabrook Breaker well into 2024.  NextEra did not complete the upgrade until November 2024.  Accordingly, NECEC's current estimated in-service date is January 2026.  As a result of NextEra's conduct, Avangrid could have known that it had suffered damages only within the four years prior to the filing of this Complaint.

358.     For years, NextEra hid its role in and extent of its conspiracy to delay NECEC. High-level facts about NextEra's involvement in the conspiracy became known in the Maine Ethics Commission's November 2023 consent decrees.  The November 2023 consent decrees mask the extent and scope of NextEra's role and involvement in delaying NECEC through campaign finance law violations and other means.

359.     NextEra's multi-pronged anticompetitive and unlawful scheme to delay NECEC and the co-conspirators with whom NextEra worked did not come into view until very recently. Through the Maine Ethics Commission's release of thousands of pages of Maine Freedom of Access Act documents in October 2024 and the unsealing of portions of those documents the week of November 4, 2024, key facts, including NextEra's role in creating and funding the Referenda, were uncovered.  Even today, the interviews of key witnesses and the Ethics Commission's report have not been released.

360.     NextEra continues to obfuscate its role in the prolonged scheme to delay NECEC, including by fighting to hide its role in funding Stop the Corridor and Alpine Initiatives.  As alleged above, NextEra concealed its involvement with Referendum 1 through a complex web of dark-money groups.  NextEra's efforts deceived Maine voters and hid a crucial part of NextEra's broad and multifaceted scheme from Avangrid.

361.     The Ethics Commission's consent decrees do not name NextEra.  As a result of NextEra's efforts to keep its role in this anticompetitive scheme a secret, they refer to NextEra as "The Client."  Despite NextEra's continued efforts to hide its identity, it is publicly known that "The Client" is NextEra.  Exhibit B to the Ethics Commission settlement agreement with Stop the Corridor lists NextEra as Stop the Corridor's sole cash contributor.  Participants in the Ethics

Commission' hearings—which were live streamed on the internet—at times inadvertently used the word "NextEra" to refer to "The Client" despite an agreement to keep "The Client" anonymous.

362.    NextEra has fought to further conceal its participation by trying to anonymize the Ethics Commission proceedings.  Indeed, apparently to protect the confidentiality of NextEra's identity as "The Client," it appears that the Ethics Commission on two occasions, once in June 2021 and again in November 2023, edited the video recordings of its public meetings to remove inadvertent mentions of "NextEra."

363.    To this day, the full extent of NextEra's involvement in Referendum 1 is unknown, though further details continue to emerge.  In October and November 2024, the Maine Ethics Commission released thousands of pages of documents it obtained and created during its investigation in response to a Maine Freedom of Access Act request.  These documents make it clear that throughout the Maine Ethics Commission's investigation, NextEra's allies refused to identify their sources of funding, even confidentially to the Commission solely for the purposes of its investigation.  The FOAA documents also reveal that NextEra and a host of co-conspirators monitored multiple regulatory proceedings with the purpose of delaying those proceedings.

364.    And to this day, NextEra through its allies continues to obscure its role in Referendum 1.

365.    Portions of the documents that NextEra fought to keep under seal were first released on November 6, 2024.  It was not until that day that the Ethics Committee documentation clearly and unequivocally stated NextEra's role as "The Client" in a draft consent agreement:

7.      In late 2017 or 2018, Hawthorn Group approached Bernstein Shur about doing work to oppose NECEC on behalf of a client, which was NextEra. David Farmer and James Cote, who were government relations consultants at Bernstein Shur, recruited Lance Dutson to manage political activities against the project. During 2018-2020, the Maine consultants worked as a team to organize opposition to NECEC and influence public opinion against the project. Their objective was "███████████████████████████████████" as described by one of the consultants in a witness interview.

8.      In April 2018, a limited liability company, Clean Energy for ME, was formed to conduct these activities. The LLC presented itself to the public as Stop the Corridor in television advertising and other outreach. The work of Stop the Corridor was performed by Mr. Dutson, an associate, and occasional field workers. Mr. Dutson was the sole member (owner) of the LLC.

9.      All of Stop the Corridor's activities to oppose NECEC were paid for by Hawthorn Group with money from NextEra, except for a small amount contributed by Mr. Dutson when Stop the Corridor was created.

**Ethics FOAA 2416**

---

10.     In their early meetings, Suzanne Hammelman of Hawthorn Group told the Maine consultants they should not disclose the client (NextEra) or Hawthorn Group. This direction covered the full range of activities that would be conducted by Stop the Corridor.

366.    Though the Maine Ethics Commission released thousands of pages of documents in response to requests under Maine's Freedom of Access Act, a large number of these documents are heavily redacted.

367.    NextEra engaged in affirmative acts that were designed to conceal NextEra's unlawful actions and deceive Avangrid, depriving Avangrid of sufficient notice of its claims. Accordingly, the doctrine of fraudulent concealment tolled the statutes of limitations on Avangrid's claims until at least November 29, 2023.

### VIII.    NEXTERA'S MONOPOLY POWER AND RELEVANT MARKETS

368.    "Monopoly power is the power to control prices or exclude competition."  *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  If in dispute, monopoly power can be established through direct or circumstantial evidence.

#### A.    NextEra Admits Monopoly Power

369.    NextEra has conceded in court filings to the U.S. Court of Appeals for the D.C. Circuit that it has the power to exclude any new power generation competitor from connecting to and selling electric power in the ISO-New England, stating that NECEC "will not be permitted" to connect to the New England grid "unless and until the [Seabrook] breaker is replaced."[170]

370.    As NextEra stated in open court in its February 2024 oral argument before the D.C. Circuit:  "We have veto power."[171]

371.    Thus, NextEra has admitted that it has monopoly power over NECEC's ability to connect to the ISO-New England grid.

#### B.    NextEra Holds a Bottleneck Monopoly

372.    Beyond NextEra's admission, NextEra holds a bottleneck monopoly through its exclusive control over the Seabrook Breaker.

373.    The Supreme Court in *Otter Tail* held that where an incumbent power generator controls a "bottleneck" physical element needed for a competitor to interconnect to the transmission grid, refusing a competitor access is a violation of Section 2 of the Sherman Act. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973).  As the Court stated:  "The record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to

---

[170] Final Reply Br. for Pet'rs NextEra Energy Res., LLC & NextEra Energy Seabrook, LLC at 10, *NextEra Energy Res., LLC v. FERC*, No. 23-01094 (D.C. Cir. Nov. 3, 2023).

[171] Oral Argument at 31:57–32:02, *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361 (D.C. Cir. 2024) (No. 23-1094), https://www.courtlistener.com/audio/90523/nextera-energy-resources-llc-v-ferc/.

foreclose competition or gain a competitive advantage, or to destroy a competitor, all in violation

of the antitrust laws." *Otter Tail*, 410 U.S. at 377.

374.    NextEra controls access to the ISO-New England transmission grid.  The Supreme

Court in *Otter Tail* has described the violation of Section 2 of the Sherman Act in control of

transmission against new entrants as follows:

> The District Court determined that Otter Tail has 'a ***strategic
> dominance in the transmission of power in most of its service area***'
> and that it ***used this dominance to foreclose potential entrants into
> the retail area from obtaining electric power from outside sources
> of supply***.   Use of monopoly power 'to destroy threatened
> competition' is a violation of the 'attempt to monopolize' clause of
> § 2 of the Sherman Act.[172]

375.    NECEC's power is critical to Massachusetts's clean power mandates.

376.    The Seabrook Breaker would have become over-dutied with any competitor's new

generation interconnection and the Breaker needed to be upgraded before any significant new

generation may interconnect anywhere on the New England grid.  Thus NECEC has no other way

to interconnect to the New England grid than through an upgrade of the Seabrook Breaker.  As

NextEra explained to the D.C. Circuit on appeal from the FERC order against it:  "Avangrid, the

third party [to the appeal], has not yet interconnected and cannot interconnect unless and until the

breaker is replaced."[173]

377.    As FERC itself put it:  "By refusing to replace the Seabrook Breaker under these

circumstances, ***Seabrook is, in essence, exercising veto power over the interconnections of new

and competing interconnection customers***."[174]   In other words, an upgrade to the Seabrook

Breaker comprises a critical and final input that would enable the delivery of NECEC's power into

---

[172] *Otter Tail*, 410 U.S. at 377 (emphasis added).

[173] Final Br. for Pet'rs NextEra Energy Res., LLC & NextEra Energy Seabrook, LLC at 40, *NextEra Energy Res., LLC v. FERC*, No. 23-01094 (D.C. Cir. Nov. 3, 2023).

[174] *NextEra Energy Seabrook, LLC*, 183 FERC ¶ 61,196, P 23 (2023).

the New England grid, resulting in the Seabrook Breaker's bottleneck status.  As the sole entity with control over the upgrade of the bottleneck, NextEra has monopoly power over a critical input.

378.    Through its actions, NextEra has wielded the bottleneck status of the Seabrook Breaker as monopoly power to exclude competition.

### C.    Direct Evidence of NextEra's Monopoly Power

379.    Direct evidence of the anticompetitive harm NextEra has caused in the form of supracompetitive prices, restricted output, and the exclusion of competition is readily observable and ongoing, and therefore does not require a precise delineation of the metes and boundaries of any relevant market nor a separate demonstration of NextEra's market power in any of those markets.

380.    NextEra's actions with respect to the Seabrook Breaker were just one piece of NextEra's intricate scheme to exclude NECEC—a scheme that also included sham litigation and the use of false and misleading statements and dark money and use of shell companies in violation of Maine campaign finance laws.  All three prongs of NextEra's interwoven scheme, individually and compounded together, demonstrate NextEra's monopoly power to exclude competition.

381.    NextEra's actions have resulted in both control over electricity prices and exclusion of new competition, and thereby demonstrate direct evidence of NextEra's monopoly power.

382.    Excluding the competition to be brought by NECEC amounts to output reduction relating to foreclosure of a competitor, supracompetitive prices, and anticompetitive harm to consumers and ratepayers in the downstream capacity and power markets.

383.    Excluding the competition to be brought by NECEC has deprived Massachusetts consumers of significant electricity price savings and the benefits of reduced carbon emissions.

384.    Nevertheless, it is a fact that NextEra has ultimate control or 100% share of the upstream bottleneck input that has precluded Clean Energy Connect and others from adding their

supplies to the downstream markets for capacity and power.  NextEra's wielding of the Seabrook Breaker's bottleneck status into an effective veto card against any new generation, and, in particular, against NECEC, amply demonstrates NextEra's monopoly power in the upstream input market.

385.    NextEra's actions led to a less reliable grid, less reliable energy supply, less diverse energy supply, and risked safety issues at Seabrook.

386.    NECEC has been delayed for years as a result of NextEra's conduct described herein, again providing direct evidence of NextEra's ability to reduce output, raise its rivals' costs, control prices, and exclude competition.

### D.    Market Definition and NextEra's Monopoly Power in Defined Markets

387.    To the extent that Avangrid is legally required to prove monopoly power through circumstantial evidence, Avangrid alleges that at all relevant times, NextEra has had monopoly power in the downstream market for wholesale electric energy supply and electric capacity in ISO-New England, as well as the upstream market for access to the downstream markets.

388.    Entry into electricity generation and transmission is difficult, expensive, capital-intensive, and time consuming.  NextEra's actions greatly increased the barriers to entry into the markets alleged here, and specifically barred NECEC from entering for years.

389.    Since NextEra owns and controls the Seabrook breaker, NextEra effectively has ultimate control and 100% market share over the last bottleneck input that any new generation requires to be able to interconnect.  This ultimate control over a critical input to new generation interconnection results in NextEra having market power in both the upstream input market and the downstream supply of capacity and power into ISO-NE markets.

390.    NextEra's wielding of its monopoly power has occurred in an upstream input market, through NextEra's ownership and refusal to upgrade a critical input, that would have allowed NECEC to supply into the downstream capacity and power markets.

### 1.    Downstream Markets in Which NextEra Participates

391.    "Wholesale Electricity" is a distinct and proper product market ("First Product Market").  Wholesale sale of electricity is a distinct market from sales of power at retail service due to the structure of the grid as regulated by FERC and centrally administered by ISO-New England.  Except in quite limited circumstances, end-use consumers purchase electricity provided by utilities and other retail sellers of electricity, and cannot access wholesale power, and vice versa.[175]

392.    The electric industry and its state and federal regulators and the public recognize wholesale sales of electricity as a distinct market.  Participation in the physical wholesale electricity market has high barriers to entry.  The construction of electric power generators and transmission systems is highly capital intensive and requires specialized vendors.  At bottom, physical wholesale electricity power production and sale is a unique product with no substitutes in New England.

393.    "Wholesale Electric Capacity" is also a distinct and proper product market ("Second Product Market").  Wholesale sale of electric capacity is when the electric power generation entity is selling a *commitment* to be available to produce electricity at some point in the future.  Thus, it is distinct from the sale of physical electricity output (the "Wholesale Electricity" described above).

---

[175] The exceptions are limited to a very small number of large industrial consumers, such as a large factory.

394.    The electric industry and its state and federal regulators and the public recognize wholesale sales of electric capacity as a distinct market.  The construction of electric power generators and transmission systems is highly capital intensive and requires specialized vendors.  At bottom, wholesale electric capacity and sale is a unique product with no substitutes.

395.    ISO-New England's control area (Massachusetts, Maine, Vermont, New Hampshire, Connecticut, and Rhode Island) is a distinct and proper geographic market ("First Geographic Market") for both the First and Second Product Markets, due to the distinct nature of the electrical grid in that region.  As explained herein, pursuant to federal law, FERC regulates ISO-New England as the single independent grid operator for the New England region.  A power generator seeking to be dispatched in New England to generate and deliver electricity at wholesale must participate in ISO-New England's Real-Time and Day-Ahead marketplaces.  There are no substitutes to the ISO-New England marketplaces for power producers seeking to (a) physically produce electricity and/or deliver it on to the region's high-voltage system *and* (b) sell it to wholesale buyers (e.g., electric utilities and retail marketing firms who sell to consumers) in New England.

396.    And a power generator seeking to commit future electricity production capacity into a centralized market in the region must similarly participate in ISO-New England's wholesale marketplaces.  Forward capacity agreements, whether entered through the ISO-New England Forward-Capacity marketplace or privately through bilateral agreements, nonetheless lead to power sales that must be physically cleared for dispatch and sale on the Wholesale Marketplaces, for which there are no substitutes.

397.    NextEra and Avangrid compete in ISO-New England for both Product Markets, i.e., for the supply of electric capacity in the Forward-Capacity marketplace and for bilaterally

negotiated contracts, and for the production/delivery/supply of power in ISO-New England to be exchanged on the Day-Ahead and Real-Time electric-energy marketplaces.  Avangrid presently competes with NextEra through Avangrid's existing power generation assets, and Avangrid's NECEC will compete with NextEra through Avangrid's partnership with Hydro-Québec to provide power via NECEC.

398.    NextEra's participation in the downstream market for electricity and capacity provides NextEra with the economic incentive to foreclose competitors through its control of (and failure to upgrade) the Seabrook breaker, a bottleneck input that would allow competitors access to the ISO-NE downstream markets.

399.    The Seabrook Breaker, which is under NextEra's control, comprises a critical component of the electrical infrastructure required to enable the interconnection of new generation facilities to the ISO-New England grid.  New generation, i.e., additional entry, has been foreclosed from interconnecting into the First Geographic Market but-for NextEra's upgrade of the Seabrook Breaker.  As demonstrated earlier (Section V.C), new electric resources with low variable cost (such as NECEC) will reduce the cost of electric energy and deliver additional benefits to ratepayers or consumers.  These facts provide direct evidence of NextEra's monopoly power in both Product Markets in the First Geographic Market because NextEra's conduct allows NextEra to both exclude competition and control prices, pushing prices higher than they otherwise would be, to the detriment of electricity consumers in Massachusetts.

400.    Finally, at various times, NextEra has had market and/or monopoly power in the market for Wholesale Electricity and Wholesale Electric Capacity in certain transmission-constrained, narrower geographic submarkets that arise in particular operating conditions within ISO-New England ("Second Geographic Market").

401.    Transmission-constrained areas are proper geographic submarkets.  Transmission lines have physical delivery limits; when such limits prevent the dispatch of economical power located in one part of the region for delivery to consumers in another, transmission "congestion" occurs, and more expensive resources closer to consumers must be dispatched to keep the lights on for those consumers.  In such circumstances, the transmission-constrained areas are considered to be "isolated" or "islanded" from other parts of the larger ISO-New England grid.  When those transmission constraints "bind" at different times in ISO-New England's region, the electricity wholesale buyers in that transmission-constrained area have fewer options for purchasing and accessing delivery of needed physical electric supply (which is purchased on the ISO-New England Day-Ahead and Real-Time marketplaces).  The prevalence of transmission-constrained areas as geographic submarkets within the ISO-New England region is a well recognized commercial reality by market participants.[176]  Under some operating conditions, NextEra also has market power in certain transmission-constrained geographic submarkets within ISO-New England for the supply of electric power in the Day-Ahead and Real-Time marketplaces.

402.    Based on which transmission constraints "bind" at any particular time, NextEra also has market power and/or monopoly power in transmission-constraint-dependent geographic submarkets within ISO-New England for both Product Markets (the supply of electric power in the Day-Ahead and Real-Time marketplaces, and the supply of electric wholesale capacity in the Forward-Capacity marketplace).  NextEra's market power in these submarkets varies (depending on season and time of day for Wholesale Electricity, and by year for Wholesale Capacity).  At any given time, NextEra's market share in ISO-New England submarkets may change, and depending on the factors described below, on information and belief, NextEra has market shares approaching

---

[176]  For example, forward capacity auctions in ISO-New England often result in different market prices for different regions or zones which become import or export constrained at different times.

100%, demonstrating monopoly power in particular geographic submarkets depending on which transmission constraints bind at different points in time.

## 2.    Upstream Markets in Which NextEra Participates

403.    A critical input into the supply of downstream wholesale electricity and capacity is access to the ISO-NE power grid.  The single bottleneck to interconnection of new wholesale electricity and capacity supply into the ISO-New England downstream markets is the Seabrook Breaker.  The upstream input market for a new source of electric power generation to be able to *access* the New England grid is a separate product market from the downstream market of transmitting and selling that power into ISO-New England through the Real-Time, Day-Ahead, and capacity marketplaces.  The upstream input market to *access* the ISO-New England grid is the "Third Relevant Product Market."

404.    NextEra has 100% control over ownership of that bottleneck resource (i.e., 100% share), and thus monopoly power over the Third Relevant Market.

405.    It is clear and irrefutable that NextEra not only has monopoly power over the bottleneck input in the upstream market, but also that NextEra has wielded that market power to raise rivals' costs and foreclose entry into the downstream markets for wholesale electric power and capacity.

406.    NextEra's presence as a competitor in the downstream market ensures that NextEra can recoup the benefits of this foreclosure through the resultant higher prices in the downstream market when competitors are excluded from upstream input market that delivers access to the ISO-New England grid.

### IX. <u>NEXTERA HAS STIFLED COMPETITION IN THE RELEVANT MARKETS, THEREBY MAINTAINING AND ENHANCING ITS MONOPOLY POWER</u>

407.    As a result of NextEra's exclusionary scheme described in Paragraphs 1 through 406, NextEra has greatly delayed entry by NECEC, and prevented NECEC from bringing cleaner, lower-priced electricity to Massachusetts and New England residents.  In addition, NextEra's exclusionary conduct has raised NECEC's cost of entry by at least 30%.

408.    NextEra's scheme—including the sham petitioning and baseless referenda, the false statements and duplicity (and unlawful political campaigning), and the exclusion of competition through its refusal to upgrade the Seabrook Breaker—has harmed competition and the competitive process in ISO-New England and the Relevant Markets.  All parts of NextEra's scheme, individually and combined, have allowed NextEra to maintain and wield its veto card over any new significant power generation source seeking to connect to and compete in ISO-New England.  That is, NextEra's conduct has allowed it to wield its control of the Seabrook Breaker to exclude rivals from ISO-New England marketplaces and the Relevant Markets.

409.    The direct effect of NextEra's Seabrook Breaker bottleneck and exclusionary scheme has been NextEra's reaping of monopoly profits from Massachusetts and New England consumers, by raising prices as compared to competing on the merits against Avangrid.

410.    In addition, the introduction of new significant sources of less expensive power generation displaces higher priced generation allowing lower priced generation units to lower the market-clearing price in electric power auctions (as explained in Section V.C above).  As a result of NextEra's foreclosure of its less expensive power generation rivals, NextEra has maintained and is maintaining artificially high prices in ISO-New England and the Relevant Markets.

411.    NextEra's foreclosure of rivals has artificially limited the growth of supply of electric power in ISO-New England and the Relevant Markets, which is equivalent to reducing output.

412.    NextEra's foreclosure of rivals has stalled and raised the cost of Massachusetts's clean energy transition and led to greater $CO_2$ emissions.

413.    NextEra's conduct targeted competition in Massachusetts specifically.  NextEra's conduct targeted Massachusetts not only because Massachusetts consumers are being harmed by paying supracompetitive prices, and because Massachusetts's legislative mandates for a clean energy transition are being delayed, but also because the electricity marketplaces for Massachusetts and all of New England are entirely cleared and settled by ISO-New England, physically located in Holyoke, Massachusetts.

414.    As a result of NextEra's conduct, not only have consumers paid supracompetitive prices, the foreclosure of NECEC has postponed Massachusetts and New England's clean energy transition.

415.    NextEra's exclusionary scheme has also harmed Avangrid by raising its NECEC construction costs stemming from years of project delay.  As a result of NextEra's conduct, Avangrid has been damaged in the form of, including but not limited to, cost overruns, re-negotiation for contractors, legal fees, revised pricing for various projects, and delay in bringing in revenue from NECEC.

416.    Additionally, NextEra's exclusionary scheme has caused Avangrid to lose hundreds of millions of dollars in revenue.  But for NextEra's exclusionary scheme, NECEC would have been in use in December 2022, but now has the best-case estimated in-service date of February 2026.  As a result of over three years of delay that NextEra caused with its unlawful

conduct, NECEC was unable to generate and collect revenue, and Massachusetts citizens were denied the financial, economic and environmental benefits from NECEC for at least three years.

## X.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF – SHERMAN ACT (15 U.S.C. § 2)
#### Monopolization of the Relevant Markets

417.   Avangrid repeats and realleges Paragraphs 1 through 416 as set forth herein.

418.   NextEra has exerted monopoly power to exclude competition in violation of Section 2 of the Sherman Act.

419.   NextEra has also monopolized the Relevant Markets in violation of Section 2 of the Sherman Act.

420.   NextEra has monopoly power in the Relevant Markets.  NextEra has controlled the competitive process by its conduct.

421.   Through the scheme described above (sham petitioning, false statements and campaign finance law violations, exclusion of competition through a bottleneck monopoly, and other scorched earth opposition), and other conduct likely to be revealed in discovery, NextEra has willfully and unlawfully maintained and enhanced its monopoly power in violation of Section 2 of the Sherman Act.  NextEra's scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

422.   NextEra's power to withhold upgrades to the Seabrook Breaker gave NextEra exclusive control and a corresponding ability to foreclose the entry of virtually any substantial, new generation resources into ISO-New England.  As a result, NextEra has already achieved and is exercising monopoly power in the Relevant Markets.

423.   The other elements of NextEra's scheme described in Sections VI.A, and VI.B were targeted at maintaining and enhancing NextEra's monopoly power in the Relevant Markets and

with the intent to foreclose competition.  If NECEC is permitted to interconnect to the New England grid, it could only be because the Seabrook Breaker was upgraded, and an upgrade to the Breaker would cause NextEra to lose its veto card, i.e., its ability to monopolize and control entry into the Relevant Markets.

424.    NextEra's scheme has stifled competition in the Relevant Markets and thwarted Massachusetts's purpose in enacting the Energy Diversity Act.

425.    As a direct result of NextEra's conduct, Avangrid suffered significant and continuing damages, including but not limited to lost profits and increased construction costs and attorneys' fees.

426.    As a result of NextEra's actions complained of herein, Avangrid has been damaged in an amount exceeding $350 million, the full amount of which remains to be determined.

### SECOND CLAIM FOR RELIEF – MASSACHUSETTS ANTITRUST ACT
### (MASS. GEN. LAWS CH. 93, § 5)
### Monopolization of the Relevant Markets

427.    Avangrid repeats and realleges Paragraphs 1 through 426 as set forth herein.

428.    NextEra has exerted monopoly power to exclude competition in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93, § 5.

429.    NextEra has also monopolized the Relevant Markets in violation of Section 5 of the Massachusetts Antitrust Act.

430.    NextEra has monopoly power in the Relevant Markets.  NextEra has controlled the competitive process by its conduct.

431.    Through the scheme described above (sham petitioning, false statements and campaign law violations, exclusion of competition through a bottleneck monopoly, and other scorched- earth opposition), and other conduct likely to be revealed in discovery, NextEra has

willfully and unlawfully maintained and enhanced its monopoly power in violation of Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93, § 5.   NextEra's scheme constitutes exclusionary conduct within the meaning of Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93, § 5.

432.    NextEra's power to withhold upgrades to the Seabrook Breaker gave NextEra exclusive control and a corresponding ability to foreclose the entry of virtually any substantial, new generation resources into ISO-New England.  As a result, NextEra has already achieved and is exercising monopoly power in the Relevant Markets.

433.    The other elements of NextEra's scheme described in Sections VI.A, and VI.B were targeted at maintaining and enhancing NextEra's monopoly in the Relevant Markets.  If NECEC is permitted to interconnect to the New England grid, it could only be because the Seabrook Breaker was upgraded, and an upgrade to the Breaker would cause NextEra to lose its veto card, i.e., its ability to monopolize and control entry into the Relevant Markets.

434.    NextEra's scheme has stifled competition in the Relevant Markets.

435.    As a direct result of NextEra's conduct, Avangrid suffered significant and continuing damages, including but not limited to lost profits and increased construction costs and attorneys' fees.

436.    As a result of NextEra's actions complained of herein, Avangrid has been damaged in an amount exceeding $350 million, the full amount of which remains to be determined.

### **THIRD CLAIM FOR RELIEF – SHERMAN ACT (15 U.S.C. § 2)**
### **Attempted Monopolization of the Relevant Markets**

437.    Avangrid repeats and realleges Paragraphs 1 through 436 as set forth herein.

438.    Through the scheme described above, and other conduct likely to be revealed in discovery, NextEra has engaged in anticompetitive conduct with a specific intent to monopolize the Relevant Markets.

439.    NextEra has market power in the Relevant Markets.

440.    If not curtailed, NextEra's conduct will continue to keep competitor power generators from entering the New England grid, resulting in a dangerous probability of NextEra achieving monopoly power in the Relevant Markets.

441.    As a result of NextEra's conduct, Avangrid suffered significant and continuing damages, including but not limited to lost profits and increased construction costs and attorneys' fees.

442.    As a result of NextEra's actions complained of herein, Avangrid has been damaged in an amount exceeding $350 million, the full amount of which remains to be determined.

### FOURTH CLAIM FOR RELIEF – MASSACHUSETTS ANTITRUST ACT
### (MASS. GEN. LAWS CH. 93, § 5)
### Attempted Monopolization of the Relevant Markets

443.    Avangrid repeats and realleges Paragraphs 1 through 442 as set forth herein.

444.    Through the scheme described above, and other conduct likely to be revealed in discovery, NextEra has engaged in anticompetitive conduct with a specific intent to monopolize the Relevant Markets.

445.    NextEra has market power in the Relevant Markets.

446.    If not curtailed, NextEra's conduct will continue to keep competitor power generators from entering the New England grid, resulting in a dangerous probability of NextEra achieving monopoly power in the Relevant Markets.

447. As a result of NextEra's conduct, Avangrid suffered significant and continuing damages, including but not limited to lost profits and increased construction costs and attorneys' fees.

448. As a result of NextEra's actions complained of herein, Avangrid has been damaged in an amount exceeding $350 million, the full amount of which remains to be determined.

### FIFTH CLAIM FOR RELIEF – SHERMAN ACT (15 U.S.C. § 2)
### Conspiracy to Monopolize

449. Avangrid repeats and realleges Paragraphs 1 through 448 as set forth herein.

450. NextEra agreed with others to undertake the scheme and conduct described herein either in whole or in part with the intent of excluding Avangrid from the Relevant Markets for years.

451. NextEra entered into a conspiracy with at least The Hawthorn Group, Bernstein Shur, Alpine Initiatives, and Stop the Corridor (along with its principal officer Lance Dutson and additional officer Riley Ploch). Dutson and Ploch, working on behalf of Stop the Corridor and NextEra, organized a joint effort to delay NECEC using illegal and surreptitious means. NextEra conspired to achieve this delay with Dutson, Ploch, Stop the Corridor, The Hawthorn Group, Bernstein Shur, Alpine Initiatives, and other groups including but not limited to the Natural Resources Council of Maine and Say No to NECEC. NextEra and its co-conspirators worked with a unity of purpose and common design towards achieving NextEra's goal of impeding NECEC.

452. As alleged throughout, NextEra and its co-conspirators undertook overt acts in furtherance of their conspiracy to monopolize the Relevant Markets. NextEra violated Good Utility Practice in refusing to upgrade its Seabrook Breaker so as to retain a veto over NECEC, instigated sham petitions to delay Avangrid's receipt of various permits and regulatory approvals, and NextEra funded a campaign of false and deceptive statements designed to discredit Avangrid

during the pendency of the referenda against NECEC. With the aim of achieving a NextEra monopoly, Stop the Corridor and Lance Dutson carried out a political operation against Avangrid and NECEC through direct sham political activity such as advertising and coordinating signature gathering, as well as by bankrolling groups also working to stop NECEC.

453.    NextEra conspired against Avangrid with the specific intent to monopolize by excluding Avangrid from the Relevant Markets as described by the conduct alleged herein. NextEra's co-conspirators, in particular Lance Dutson, Riley Ploch, and Stop the Corridor, prosecuted their campaign against Avangrid and NECEC with the explicit goal of keeping NECEC from operating for years. Dutson, Ploch, and Stop the Corridor acted at the behest of NextEra to aid it in its exclusionary acts towards Avangrid's NECEC.

454.    NextEra's conspiracy with Stop the Corridor, Dutson, Ploch, and others caused Avangrid to suffer significant and continuing damages and protected NextEra's monopoly profits.

### SIXTH CLAIM FOR RELIEF – MASSACHUSETTS ANTITRUST ACT (MASS. GEN. LAWS CH. 93, § 5)
### Conspiracy to Monopolize

455.    Avangrid repeats and realleges Paragraphs 1 through 454 as set forth herein.

456.    NextEra agreed with others to undertake the scheme and conduct described herein either in whole or in parts with the intent of excluding Avangrid from the Relevant Markets for years.

457.    NextEra entered into a conspiracy with at least The Hawthorn Group, Bernstein Shur, Alpine Initiatives, and Stop the Corridor (along with its principal officer Lance Dutson and additional officer Riley Ploch). Dutson and Ploch, working on behalf of Stop the Corridor and NextEra, organized a joint effort to delay NECEC using illegal means. NextEra conspired to achieve this delay with Dutson, Ploch, Stop the Corridor, The Hawthorn Group, Bernstein Shur,

Alpine Initiatives, and other groups including but not limited to the Natural Resources Council of Maine and Say No to NECEC.  NextEra and its co-conspirators worked with a unity of purpose and common design towards achieving NextEra's goal of impeding NECEC.

458.    As alleged throughout, NextEra and its co-conspirators undertook overt acts in furtherance of their conspiracy to monopolize the Relevant Markets.  NextEra violated Good Utility Practice in refusing to upgrade its Seabrook Breaker so as to retain a veto over NECEC, instigated sham petitions to delay Avangrid's receipt of various permits and regulatory approvals, and NextEra funded a campaign of false and deceptive statements designed to discredit Avangrid during the pendency of the referenda against NECEC.  With the aim of achieving a NextEra monopoly, Stop the Corridor and Lance Dutson carried out a political operation against Avangrid and NECEC through direct sham political activity such as advertising and coordinating signature gathering, as well as by bankrolling groups also working to stop NECEC.

459.    NextEra conspired against Avangrid with the specific intent to monopolize by excluding Avangrid from the Relevant Markets as described by the conduct alleged herein.  NextEra's co-conspirators, in particular Lance Dutson, Riley Ploch, and Stop the Corridor, prosecuted their campaign against Avangrid and NECEC with the explicit goal of keeping NECEC from operating.  Dutson, Ploch, and Stop the Corridor acted at the behest of NextEra to aid it in its attempt to exclude Avangrid from the Relevant Markets.

460.    NextEra's conspiracy with Stop the Corridor, Dutson, Ploch, and others caused Avangrid to suffer significant and continuing damages and protected NextEra's monopoly profits.

## **SEVENTH CLAIM FOR RELIEF – CIVIL CONSPIRACY**

461.    Avangrid repeats and realleges Paragraphs 1 through 460 as set forth herein.

462.     NextEra engaged in the violations described above in Paragraphs 1 through 355 in furtherance of its illegal scheme, including engaging in conduct that constituted intentional interference with contract, violations of Mass. Gen. Laws ch. 93A, § 1, and other tortious and exclusionary conduct that is likely to be revealed in discovery.

463.     NextEra conspired with other entities and individuals, including at least Stop the Corridor, Alpine Initiatives, Lance Dutson, Riley Ploch, Red Hill Strategies, Bernstein Shur, The Hawthorn Group, L.C., Natural Resources Council of Maine, and other firms and individuals that will be revealed in discovery, to form a common design or agreement to perpetuate an attack campaign based on false and misleading claims against NECEC using dark money in violation of campaign finance law, and to intervene without basis in NECEC's permitting process for unlawful purposes, including the purposes of increasing Avangrid's burden to comply and/or preventing Avangrid's timely compliance with the contractual agreements between Avangrid and the Massachusetts EDCs and delaying NECEC.

464.     NextEra funded Stop the Corridor, an entity created by Bernstein Shur and The Hawthorn Group, L.C. and controlled by Lance Dutson, with the purpose of delaying or rendering impossible Avangrid's compliance with the contracts it entered with the Massachusetts EDC. Together, these entities and others coordinated a campaign against Avangrid and NECEC through direct sham political activity such as advertising and coordinating signature gathering, illegally using dark money in violation of campaign finance law.

465.     In addition, NextEra and its allies collaborated with the NRCM and others to put forward baseless administrative challenges to NECEC.  This collaboration provided NextEra with an environmentally focused ally to "greenwash" its public campaign against NECEC.  In return,

the NRCM received a donation from Stop the Corridor.  Discovery will reveal the extent of the donations from NextEra and Clean Energy for ME to the NRCM and other local groups.

466.    As a result of being delayed from completing the NECEC transmission line and fighting the series of challenges to and appeals of permits, Avangrid suffered injury.

467.    As a result of NextEra's conduct, Avangrid suffered significant and continuing damages, including but not limited to lost profits and increased construction costs and attorneys' fees.

468.    As a result of NextEra's actions complained of herein, Avangrid has been damaged in an amount exceeding $350 million, the full amount of which remains to be determined.

## EIGHTH CLAIM FOR RELIEF – INTENTIONAL INTERFERENCE WITH CONTRACT

469.    Avangrid repeats and realleges Paragraphs 1 through 468 as set forth herein.

470.    Avangrid has contractual agreements with Massachusetts EDCs to transmit clean, green hydroelectric power for the ultimate benefit of Massachusetts residents and businesses. These contractual agreements include:

  a.  TSA by and between Central Maine Power Company and Nstar Electric Company d/b/a Eversource Energy (June 13, 2018);

  b.  TSA by and between Central Maine Power Company and Massachusetts Electric Company and Nantucket Electric Company d/b/a National Grid (June 13, 2018); and

  c.  TSA by and between Central Maine Power Company and Fitchburg Gas and Electric Light Company d/b/a Unitil (June 13, 2018).

471.    These contractual agreements were available to the public and part of the record generated during NextEra's baseless challenge to the NECEC before the Massachusetts DPU.

472.     Avangrid also has contractual agreements that are a necessary part of constructing NECEC.

473.     Having lost the competitive RFP process to Avangrid and then as a sophisticated and constant presence in every regulatory proceeding or litigation involving NECEC stretching out over years, NextEra was well aware of these Avangrid contracts during the entire course of the events alleged herein.

474.     Through the scheme and conduct described herein, NextEra intentionally and maliciously interfered with Avangrid's contractual obligations and advantageous business relationships for the purpose of delaying Avangrid's market entry.  NextEra knew that its conduct would prevent performance of the contracts and/or make performance more expensive and burdensome.  NextEra took its action with actual malice with an improper motive and/or using improper means.  NextEra knew that its conduct was substantially certain to interfere with Avangrid's contracts and to result in harm to Avangrid.

475.     NextEra employed improper means to interfere with Avangrid's contracts, as described herein, including through NextEra's sham petitioning; use of false and misleading statements, dark money, and campaign finance violations; refusing to upgrade the Seabrook Breaker in violation of industry standards and its own contractual obligations; and with all of the above comprising antitrust violations and business torts.

476.     As a result of NextEra's conduct, Avangrid suffered significant and continuing damages, including but not limited to lost profits and increased construction costs and attorneys' fees.

477.     As a result of NextEra's actions complained of herein, Avangrid has been damaged in an amount exceeding $350 million, the full amount of which remains to be determined.

## **NINTH CLAIM FOR RELIEF – UNJUST ENRICHMENT**

478.    Avangrid repeats and realleges Paragraphs 1 through 477 as set forth herein.

479.    NextEra has engaged in exclusionary and anticompetitive conduct and made deceptive and misleading statements to delay NECEC to increase NextEra's own profits.  NextEra had full knowledge and appreciation as to the benefits it would achieve through its anticompetitive scheme and use of deceptive and misleading statements.

480.    NextEra's conduct harmed Avangrid financially as a result of NECEC's delay, including with respect to direct costs resulting from the delay and Avangrid's delay in earning profit from NECEC.

481.    NextEra's enrichment and the harm to Avangrid are related, in that but for NextEra's conduct, NECEC would have begun operating by December 13, 2022, and Avangrid would not have been financially harmed as a result of the delay.  Thus, NextEra was unjustly enriched at Avangrid's expense.

482.    NextEra's only justification for engaging in the conduct described in this Complaint is its desire to profit in violation of the law.

483.    Allowing NextEra to retain the benefits accrued through its unreasonable, anticompetitive, and deceptive acts would be inequitable absent payment to Avangrid, given that Avangrid has been foreclosed from bringing NECEC online by NextEra's actions.  Avangrid seeks restitution of profits conferred on NextEra whose retention thereof would be unconscionable.

484.    Avangrid seeks this remedy in equity to the extent there is a lack of remedy provided in law.

**TENTH CLAIM FOR RELIEF – REGULATION OF BUSINESS PRACTICES FOR
CONSUMERS PROTECTION (MASS. GEN. LAWS CH. 93A, §§ 2, 11)**
**Unfair Business Practices**

485.    Avangrid repeats and realleges Paragraphs 1 through 484 as set forth herein.

486.    Both Avangrid and NextEra, directly or through subsidiary companies, are engaged in trade or commerce in the Commonwealth of Massachusetts as defined in Mass. Gen. Laws ch. 93A, § 1.  Avangrid and NextEra compete in ISO-New England in the downstream Relevant Markets.  Avangrid competes with NextEra both through its own power generation and in partnership with Hydro-Québec to provide power through NECEC.

487.    NextEra has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11.  NextEra's unfair methods of competition and unfair and deceptive acts and practices include, but are not limited to, monopolization, attempted monopolization, civil conspiracy, the intentional interference with contract, sham litigation, sham and defective referenda, the use of dark money in violation of applicable campaign finance law, and the use and dissemination of false and misleading statements.  NextEra willfully and knowingly acted to delay Avangrid, a business competitor, from completing a transmission line for delivering clean, green hydroelectricity to Massachusetts consumers by filing and/or supporting a series of baseless challenges to and appeals of NECEC's needed permits, which were ultimately granted.

488.    NextEra's conduct targeted competition in Massachusetts by causing Massachusetts customers—who pay some of the highest electricity rates in the country—to pay supracompetitive prices, and also because Massachusetts's legislative mandates for a clean energy transition are being delayed.  Moreover, NextEra's conduct targeted Massachusetts because the

electricity marketplaces for all New England are cleared and settled in Holyoke, Massachusetts by ISO-New England.

489.     Avangrid has suffered and continues to suffer a loss of money as a result of the unfair methods of competition and unfair and deceptive acts and practices committed by NextEra and as such is a proper plaintiff under Mass. Gen. Laws ch. 93A, § 11.

490.     As the direct and proximate result of NextEra's unfair methods of competition and unfair and deceptive acts and practices, Avangrid suffered damages for which NextEra is liable.

491.     As a result of NextEra's conduct, Avangrid suffered significant and continuing damages, including but not limited to lost profits and increased construction costs and attorneys' fees.

492.     As a result of NextEra's actions complained of herein, Avangrid has been damaged in an amount exceeding $350 million, the full amount of which remains to be determined.

## XI.     PRAYER FOR RELIEF

493.     WHEREFORE, Avangrid respectfully prays that the Court enter judgment against NextEra and in favor of Avangrid, as follows:

a.  Declaring NextEra's conduct unlawful and in violation of the above-referenced statutes and common law;

b.  Awarding Avangrid money damages, trebled pursuant to law, plus interest;

c.  Awarding Avangrid damages available in equity;

d.  Awarding Avangrid the costs of this lawsuit, including its reasonable attorneys' fees, expenses and court costs;

e.  Entering appropriate preliminary and permanent injunctive relief barring NextEra from continuing to undertake its anticompetitive scheme; and

f.  Ordering such other and further relief as the Court may deem just, proper, and equitable.

## XII.    <u>JURY TRIAL DEMANDED</u>

494.    Avangrid demands a trial by jury for all issues triable by jury.


Dated: November 12, 2024                          Respectfully submitted,


                                                  */s/ Michael Kendall*
                                                  Michael Kendall (#544866)
                                                  **White & Case LLP**
                                                  75 State Street
                                                  Boston, Massachusetts 02109-1814
                                                  Tel: (617) 979-9300
                                                  Fax: (617) 979-9301
                                                  michael.kendall@whitecase.com

                                                  J. Mark Gidley (*Pro Hac Vice* forthcoming)
                                                  Kathryn J. Mims (*Pro Hac Vice* forthcoming)
                                                  Jaclyn Phillips (*Pro Hac Vice* forthcoming)
                                                  **White & Case LLP**
                                                  701 13th Street NW
                                                  Washington, DC 20005-3807
                                                  Tel: (202) 626-3600
                                                  Fax: (202) 639-9355
                                                  mgidley@whitecase.com
                                                  kmims@whitecase.com
                                                  jaclyn.phillips@whitecase.com

                                                  John P. Pucci (#407560)
                                                  Michael D. Roundy (#669357)
                                                  **Bulkley, Richardson and Gelinas, LLP**
                                                  1500 Main Street, Suite 2700
                                                  Springfield, Massachusetts 01115-5507
                                                  Tel: (413) 272-6290
                                                  Fax: (413) 707-1746
                                                  jpucci@bulkley.com
                                                  mroundy@bulkley.com

                                                  *Counsel for Avangrid, Inc., Avangrid*
                                                  *Networks, Inc., Central Maine Power*
                                                  *Company, and NECEC Transmission LLC*

## APPENDIX

| Common Abbreviations & Acronyms | | First Use |
|---|---|---|
| AC/DC | Alternating Current/Direct Current | 32 |
| BEP | Board of Environmental Protection | 54 |
| BQC | Ballot Question Committee | 56 |
| CMP | Central Maine Power Company | 7 |
| CPCN | Certificate of Public Convenience and Necessity | 39 |
| DEP | Department of Environmental Protection | 9 |
| DOER | Department of Energy Resources | 7 |
| DPU | Department of Public Utilities | 9 |
| EDC | Electric Distribution Company | 7 |
| FERC | Federal Energy Regulatory Commission | 5 |
| FPL | Florida Power & Light | 58 |
| HQUS | H.Q. Energy Services (US) Inc. | 34 |
| HVDC | High-Voltage Direct Current | 7 |
| ISOs | Independent Systems Operators | 20 |
| kV | Kilovolt | 32 |
| LGIA | Large Generator Interconnection Agreement | 41 |
| MCPC | Maine Clean Power Connection | 32 |
| MLP | Mainers for Local Power | 11 |
| MW | Megawatt | 22 |
| MWh | Megawatt Hour | 32 |
| NECEC | New England Clean Energy Connect | 1 |
| NRCM | Natural Resources Council of Maine | 55 |
| PAC | Political Action Committee | 11 |
| PPA | Power Purchase Agreement | 34 |
| PUC | Public Utilities Commission | 9 |
| RFP | Request for Proposal | 31 |
| RTOs | Regional Transmission Organizations | 20 |
| SIS | System Impact Study | 40 |
| TSA | Transmission Service Agreement | 34 |