UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AVANGRID, INC., AVANGRID NETWORKS, INC., CENTRAL MAINE POWER COMPANY, and NECEC TRANSMISSION LLC, <br><br> Plaintiffs, <br><br> v. <br><br> NEXTERA ENERGY, INC., NEXTERA ENERGY CAPITAL HOLDINGS, INC., NEXTERA ENERGY RESOURCES, LLC, and NEXTERA ENERGY SEABROOK, LLC, <br><br> Defendants. | Civil Action No. 24-30141-MGM |

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS
(Dkt. No. 57)

September 22, 2025

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

At its core, this action seeks to shift the costs of regulatory friction associated with construction of a large-scale public utility project from the entities developing the project—Avangrid Inc., Avangrid Networks, Inc., Central Maine Power Company, and NECEC Transmission LLC (collectively "Avangrid" or "Plaintiffs")—to competitors whose actions delayed the project—NextEra Energy, Inc., NextEra Energy Capital Holdings, Inc., NextEra Energy Resources, LLC, and NextEra Energy Seabrook, LLC (collectively "NextEra" or "Defendants").[1] The events leading to this

---

[1] Avangrid Networks, Inc., Central Maine Power Company, and NECEC Transmission LLC are directly or indirectly wholly owned subsidiaries of Avangrid Inc., a New York Corporation with a principal place of business in Connecticut. (Compl., Dkt. No. 1, ¶ 52; Corp. Discl. Statement, Dkt. No. 2.) NextEra Energy

litigation began after Massachusetts adopted legislation aimed at increasing the supply of "clean" energy available to Massachusetts electric consumers. Avangrid, NextEra, and other companies submit bids to build projects designed to meet the state's clean energy goals. Massachusetts selected a project proposed jointly by Avangrid and Hydro-Québec and known as New England Clean Energy Connect ("NECEC"). After NECEC was selected as the winning project bid, NextEra used political and regulatory channels to delay or prevent Avangrid from obtaining the approvals needed to construct the project. Avangrid contends NextEra's actions lacked a legitimate business purpose and increased the cost to complete NECEC by 30%.

Plaintiffs now seek to recoup those additional expenses from Defendants. In this action, brought pursuant to both the court's federal question and diversity jurisdiction, Plaintiffs allege Defendants' conduct ran afoul of federal and state antitrust laws, specifically Section 2 of the Sherman Act, 15 U.S.C. § 2 (Counts I, III, and V) and corresponding provisions of the Massachusetts Antitrust Act, Mass. Gen. Laws c. 93, § 5 (Counts II, IV, and VI), and also state statutory and common law provisions barring intentional interference with contract (Counts VII and VIII), unjust enrichment (Count IX), and unfair business practices (Count X). Defendants have moved to dismiss the complaint in its entirety. They argue all their actions were permissible under federal and state law and they are not liable for the damages Avangrid suffered due to NECEC delays. The court held a hearing during which it limited argument to the antitrust claims. For the reasons that follow, this court concludes Plaintiffs' complaint fails to plausibly state violations of Section 2 of the Sherman Act and the Massachusetts Antitrust Act. The court will issue a separate order addressing the remaining state claims. Either party may request the court consider additional briefing or hear oral argument on those claims by filing a motion within fourteen days from the date of this order.

Resources, LLC, and NextEra Energy Seabrook, LLC are indirect wholly owned subsidiaries of NextEra Energy, Inc., a Florida corporation with a principal place of business in Florida. (Compl, Dkt. No. 1, ¶ 57; Corp. Disc. Statement, Dkt. No. 19.)

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); Fed. R. Civ. P. 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court accepts all well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor, but "do[es] not credit legal labels or conclusory statements." *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022). Dismissal is appropriate if the complaint fails to establish at least one "material element necessary to sustain recovery under some actionable legal theory." *N.R. by and through S.R. v. Raytheon Co.,* 24 F.4th 740, 746 (1st Cir. 2022) (internal quotations omitted).

## III.   BACKGROUND[2]

A.   The Massachusetts Electricity Market

The generation, transmission, and distribution of electricity are highly regulated activities. Generation facilities are subject to different regulators depending on the method used to generate electricity. Interstate transmission and the wholesale electricity market are regulated by the Federal

---

[2] These facts are primarily drawn from Plaintiffs' complaint. (Dkt. No. 1.) Additional facts are taken from judicial decisions referenced in the Complaint. In particular, the court has taken notice of facts regarding the history, regulation, and operation of the New England power grid set forth in *NextEra Energy Resources, LLC v. Federal Energy Regulatory Commission*, 118 F.4th 361 (D.C. Cir. 2024).  *See Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020) (describing "matters susceptible to judicial notice" which may be considered by a district court deciding a motion to dismiss).

Energy Regulatory Commission ("FERC"). States regulate the intrastate transmission of electricity and local distribution to retail consumers by electric distribution companies ("EDCs").

"The transmission market has high barriers to entry, so transmission owners typically enjoy a natural monopoly." *NextEra Energy Resources, LLC v. Federal Energy Regulatory Commission*, 118 F.4th 361, 365 (D.C. Cir. 2024) (internal quotations omitted). FERC has taken steps to ensure owners of transmission facilities do not exploit their monopoly power in a manner that harms consumers. In 2003, FERC adopted a regulation which requires transmission facilities to use standard Large Generator Interconnection Agreements ("LGIAs") to give generators larger than 20 megawatts ("MWs") equal access to interconnect to transmission facilities. FERC has also encouraged owners of transmission facilities to establish Independent System Operators "to operate transmission facilities on behalf of the individual owners." *Id.* at 366. In New England, an independent system operator—ISO New England ("ISO-NE")—manages the flow of high-voltage electricity, operates the single regional power grid covering the six New England states, and administers the wholesale marketplaces for electricity deliverable to consumers through the power grid. Consistent with its obligations under the Federal Power Act, 16 U.S.C. § 824d(c), ISO-NE "has filed a systemwide tariff setting rates and other terms of service." *Id.* The ISO-NE tariff (the "Tariff") includes rules for interconnecting new sources of electricity without endangering the reliability of the facilities already connected to the regional power grid. Under the applicable rules, new sources of electricity cannot connect to the grid if the interconnection would have a significant adverse effect on the reliability of the facilities already connected to the grid. Before approving a new connection, the Tariff requires ISO-NE conduct a study to identify any potential, significant adverse effects. If the study identifies an issue, ISO-NE determines what upgrades are reasonably necessary to avoid the issue and the party seeking interconnection must complete or fund the work before interconnecting to the grid.

Electricity must be generated, transmitted, and delivered simultaneously because electricity cannot be effectively stored within the existing grid. Since electric consumption fluctuates, the amount of electricity moving within the grid is constantly adjusted. ISO-NE uses three separate markets to ensure EDCs can purchase competitively priced electricity in sufficient quantities to meet the needs of retail consumers. EDCs can purchase power (1) during a particular hour for immediate distribution to retail consumers (the "Real-Time" marketplace); (2) commit to purchasing electricity to be delivered to retail consumers the following day (the "Day-Ahead" marketplace); or (3) purchase capacity for power production three years in advance (the "Forward-Capacity" marketplace). When the future production date arrives, the electricity that is actually generated must be offered on the Day-Ahead or Real-Time marketplace.

In the Day-Ahead and Real-Time markets, generating entities offer to sell a set quantity of electricity for a specific price per MW. ISO-NE lines up the offers from lowest to highest price and the least expensive electricity available is used to fill the order. Some generating facilities provide a consistent supply of electricity and have relatively fixed operational costs regardless of the amount of electricity generated. Other facilities can increase or decrease production based on demand; typically, facilities with this type of flexibility produce electricity by burning fossil fuels and have relatively high operational costs during periods of production. Generating facilities with fixed costs typically offer power at a lower cost per MW than facilities with more variable production and operational costs.

When an order is filled with power offered at different prices, the highest price is the price the EDCs pay to all included generating entities. Under this system, the price power generators receive is determined by the price of the most expensive power required to meet the level of demand, rather than the price each power generator sets for the power it produces. As a result, an increase in the amount of power offered by lower-cost generators will reduce the need for more

expensive power and the higher rates paid to all suppliers when consumer demand requires EDCs obtain electricity from higher-cost generators in the Real-Time or Day-Ahead markets. There may be some areas in Massachusetts where a limited number of power generators participate in the Day-Ahead and Real-Time markets due to transmission constraints, but Plaintiffs have not specifically identified any such areas or identified the power generators that occupy favorable positions in those areas.

Avangrid and NextEra both sell power through the wholesale markets administered by ISO-NE. NextEra owns and operates eleven power generation plants in New England with a combined generation capacity of over 2,700 MWs of power. Three of the power plants NextEra operates in New England rely on fossil fuels and one, Seabrook Station, is a large nuclear power plant that incurs significant, fixed operating costs and generates a relatively consistent supply of electricity. Plaintiffs have alleged NextEra is the largest power company in the United States as measured by market capitalization, as well as the largest publicly traded power company in the world, but they have not alleged the percentage of generation capacity available on the New England grid that is controlled by NextEra or how many competitors sell wholesale electricity in the ISO-NE marketplaces.

Avangrid has alleged that, prior to November 2024, NextEra could exclude new entrants to the wholesale electricity marketplaces operated by ISO-NE because ISO-NE would not approve interconnection of significant additional generation capacity until after a circuit breaker installed at Seabrook Station (the "Breaker") had been upgraded. Electricity generated at Seabrook Station enters the grid through the Breaker and if there is a fault current on the grid, the Breaker temporarily cuts Seabrook Station off to prevent damage to Seabrook Station and the grid. To function properly, the Breaker's capacity must be sufficient to handle the amount of power flowing through the grid. By 2020 the Breaker was operating at 99.6% of its capacity. Operating this close to capacity created

some safety risks. The addition of new power to the grid, at the scale proposed by NECEC, would have exceeded the capacity of the Breaker and created significant new safety and reliability risks for Seabrook Station and the grid. Pursuant to the Tariff, a project like NECEC could not interconnect to the grid until the Breaker was upgraded, but once upgraded, the Breaker will not be a factor for future interconnections until the power on the grid would exceed the capacity of the upgraded Breaker.

B.      Massachusetts Clean Energy Legislation

The Massachusetts legislature has adopted legislation aimed at reducing the state's consumption of fossil fuels. In early 2017, Massachusetts EDCs issued a request for proposals ("RFP") for projects to increase the amount of sustainably generated electricity available to Massachusetts consumers. As required by the statute, the Massachusetts Department of Environmental Resources ("DEP") and the Massachusetts Attorney General's Office selected an independent evaluator to monitor the bid evaluation and selection process. There were thirty-six submitted bids which met eligibility and other threshold requirements. These included the NECEC bid, submitted by Avangrid, Hydro-Québec, and Avangrid subsidiary Central Maine Power ("CMP"), as well as bids for three different projects submitted jointly by NextEra and CMP.

C.      NECEC Project

In March 2018, Massachusetts EDCs, assisted by the independent evaluator, selected NECEC as the winning bid. The NECEC bid proposed building transmission infrastructure and delivering 1,200 MWs of hydroelectric power generated in Canada to EDCs serving Massachusetts consumers. NECEC has three key physical components: (1) a 145-mile-long high voltage, DC overhead transmission line running through Maine from the Canadian border to Lewiston, Maine;

(2) a new facility to convert the electricity from DC to AC; and (3) a 1.6-mile transmission line from the new converter station to CMP's existing Larrabee Road Substation, where the electricity would enter the New England power grid.

Two sets of contracts govern the delivery of electricity through NECEC. Power Purchase Agreements ("PPAs") between the Massachusetts EDCs and H.Q. Energy Services (US) Inc. ("HQUS"), an affiliate of Hydro-Québec, govern the sale of electricity. Transmission Service Agreements ("TSAs"), one set between NECEC and HQUS and another between NECEC and Massachusetts EDCs, set the terms for transmission. Pursuant to these agreements, Massachusetts EDCs have agreed to purchase 9.45 million MW hours of hydroelectric power per year for 20 years, to be delivered over the NECEC transmission infrastructure.

Successful completion of NECEC required Avangrid to secure a lease allowing construction of transmission infrastructure on public land in Maine, obtain approvals from multiple government entities in Maine and Massachusetts, and interconnect NECEC to the New England power grid. CMP and Maine Bureau of Parks and Land executed the lease on June 30, 2020. Before construction could start, NECEC also required a Certificate of Public Convenience and Necessity ("CPCN") from the Maine Public Utilities Commission ("PUC") and a Development Permit issued by the Maine Department of Environmental Protection ("DEP"). In Massachusetts, the PPAs and TSAs needed to be reviewed and approved by the Massachusetts Department of Public Utilities ("DPU"). Finally, Plaintiffs needed ISO-NE's approval before NECEC could be connected to the New England power grid, and ISO-NE could not approve the interconnection until the Breaker was upgraded.  CMP began the process of obtaining the needed approvals in 2017, before NECEC had been selected as the winning bid. The final step required for interconnection, the Breaker replacement, was not completed until November 2024.

D.    NextEra Opposition to NECEC

NextEra devoted significant resources to block or delay completion of NECEC. Avangrid contends NextEra had no legitimate business purpose for its actions and repeatedly made arguments it knew lacked legal merit for the purpose of driving up Avangrid's costs and delaying completion of NECEC to protect its revenue in the wholesale electricity marketplaces. NextEra's actions fall into three categories: meritless challenges to state regulatory approvals sought by Avangrid; improper support for legally flawed ballot questions to block construction of NECEC in Maine; and impermissible efforts to leverage ownership of the Breaker to add delay and increase Avangrid's costs.

i.    Challenges to State Regulatory Approvals

On September 27, 2017, before NECEC had been selected as the winning bid, CMP filed its CPCN application with the Maine PUC. On March 8, 2018, NextEra sought to intervene by filing a late petition. After reviewing CMP's CPCN application and NextEra's objections, the Maine PUC hearing examiners issued a 162-page report and recommended approval of CMP's petition on March 29, 2019. The Maine PUC rejected NextEra's objections and unanimously granted CMP's CPCN application on May 3, 2019. NextEra appealed the decision to Maine's highest court, relying on the same arguments previously rejected by the Maine PUC. On March 17, 2020, the Maine Supreme Judicial Court affirmed the Maine PUC and concluded NextEra had not shown the Maine PUC's "issuance of the CPCN . . . was arbitrary or otherwise based on an error of law." *NextEra Energy Resources, LLC v. Maine Public Utilities Comm'n*, 227 A.3d 1117, 1129 (2020). Avangrid contends NextEra challenged CMP's application despite knowing its legal arguments were baseless, solely to delay final approval of the CPCN.

CMP also notified the Maine DEP about NECEC and applied for land use permits on September 27, 2017. The Maine DEP assesses the environmental impacts of proposed development projects. NextEra was one of many parties who participated in the Maine DEP's two-year review of CMP's application for permits from the Maine DEP. Although NextEra and CMP had submitted a bid for a project with an above-ground transmission line through the same area where NECEC proposed placing an above-ground transmission line, NextEra argued the Maine DEP should have required a more thorough review of underground placement. The Maine DEP rejected the argument, finding underground transmission lines posed significant technical challenges and increased environmental impacts.

On May 11, 2020, the Maine DEP approved CMP's application for land-use permits for NECEC. NextEra appealed the decision to the Maine Board of Environmental Protection ("BEP"). The appeal was denied on July 21, 2022, in a ruling that rejected NextEra's arguments about underground placement of transmission lines and found its other arguments were futile because NextEra had not presented them to the Maine DEP. NextEra appealed the final decision issued by the Maine BEP to the Kennebec County Superior Court in August 2022, but abandoned the appeal in June 2023.

While CMP's applications were pending in Maine, the Massachusetts EDCs sought review and approval by the Massachusetts DPU of the NECEC PPAs and TSAs. NextEra petitioned to intervene in the process, advanced arguments it knew were factually unsupportable, and requested extensive discovery. NextEra argued there was insufficient evidence demonstrating NECEC could be constructed in a commercially reasonable timeframe, the Larabee Road substation was an inappropriate point to interconnect with the New England power grid, NECEC lacked sufficient protections against power delivery interruptions during the winter, and NECEC would require more transmission upgrades than had been proposed. Following an evidentiary hearing held in February

10

2019, the Massachusetts DPU approved the PPAs on June 25, 2019. The Massachusetts DPU concluded the RFP process had been open, fair, transparent, and reasonable and the PPAs and TSAs satisfied the RFP requirements. In a separate order, the Massachusetts DPU rejected the arguments advanced by NextEra and denied NextEra's discovery requests, finding they had been unreasonable. NextEra appealed the decision, despite knowing that its position lacked merit. In September 2020, the Massachusetts Supreme Judicial Court upheld the approval in a lengthy decision that included strong language rejecting NextEra's arguments. *Nextera Energy Res., LLC v. Dep't of Pub. Utilities*, 152 N.E.3d 48 (Mass. 2020).

       ii.      Ballot Initiatives

After NECEC was selected as the winning bid, NextEra made secret political contributions and funded two unsuccessful efforts to use Maine ballot initiatives to block NECEC. Believing Democrats were more likely to oppose NECEC, NextEra made a $150,000 donation to the Maine Democratic Party on October 30, 2018. The donation was made through a separate entity, Alpine Initiatives, created by NextEra solely to obscure the source of the contribution. Alpine Initiatives did not register as a political action committee ("PAC") and was dissolved after 14 months. The Maine Commission on Governmental Ethics and Election Practices ("Ethics Commission") later found Alpine Initiatives had violated Maine campaign finance law. In 2023, Alpine Initiatives paid a $160,000 penalty and admitted that it should have registered as a PAC and filed a campaign finance report.

NextEra also supported two Maine ballot initiatives. The first initiative sought to require the Maine PUC to rescind its approval of the NECEC CPCN ("Referendum 1"). NextEra created a separate entity, Clean Energy for ME, LLC, which operated under the name Stop the Corridor, to secretly fund and coordinate efforts to place Referendum 1 on the November 2020 ballot. Working

through Stop the Corridor, NextEra also supported efforts by other entities working to place Referendum 1 on the Maine ballot and win voter approval. Between September 2019 and January 2020, Stop the Corridor provided more than $40,000 in donations to a political action committee ("PAC") known as No CMP Corridor and donated undisclosed amounts to the Natural Resources Council of Maine. Stop the Corridor also worked with Mainers for Local Power, another PAC involved in submitting signatures required to get Referendum 1 on the Maine ballot. Entities receiving funds from NextEra via Stop the Corridor often made false public statements about NECEC, the process by which it received governmental approvals, and the social and environmental characteristics of hydroelectric power generated in Québec.

Although Stop the Corridor was directly involved in promoting Referendum 1, it did not register as a ballot question committee or file Maine campaign finance reports between October 2019 and April 2020. Those failures obscured NextEra's support for Referendum 1 and led the Maine Ethics Commission to investigate Stop the Corridor's funding and participation in political activity. Stop the Corridor unsuccessfully challenged the scope of the investigation. In May 2023, the Maine Ethics Commission found Stop the Corridor had violated Maine campaign finance law and fined Stop the Corridor $50,000 in civil penalties. NextEra took steps to ensure it was not identified by name in the consent agreement publicly released after the investigation.

In February 2020, supporters of Referendum 1 submitted enough signatures to qualify Referendum 1 with the Maine Secretary of State for placement on the November 2020 ballot. A few months later, Avangrid filed suit to keep Referendum 1 off the ballot. Avangrid argued Referendum 1 impermissibly sought to use the legislative process to usurp executive and judicial authority in violation of the separation-of-powers clause of the Maine Constitution. The Maine Secretary of State concluded Referendum 1 was not legislative and supported Avangrid's challenge. In August 2020,

12

the Maine Supreme Judicial Court ruled Referendum 1 exceeded the scope of legislative powers conferred on voters under the Maine Constitution and should not be placed on the ballot.

The next month, Thomas Saviello, the head of the No CMP Corridor PAC, filed an application for a second ballot initiative opposing construction of NECEC ("Referendum 2"). Portions of Referendum 2 proposed a retroactive prohibition against construction of high-impact electric transmission lines in the Upper Kennebec region and requirement that a two-thirds majority in each legislative chamber approve any high impact electric transmission line project passing through Maine public lands. Referendum 2 did not identify NECEC as a target, but NECEC was the only project impacted by the retroactive change. NextEra and Mainers for Local Power worked with Saviello to support efforts to place Referendum 2 on the 2021 ballot. Stop the Corridor was under investigation by the Maine Ethics Commission, and NextEra did not attempt to hide its support for Referendum 2. In October 2020, NextEra publicly provided $1,475,000 to Mainers for Local Power, and, over the next year, NextEra made almost $20 million in cash contributions. As occurred during the campaign to support Referendum 1, entities funded by NextEra used the same types of false statements to mislead the public about the NECEC project.

On November 2, 2021, Maine voters approved Referendum 2. Avangrid immediately sought a preliminary injunction from the Maine Business and Consumer Court. While Avangrid's motion was pending, the Maine DEP ordered Avangrid to suspend all construction of NECEC transmission infrastructure due to Referendum 2.[3] NextEra coordinated, and funded, a group, including six individuals and the Natural Resources Council of Maine, who intervened to oppose the injunction.

---

[3] Referendum 2 was also cited in a separate action by a plaintiff who argued it retroactively invalidated the 2020 lease between the Maine Bureau of Parks and Lands and CMP. In November 2022, the Maine Supreme Judicial Court held Referendum 2 was unconstitutional as applied to the 2020 lease, and noted NECEC was the only target of the retroactive application language in Referendum 2. *Black v. Bureau of Parks & Lands*, 288 A.3d 346 (Me. 2022).

The Maine Business and Consumer Court denied Avangrid's motion to enjoin enforcement of Referendum 2 in December 2021, then granted Avangrid's motion to immediately appeal the ruling to the Maine Supreme Judicial Court. Avangrid's appeal received expedited briefing and argument. On August 30, 2022, the Maine Supreme Judicial Court concluded that the relevant portion of Referendum 2 could not be applied retroactively to NECEC's CPCN without "infring[ing] on NECEC's constitutionally-protected vested rights if NECEC can demonstrate by a preponderance of the evidence that it engaged in substantial construction of the [p]roject in good-faith reliance on the authority granted by the CPCN before Maine voters approved [Referendum 2]." *NECEC Transmission LLC v. Bureau of Parks & Lands*, 281 A.3d 618, 637, *as revised* (Me. Sept. 8, 2022). The case was remanded for a trial in the lower court to determine whether NECEC had acquired vested rights in its project prior to voters approving Referendum 2. Following a seven-day trial, a nine-person jury unanimously ruled in Avangrid's favor, finding it had undertaken substantial construction on NECEC in reliance on the CPCN, before Referendum 2 was approved, and according to a schedule that was not created, or expedited, as a means to create a vested rights claim. The trial court entered judgment in Avangrid's favor in April 2023, and there was no appeal.

iii.    ISO-NE Interconnection and the Breaker Upgrade

Before approving NECEC's interconnection to the New England power grid, ISO-NE conducted a System Impact Study to identify any significant adverse effects NECEC's connection might cause to the infrastructure and users already connected to the grid. Under the ISO-NE Tariff, Avangrid, as the party seeking interconnection, was required to fund any work ISO-NE determined was reasonably necessary to prevent a significant adverse effect identified in the study. The requirement to fund necessary upgrades applied even when the equipment requiring upgrade was part of a generation facility rather than part of the transmission infrastructure.

14

Since no later than 2010, ISO-NE and NextEra had known the Breaker was operating so close to capacity that no significant new source of power could be safely connected to the New England grid until the Breaker was upgraded. NextEra also knew operating the Breaker so close to capacity created some safety risks. Despite safety concerns and the Breaker's impact on the grid, NextEra had not been required to upgrade the Seabrook Breaker by ISO-NE, FERC, or the Nuclear Regulatory Commission. By waiting to upgrade the Breaker until a significant new source of electricity sought to connect to the New England grid, NextEra could pass the upgrade costs to the entity seeking interconnection.

ISO-NE issued the NECEC System Impact Study on March 12, 2020. Consistent with a similar study conducted in 2016, the Seabrook Breaker was identified as a piece of equipment that would be adversely impacted by NECEC's interconnection to the New England power grid. Avangrid and NextEra began negotiating an agreement to upgrade the Breaker in April 2020. At that time, Avangrid hoped to place NECEC in service during the spring of 2023.

Seabrook Station is periodically taken offline for refueling, and the parties agreed economic considerations required the upgrade be completed during one of those scheduled shutdowns. When the parties began their negotiations the next refueling was scheduled for the fall of 2021 and another was scheduled in the spring of 2023. In August 2020, after several months of negotiations, NextEra informed Avangrid that there was insufficient time to prepare to replace the Seabrook Breaker during the scheduled refueling in fall 2021. NextEra also sent Avangrid a draft Affected System Agreement setting terms for the breaker upgrade and refused to begin any planning or preparation for the upgrade until the parties finalized their agreement.

Avangrid judged the terms proposed by NextEra to be commercially unreasonable. NextEra's proposal made Avangrid liable for both the direct and indirect costs to upgrade the Breaker. The indirect costs included NextEra's legal fees, any consequential damages, and any

15

economic losses NextEra might suffer due to the replacement. Such costs are typically paid by the equipment owner. Unable to reach agreement, both parties asked FERC to resolve their dispute.

On October 5, 2020, NextEra filed a petition asking FERC to issue a declaratory order stating NextEra had no duty to upgrade the Breaker and could condition replacement on Avangrid agreeing to pay both direct replacement costs and any indirect costs. NextEra did not seek expedited processing time for its petition, despite the narrow window of time available to plan for a breaker replacement during the next scheduled shutdown. The following week, Avangrid filed a complaint with FERC, and requested expedited processing. Avangrid argued the Tariff required NextEra to negotiate the terms for upgrading the Breaker in good faith and on commercially reasonable terms. NextEra opposed on the grounds that the Tariff had terms requiring upgrades to transmission facilities, but those terms do not apply to generation facilities and the Breaker is part of Seabrook Station, not the transmission infrastructure operated by ISO-NE.

In an order dated February 1, 2023, FERC partially granted Avangrid's complaint and declined to address NextEra's petition. *Nextera Energy Seabrook, LLC Necec Transmission LLC & Avangrid, Inc.*, 182 FERC ¶ 61,044 (Feb. 1, 2023). FERC concluded the Tariff did not require NextEra to upgrade the Breaker, but determined the Seabrook Station LGIA required the replacement because it was necessary for the reliable operation of Seabrook Station and to comply with Good Utility Practice. FERC also ruled that the Tariff only required Avangrid to pay the direct cost of the replacement and not the additional opportunity costs. NextEra filed a request for rehearing, which FERC denied on June 15, 2023. NextEra then appealed the decision to the D.C. Circuit Court of Appeals. In a 2-1 decision, issued October 4, 2024, the D.C. Circuit affirmed FERC's decision, agreed that the Seabrook LGIA created a duty to upgrade the Breaker, and concluded the Tariff only required Avangrid to pay the direct costs of the upgrade. The dissenting judge disagreed with the majority's reading of the LGIA and asserted FERC lacked authority to

require NextEra to upgrade the Breaker without first utilizing the statutory process to modify the Tariff. The Breaker upgrade was completed in November 2024 and Avangrid immediately filed this action.

## IV.    ANALYSIS

Avangrid alleges NextEra's efforts to delay or derail NECEC constituted an unlawful scheme to exclude competition in violation of § 2 of the Sherman Act.[4] Antitrust laws, including the Sherman Act, are general provisions with broad applicability, even in regulated industries. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421 (1986); *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 372 (1973) ("Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws."). At its core, the Sherman Act "is predicated on one assumption alone—'competition is the best method of allocating resources' in the Nation's economy." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96 (2021) (quoting *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978)). However, taken too far, protecting competition risks reducing innovation by removing the reward for successful risk taking: "[t]he opportunity to charge monopoly prices—at least for a short period." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). When seeking to balance these competing values, it is helpful to remember that "[t]he purpose of [the Sherman Act] is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). For example, when there is "a regulatory structure designed to deter and remedy anticompetitive harm . . . the additional benefit to competition provided by

---

[4] Although Avangrid asserts both federal and state antitrust violations, the court's antitrust analysis focuses on § 2 of the Sherman Act because the Massachusetts Antitrust Act is "construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable." Mass. Gen. Law ch. 93, § 1.

antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny." *Trinko*, 540 U.S. at 412.

"Section 2 of the Sherman Act makes it unlawful to 'monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations.'" *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) (quoting 15 U.S.C. § 2). A violation of § 2 thus requires (1) "possession of monopoly power in the relevant market" and (2) "'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Trinko, LLP*, 540 U.S. at 407 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). "The mere possession of monopoly power, and the concomitant charging of monopoly prices . . . will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Id.* (emphasis omitted). By the same token, anticompetitive conduct violates § 2 "only when it threatens actual monopolization." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984).

Market power becomes problematic to antitrust when it grants a competitor the ability "(1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period of time without erosion by new entry or expansion." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 501 (2025) (*Antitrust Law*). Courts regularly "define[] monopoly power as 'the power to control prices or exclude competition.'" *Grinnell Corp.*, 384 U.S. at 571 (citing *United States v. E. I. du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956)). Though common, this formulation lacks precision. *Antitrust Law* ¶ 501; *see also Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 61 (1st Cir. 2002) (explaining that "'exclusion' is only a gloss on the statutory term 'monopolize'")). The phrasing obscures the important distinction between the market power and anticompetitive conduct requirements by suggesting courts can undertake a single inquiry into "whether the defendant(s)

18

obtained market power through improper exclusionary conduct." *Antitrust Law* ¶ 501. Additionally, "the disjunctive 'or' implies erroneously that excluding rivals—whether by the defendant, the law, or market circumstances—itself brings substantial market power." *Id.* A barrier may prevent competitors from entering or expanding their presence in the relevant market without creating sufficient market power for a defendant to profit from supracompetitive prices. The essential inquiry for assessing the existence of monopoly power is "whether the defendant can price monopolistically without prompt erosion from rivals' entry or expansion." *Id.*; *see also Eastman Kodak Co. v. Image Technical Svcs., Inc.*, 504 U.S. 451, 481 (1992) (observing that "[m]onopoly power under § 2 requires, of course, something greater than market power under § 1").

## A.    Relevant Market

 "The relevant market is the area of effective competition . . . and includes both a relevant geographic market and a relevant product market." *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 296 (1st Cir. 2022) (internal quotations and citations omitted). At the motion to dismiss stage, plaintiffs must plausibly allege the scope of the relevant market in geographic and product terms. *See id.* at 296-97. Avangrid's Complaint asserts NextEra had monopoly power in three separate product markets: (1) the downstream market for wholesale electricity administered by ISO-NE; (2) the downstream market for wholesale electricity capacity interconnected to the New England power grid; and (3) the upstream market for access to the downstream markets. The consumers are purchasers of wholesale electricity to be delivered through the New England grid and the geographic market is the area served by the New England grid. Avangrid has also suggested there is a second geographic market for the wholesale electric and wholesale electric capacity markets comprised of "certain transmission-constrained, narrower geographic submarkets," but has not identified any

specific examples of such submarkets. (Compl., Dkt. 1, ¶ 400.) The court, therefore, considers the area served by ISO-NE to be the only relevant geographic market.

A product market is defined by "the universe of products that are considered 'reasonably interchangeable by consumers for the same purposes.'" *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 (1st Cir. 2016) (quoting *du Pont,* 351 U.S. at 395). "[T]he substitutes that a consumer might employ and 'the extent to which consumers will change their consumption of one product in response to a price change in another'" taken together establish the relevant product market. *Id.* (quoting *Eastman Kodak*, 504 U.S. at 469). The first of plaintiff's proposed product markets appears to include all wholesale electricity generated, sold through the Real-Time and Day-Ahead marketplaces operated by ISO-NE, and transmitted on the New England power grid immediately or in the very near term. The product defining the second proposed product market is future capacity to generate electricity transmissible through the New England power grid, as sold via ISO-NE's Forward-Capacity marketplace and bilateral contracts between generating entities and EDCs. At this stage, the court accepts that these are two separate product markets.

In contrast, Avangrid's third proposed relevant market, an "upstream input market to access the ISO-N[E] grid" does not correspond with a wholesale electricity marketplace operated by ISO-NE and lacks a defined product and consumers. (Compl., Dkt. No. 1, ¶ 403 (emphasis omitted)). ISO-NE administers the New England power grid according to the terms set forth in the Tariff and agreements with entities operating facilities connected to the grid. Interconnection access for new projects is determined by ISO-NE, consistent with the terms of the Tariff. Once a generating entity has connected to the grid, it is able to participate in the wholesale electricity and Future-Capacity product markets.

B.    Market Power

"[T]the substantial market power that concerns antitrust law arises when the defendant (1) can profitably set prices well above its costs and (2) enjoys some protection against rival's entry or expansion that would erode such supracompetitive prices and profits." *Antitrust Law* ¶ 501; *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1007 (7th Cir. 2012) (defining market power in the antitrust context as "the power to raise price above the competitive level without losing so much business to other sellers that the price would quickly fall back to that level."). "To determine whether a party has or could acquire monopoly power in a market, 'courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market.'" *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996) (quoting *Spectrum Sports*, 506 U.S. at 456). There are two ways to prove a defendant enjoyed monopoly power or had "a dangerous probability of achieving monopoly power": direct evidence that the defendant set supracompetitive prices or indirect evidence of monopoly power. *Díaz Aviation Corp. v. Airport Aviation Servs., Inc.*, 716 F.3d 256, 265 (1st Cir. 2013).

"Absent direct proof of supracompetitive prices, monopoly power is typically proven by defining a relevant market and showing that the defendant has a dominant share of that market." *Id.* Monopoly power will typically be inferred where a defendant controls "70% to 90% of the sales in a well-defined marketplace." *Town of Concord, Mass. v. Bos. Edison Co.*, 915 F.2d 17, 30 (1st Cir. 1990); *see also Eastman Kodak*, 504 U.S. at 481 (concluding "[t]he existence of the first element, possession of monopoly power, [was] easily resolved" where the defendant controlled "nearly 100%" of one relevant market and "80% to 95%" of a second relevant market); *Otter Tail Power Co.*, 410 U.S. at 369-70 (inferring defendant's monopoly from its control over the electricity distribution facilities in 91% of towns in Defendant's service area); *Grinnell*, 384 U.S. at 571 (finding monopoly power existed where the defendant enjoyed 87% of business in the relevant market).

21

Avangrid has not identified NextEra's percentage of market share in the relevant markets or even alleged, more generally, that NextEra possessed a predominant share of either relevant market. Prices in the wholesale electricity marketplaces and the future capacity marketplaces were set according to uniform policies administered by ISO-NE and equally applicable to all market participants. While Avangrid has alleged interconnection of NECEC was likely to lower NextEra's revenue in the relevant markets, there are no facts from which the court could plausibly conclude NextEra was able to set above-market prices in marketplaces operated by ISO-NE. The factual allegations do not suggest those highly regulated marketplaces were too concentrated to function as competitive markets, so, by definition, EDCs paid competitive prices for the electricity supplied by NextEra, and would have continued to do so regardless of whether NECEC entered the relevant markets.

Rather than alleging NextEra possessed sufficient market share to obtain supracompetitive prices, Avangrid contends NextEra had monopoly power because it used the Breaker to exclude new competitors from entering the relevant market. This argument falls short in several ways. First, as a factual matter, entry to the relevant markets is decided by ISO-NE, consistent with the authority granted by the terms of the Tariff. Avangrid, and other potential entrants, did not need to use transmission infrastructure owned or operated by NextEra to participate in the relevant markets. The Breaker presented an isolated obstacle to interconnection until it was upgraded and, as the D.C. Circuit ultimately concluded, regulatory rules limited NextEra's ability to use the Breaker to exclude competition. Second, as discussed above, the existence of entry barriers, or a bottleneck that limits entry into the relevant market, on its own, is insufficient evidence of monopoly power. There must also be a basis for finding the defendant can "profitably set prices well above its costs" or would gain such power through the challenged conduct. *Antitrust Law* ¶ 501.

In *Otter Tail*, a case heavily relied upon by Avangrid, the district court found Otter Tail, a vertically integrated power company, violated § 2 of the Sherman Act by (1) refusing to sell electricity at wholesale to municipalities seeking to distribute electricity to retail customers, (2) refusing to allow electricity from other utilities travel over transmission lines owned by Otter Tail, (3) applying pressure to dissuade other power suppliers from providing power to municipal distribution systems, and (4) using litigation to prevent or delay the establishment of new municipal distribution systems. On review, the Supreme Court explained that a natural monopoly existed in each town because the market could support only one retail distribution system and described defendant's ownership of electricity transmission and distribution infrastructure serving 91% of towns within the relevant geographical market. *Otter Tail*, 410 U.S. at 369-70. While the Court went into considerably more depth analyzing whether defendant's efforts to prevent municipalities from distributing electricity to their residents violated § 2 of the Sherman Act, the defendant's significant market power was a necessary element of the Court's ultimate conclusion.[5] In the absence of sufficient allegations to support a finding that NextEra was able to charge supracompetitive prices within the relevant markets, or was likely to become able to do so if it could delay or prevent NECEC from entering those markets, the court cannot find NextEra's multi-pronged campaign to delay or derail NECEC violated § 2 of the Sherman Act. *See Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 70 (1st Cir. 2016) ("Some antitrust cases are intrinsically hopeless because they merely dress up in antitrust garb what is, at best, a business tort or contract violation." (internal quotations and alterations omitted)).

---

[5] The Supreme Court affirmed the lower court ruling that the defendant violated § 2 of the Sherman act when it refused to sell wholesale power to municipalities and provide access to transmission facilities. The lower court had also ruled the defendant's use of litigation to delay or prevent municipalities from competing in the retail electricity distribution market violated § 2 of the Sherman Act, but the Supreme Court remanded for reassessment consistent with an intervening decision applying the principles outlined in *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961), to administrative and judicial processes. *Otter Tail*, 410 U.S. at 379-80.

V.    CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss (Dkt. No. 57) is ALLOWED as to Plaintiffs' antitrust claims (Counts I-VI). Defendants' motion remains under advisement as to the remaining state law claims (Counts VII-X). The parties may request the court consider additional briefing or hear oral argument on those claims by filing a written request within fourteen days of the date of this order.

It is So Ordered.

   /s/ Mark G. Mastroianni

MARK G. MASTROIANNI
United States District Judge